GLOBAL PLASMA SOLUTIONS,

*Plaintiff,*

v.

ELSEVIER INC. and ELSEVIER LTD.,

*Defendants.*

Case No. 3:22-cv-00034-RJC-DSC

## MEMORANDUM OF DEFENDANTS ELSEVIER INC. AND ELSEVIER LTD. IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendants Elsevier Inc. and Elsevier Ltd. respectfully submit this Memorandum in support of their motion for dismissal of the Complaint filed against them by plaintiff Global Plasma Solutions, Inc. (hereinafter sometimes "GPS"), under Fed. R. Civ. P. 12(b)(6). The Complaint fails to state a claim upon which relief may be granted, either for defamation or for violation of the Unfair and Deceptive Trade Practices Act.

## INTRODUCTORY STATEMENT

This case concerns an article in the scholarly scientific journal *Building and Environment*, published by defendant Elsevier Ltd. The article describes certain experiments undertaken by a group of scientists to test the efficacy of equipment manufactured by plaintiff GPS, and to test the degree to which it led to the formation of possibly harmful byproducts. The results of their experiments were not flattering to GPS.

1

Rather than suing the authors of the article, GPS has sued two entities, Elsevier Inc. and Elsevier Ltd. But Elsevier Inc. was not the publisher of the article by which GPS claims to have been defamed, and GPS has not alleged any basis on which it should be held liable. Therefore, the Complaint cannot stand against Elsevier Inc.

As for Elsevier Ltd., a company headquartered in the United Kingdom, it is indeed the publisher of the article in question. But being the publisher, as such, is not sufficient grounds for liability. Elsevier Ltd. is not like the typical media defendant – the newspaper publisher or broadcast company whose employees say things that give offense. The journal it publishes is peer-reviewed, meaning that editorial decisions for the journal are made by an independent editor and independent scholarly referees, none of whom is an employee of Elsevier Ltd. or in any way under its control. Yet GPS seeks to hold Elsevier Ltd. liable without even suggesting that the editor or any of the peer reviewers, let alone any of the authors of the article in question, were employees of Elsevier, or otherwise under Elsevier's control. There is no legal basis for such liability, and to impose liability would have far-reaching adverse consequences for scholarship.

Alternatively, GPS seeks to impose liability on Elsevier for what it calls a "sham" peer review process, without providing any evidence for the alleged "sham" other than that the process failed to detect the alleged shortcomings of the article. However, GPS fails to plead any facts that would permit the trier of fact to follow its leap of faith.

Furthermore, the article in question, "Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation" (hereinafter the "Article"), is not even defamatory, properly read. It is a factual report of two experiments in which the authors attempted to assess the efficacy of plaintiff's product, and its conclusions consist of data and some opinions about the implications of that data. GPS picks fights with its methodology,

2

but the methodology is all explained in detail, easily visible to anyone in the narrow community of those with the skill to read the Article. Choosing flawed methodology (even if that were the case, which Elsevier does not concede) is not defamatory in any event, and certainly not when the "flaws" have all been disclosed.

The deficiencies of the Complaint are even starker given the context in which the article appeared. Prior to publication of the article, GPS had engaged in an extensive publicity campaign, claiming that its equipment would stop the spread of Covid-19 in buildings, and this campaign had begun to generate a backlash among skeptical scientists. The issue received press attention for obvious reasons, given the toll that the pandemic was taking on the public. As a result of all this publicity and commentary – much of it eagerly sought by GPS, until the tide turned against it – GPS is a "limited purpose public figure" that must show "actual malice" – knowledge of falsity, or reckless disregard for probable falsity – in order to prevail. And it must plead facts that, if taken at face value, would establish malice. Its Complaint fails to do so.

Finally, GPS's claim under North Carolina's Unfair and Deceptive Trade Practices Act fails because GPS and Elsevier have no business relationship, because no harm to consumers is alleged – and more fundamentally, because the UDTPA cannot be used to make an end run around the principles of defamation law.

## LEGAL STANDARD

### I. Under F.R.C.P. Rules 8 and 12, A Complaint Must Plead Facts That Show A Plausible Claim to Relief.

In order to survive a motion to dismiss under Rules 8 and 12 of the Federal Rules of Civil Procedure, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

3

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id*. It requires the plaintiff to articulate facts that show the plaintiff has stated a claim entitling him to relief. *Id*.; *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

As the Fourth Circuit has explained,

[A] complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' To discount such unadorned conclusory allegations, 'a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.' This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'

. . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' – 'that the pleader is entitled to relief,' as required by Rule 8. … [E]ven though Rule 8 'marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'

*Francis v. Giacomelli*, 588 F.3d at 193 (internal citations to *Iqbal* and *Twombly* omitted). As will be shown, the Complaint here fails to meet this standard.[1]

## ARGUMENT

### I.     GPS's Claim Against Elsevier Inc. Is Deficient on Its Face.

Elsevier Inc. and Elsevier Ltd. are two separate corporations, one incorporated in Delaware with a principal place of business in New York, and the other in the United Kingdom with a principal place of business in the United Kingdom. The Complaint acknowledges this at Compl. ¶¶ 17-18. The Complaint, however, tries to yoke them together in common liability by the simple expedient of referring to them collectively as "Elsevier."

---

[1] In one specific instance, discussed *infra*, the special pleading standards of Fed. R. Civ. P. 9(b), applicable to claims of fraud, also apply – and also are not met.

4

Yet as the Article, attached as Exhibit A to the Complaint (Doc 1-1, p. 2), shows, Elsevier Ltd. is the publisher of the Article. not Elsevier Inc. At the bottom of the first page of the Article the Court will see the following statement:

**Published by Elsevier Ltd.**

GPS makes no allegation that even suggests how Elsevier Inc., not being the publisher of the Article, could have any liability whatsoever for the alleged defamation. Elsevier Inc. does not magically become liable by dint of sharing the moniker "Elsevier" in its corporate name. This is not just a failure to meet the "plausibility" threshold required of federal pleadings; it is a failure to plead anything at all. The Complaint must be dismissed as against Elsevier Inc.

## II.   Elsevier Ltd. Cannot be Held Vicariously Liable for Alleged Defamation.

Nearly all the allegations and rhetoric in plaintiff's Complaint are directed at the authors of the Article. But a publisher cannot be held liable for the actions of authors whose work it publishes unless they were acting within the scope of their employment. This is a classic application of the doctrine of *respondeat superior*. *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974). "Employment" in this sense goes beyond the standard salaried relationship; it is judged according to a thicket of rules that seek to draw a line between someone who acts as an independent contractor and someone who, regardless of how they are paid, is acting under the direction and control of someone else.

Thus, in *D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001), the Court had to decide whether a writer who was commissioned by the magazine to write a story was sufficiently under the magazine's control that his alleged knowledge of the falsity of his article could be imputed to the magazine. Applying what it called the "decisive test," namely the "right of control over the mode and manner in which

the work is done," the Court found he was not. *Id.* at 1279 (quoting *Brose v. Union-Tribune Publishing Co.*, 183 Cal. App. 3d 1079, 1082 (1986)). The writer had entered into a standard "contributor's agreement" with *Rolling Stone*, and *Rolling Stone* did not control how, when, or where he did his writing on any article he was doing for it. Because *Rolling Stone* could control only the decision whether to publish the final article, and not when and how the article was written, the author could not be treated as an employee, and the magazine could not be held liable for his alleged defamation. *Id. Accord Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990) (alleged malice of book author cannot be imputed to the publisher or the publisher's editor); *Price v. Viking Penguin*, 881 F.2d 1426, 1446 (8th Cir. 1989).

Against this background, consider the allegations of the Complaint as regards the identity of the Article's authors. The authors are:

- Brent Stephens, a professor at Illinois Institute of Technology ("IIT") (Compl. ¶ 2);

- Mohammed Haiderinajad, also a professor at IIT (Compl. ¶ 42);

- Yicheng Zeng, an IIT graduate student studying under Prof. Stephens (Compl. ¶ 43);

- Prashik Manwatkar, an IIT graduate student studying under Prof. Stephens (Compl. ¶ 43);

- Marina Beke, an IIT graduate student studying under Prof. Stephens (Compl. ¶ 43);

- Insung Kang, an IIT graduate student studying under Prof. Stephens (Compl. ¶ 43);

- Akram Ali, an IIT graduate student studying under Prof. Stephens (Compl. ¶ 43);

- Elliott Gall, a professor at Portland State University (Compl. ¶ 44);

- Aurelie Laguerre, a graduate student studying under Prof. Gall (Compl. ¶ 44); and

- Delphine Farmer, an assistant professor at Portland State University (Compl. ¶ 45).

6

Thus, on the face of the Complaint, not a single author is an employee of Elsevier or otherwise under Elsevier's control, and the Complaint makes no allegation to the contrary.[2] The Complaint does even allege that Elsevier commissioned the Article, let alone dictated its contents. The misdeeds that the Complaint, in vivid prose, alleges these authors committed cannot therefore be imputed to Elsevier.

As for the Editor-in-Chief of *Building and Environment*, Qingyan Chen, the only allegation against him is that he "failed to identify obvious errors" in the Article. Compl. ¶ 64.[3] Even if "failure to identify obvious errors" were actionable conduct, there is again no allegation of employment or control by Elsevier. The Complaint identifies Chen as Professor Emeritus of Mechanical Engineering at Purdue University (Compl. ¶ 10 and Exh. B thereto, Doc.1-2), and nothing more.

The final group of individuals whose work the Complaint assails are the peer reviewers who reviewed the manuscript of the Article.

Peer review has been justly described as "a central . . . quality-control feature in the scientific enterprise." *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 167-68 (E.D.N.Y. 1988) (internal citations to testimony omitted). As the Supreme Court said in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993), "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." Thus the fact of publication in a peer reviewed journal is "a

---

[2] In this sentence, and for the balance of this memorandum, Elsevier Ltd. is referred to as "Elsevier" for the sake of simplicity.

[3] Indeed, GPS's long letter to Prof. Chen, asking for retraction of the Article, is couched as an appeal to a neutral scientific arbiter, not as an accusation of wrongdoing. (Doc 1-2, pp. 2-9).

7

relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id*. at 594.

What, then, does the peer review process mean, for purposes of this action? Since plaintiff has cited in the Complaint an Elsevier webpage concerning peer review, it is appropriate to take a closer look at what appears on that web page.[4]

At the cited page, https://www.elsevier.com/reviewers, if one scrolls down and clicks on "The role of a reviewer," one comes to a subpage, https://www.elsevier.com/reviewers/role. This page – reproduced in Exhibit A to Elsevier's motion[5] – explains what reviewers (and editors) do:

> Reviewers evaluate article submissions to journals based on the requirements of that journal, predefined criteria, and the quality, completeness and accuracy of the research presented. They provide feedback on the paper, suggest improvements and make a recommendation to the editor about whether to accept, reject or request changes to the article. The ultimate decision always rests with the editor but reviewers play a significant role in determining the outcome.

This subpage also explains how peer reviewers are chosen. About a third of the way down the subpage one comes to the following text:

> Typically, reviewers are invited to conduct a review by a journal editor. Editors usually select researchers that are experts in the same subject area as the paper. However, if you think you would be a good referee for a specific journal you can volunteer to review on our Reviewer Hub. On the "Volunteer to review" section of the Reviewer Hub, you can search for the journal(s) of your choosing and click on "Review for journal" to indicate your interest. Please note that you should first complete your reviewer profile.[6]

---

[4] Compl. ¶¶ 8, 61-63. As the Fourth Circuit held in *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. 2011), documents incorporated in a complaint should be evaluated in a motion to dismiss. Here, GPS incorporated the web page by reference.

[5] All Exhibits referenced in this Memorandum are exhibits to Elsevier's Rule 12(b)(6) motion.

[6] For their efforts, peer reviewers receive thirty days' free access to two scholarly research services owned by Elsevier, Scopus and ScienceDirect, and discounts for some other Elsevier services. See same subpage under the heading "Recognizing Reviewers."

8

In short, peer reviewers are selected by the editor of a journal (in this case. Prof. Chen) either because the editor knows of their expertise, or because they have volunteered by signing up on the Reviewer Hub. They are not employees of or otherwise controlled by Elsevier. Plaintiff nowhere in its Complaint alleges otherwise, and having incorporated in its Complaint the web page discussed above, without criticism or challenge, plaintiff must be deemed to have accepted the truth and relevance of its contents.[7]

To sum up: the Article was written by people who were under no control by Elsevier, and subjected to an editorial process involving an editor and peer reviewers who were under no control by Elsevier. Whatever sins of commission or omission GPS may wish to lay at the feet any of these individuals, those sins cannot as a matter of law be attributed to Elsevier.[8]

In saying this, Elsevier is not simply taking shelter in a well-established legal doctrine. The whole point of the peer review process is to ensure that what gets published in a scholarly journal is vetted and approved by the scholarly peers of the authors. That is why it is "a central . . . quality-control feature in the scientific enterprise." Consider what would happen if Elsevier were to be held liable for the aforesaid alleged sins. To protect itself in the future it could not rely on the decisions of the editors and peer reviewers of its journals. It would have to engage in a separate

---

[7] In paragraph 49, the Complaint refers to the peer reviewers as "the peer reviewers at Elsevier." This either willfully or carelessly ignores the information concerning peer review provided on the Elsevier web page that the Complaint itself cites. Nothing in the Complaint provides any basis for supposing that the peer reviewers were "at [i.e., employed by] Elsevier." In fact, Elsevier's peer reviewer information specifically states: "Please be aware that the choice of whether or not to choose a particular referee for a paper is entirely at the discretion of the editor and Elsevier plays no part in this decision."

[8] *Cantrell v. Forest City Pub. Co*. and the other cases cited above on the issue of vicarious liability all involve allegations of actual malice on the part of the writers concerned. As Elsevier will show in the penultimate section of this memorandum, "actual malice" is the applicable standard here as well. However, Elsevier could not be held liable even if the applicable standard were negligence. Negligence cannot be imputed to a non-employer any more than malice can.

9

review of every article published in any of its journals – a review for which it has no expertise. Worse, it would have to assert an explicit power to overrule the scientific decisions of the editors and peer reviewers of its journals – and so would every other publisher in the scholarly world. That by itself would undermine the integrity of the entire scholarly publishing process, and deprive science of the independent judgments of experts provided through the peer review process – a process that the Supreme Court has identified as critical to "good science." This Court should not be abused for such a destructive purpose.

### III. The Complaint Fails to Plead Facts that Would Make Elsevier Directly Liable.

Finally, one comes to the last remaining question of liability: what is Elsevier itself accused of?

The accusations in the Complaint against Elsevier are:

- That it circulated the Article "under the guise of academia." Compl. ¶ 5.

  This is a meaningless accusation from a legal standpoint. It is not even clear what GPS is trying to express here, beyond a sort of general contempt or irritation.

- That Elsevier "knew or should have known" that Brent Stephens, the IIT professor, had – *before the Article was even written* – consulted with IIT counsel about whether to name GPS in the Article, and "reached out" to a New York Times reporter about his research in "an attempt to gain publicity" and with the intent of "chasing fame and grant money from GPS's competitors." Compl. ¶ 6.

  How Elsevier was supposed to know of these private, even privileged, conversations, GPS nowhere explains. Here, again, is a failure to allege any plausible fact that could be the basis of liability.

- That "the authors and Elsevier ignored contradictory data and discarded relevant test data," as if Elsevier were involved in the writing process of the Article. Compl. ¶ 54.

  Needless perhaps to point out, the Complaint never suggests when, where, or how such a thing could actually have taken place.[9] The statement is simply careless failure to distinguish between the actors in this drama, of the sort that permeates the Complaint.

- That after the Article was published, upon receiving a demand letter from GPS's counsel, Elsevier "failed to take corrective action," i.e., to "meaningfully respond" to GPS or to retract the Article. Compl. ¶¶ 10-13.

  Here again, GPS alleges no actionable conduct. As a matter of First Amendment law, a party claiming to have been defamed has no right to a retraction, for that would amount to compelling speech by the defendant. *Kramer v. Thompson*, 947 F.2d 666, 680-82 (3d Cir. 1991). Imposing liability for *failure* to retract would have the same serious First Amendment implications. *See also McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1515 (D. C. Cir. 1996) ("[Plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication.").

- That Elsevier's peer review process with respect to the Article was a "sham."

  This allegation of a "sham" seems to be the main thrust of the Complaint, as it is repeated several times. Compl. ¶¶ 2, 10, 14, and page 14 (heading C). It fails to meet the pleading requirements of *Iqbal* and *Twombly*, and the special pleading standards of F.R.C.P. 9(b).

---

[9] Note that in paragraph 8, the Complaint alleges that one of the authors, Brent Stephens, "knowingly and selectively disregarded data," but does not claim Elsevier was involved in that conduct.

11

The relevant meanings of the word "sham" are "a trick that deludes: [a] hoax," and "an imitation or counterfeit purporting to be genuine."[10]  To call something a "sham," therefore, is to accuse its perpetrator of intentional fraud.  But GPS nowhere alleges any facts that could support a finding that Elsevier's peer review process was an intentional fraud.  It is hard to imagine what sort of systemic misconduct Elsevier would have had to commit for its peer review process to be fraudulent, but in any case, GPS certainly alleges nothing to support such a claim.  In fact, as noted above, GPS cites *without criticism* Elsevier's own online description of its peer review process, which certainly undercuts any claim that the process was inherently a "sham."

This failure to offer any facts, let alone connect them in a plausible narrative showing that Elsevier's peer review process was fraudulent, falls far short of GPS's pleading obligations.  The allegations of a "sham" are nothing more than "naked assertions of wrongdoing" that do not permit this court to infer more than the "mere possibility of misconduct," and thus fail to clear the hurdle articulated in *Francis v. Giacomelli*, *supra*, 588 F.3d at 193.  GPS's allegations also fail, *a fortiori*, the heightened standard of Fed. R. Civ. P. 9(b), which requires that in alleging fraud "a party must state with particularity the circumstances constituting fraud."

Instead of pleading any actionable conduct by Elsevier, GPS asks the Court to infer such conduct from the outcome. It claims the peer review process was a "sham" because Elsevier "should have detected" the alleged flaws in the Article. Compl. ¶¶ 8, 49, 57-59.  That, and nothing more, is what GPS's Complaint really boils down to.[11]  It is as if someone said: my roof caved in

---

[10] https://www.merriam-webster.com/dictionary/sham.

[11]  If there were any doubt on that score, a review of GPS's own press release concerning this case would dispel it. (The relevant portion is attached as Exhibit B.) The press release is posted online at https://www.businesswire.com/news/home/20220216005820/en/GPS-Pushes-Back-New-Filing.

12

when the tree landed on it, so someone must have cheated me when they built the roof. That is not permissible pleading. The chain of causation is missing.

Even assuming for the sake of argument that GPS's grievances with the Article were valid, and the peer review process failed to detect them, the most one can permissibly infer from those premises is that the peer review process failed to work in this particular instance. The Complaint alleges no action by Elsevier that caused such alleged failure.

The fact of the matter is that the peer review process is not perfect – and no one claims it is. As the Supreme Court said in *Daubert,* while "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability." 509 U.S. at 593. The imperfections of the peer review process are a perennial subject of discussion in the scientific community. Perhaps the most succinct – and one of the best known – summaries of the matter was written back in 1989 by Dr. Arnold S. Relman and Dr. Marcia Angell, who at that time were the Editor and Assistant Editor of *The New England Journal of Medicine*, the nation's oldest and most prestigious medical journal. In an editorial entitled "How Good is Peer Review?"[12] they wrote:

> [G]ood peer-reviewed scientific journals should provide their readers with reports of the best available research, free of obvious major flaws. Still, although peer review can screen out work that is clearly invalid and greatly improve the chances that published work is valid, it cannot guarantee scientific validity. Authors, editors, and reviewers are fallible, and no human enterprise is free of error. Authors may commit many forms of honest error, resulting from such things as observer bias, insensitive methods, failure to recognize and control for confounding variables, and just plain carelessness. These sorts of errors can easily be missed by reviewers and editors. In addition, concepts and methods are constantly changing and advancing, and new information can modify or refute even the most carefully reviewed published articles. Peer review may hold a manuscript to the highest standards, but error is inherent in research, and validity is

---

[12] N Engl J Med 1989; 321:827-829 (Sept. 21, 1989). A copy is attached as Exhibit C hereto. The quoted passage appears on page 828.

always conditional. In a sense, science advances by the continual discovery and correction of error.

Given this simple truth of fallibility, there is no basis for inferring any misconduct on the part of anyone involved in the peer review of the Article, let alone on the part of Elsevier. The Complaint not only fails to state a plausible case of misconduct, it fails even to show what *Iqbal* dismissed as the "mere possibility" of misconduct. *Ashcroft v. Iqbal, supra,* 556 U.S. at 679.

### IV.    The Article is Not Defamatory.

Given GPS's failure to plead facts that would establish any liability on Elsevier's part, it is theoretically beside the point whether the Article is in fact defamatory. But Elsevier wishes to address this question briefly, because the Article, properly read, is not defamatory.

The Complaint repeatedly asserts that the peer review process should have spotted all the flaws in the Article. Compl. ¶¶ ¶¶ 8, 49, 57-59. But if all the alleged flaws in the Article were so obvious, the Article could not be defamatory as a matter of law. A statement cannot be defamatory if it sets out the basis of the author's assertions, so that readers can form their own opinions as to the meaning and validity of the statement. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) and cases cited therein. By "readers," we are speaking here of scientists, not laymen, since the Article is written by scientists for scientists. *See Sprague v. American Bar Association*, 2001 U.S. Dist. LEXIS 18707, at *8-9 (E.D. Pa. Nov. 14, 2001) (an article in the *ABA Journal* should be read as lawyers would understand it).

The Article sets out in exhaustive detail exactly how the experiments it describes were conducted, and what the results were. One would expect GPS to identify one or more data sets or conclusions in the Article as false, and allege that the authors knew it to be false. But in fact the Complaint makes no such allegations. Rather, it tries to create the impression of inaccuracy,

14

mostly by criticizing certain methods used and choices made by the authors. Here is a list of its grievances, and why they are not defamatory:

1.      The data in Appendices 1 and 2 (part of the "Supplementary data" published with the Article) contain values for "Ionizer On" and "Ionizer Off" that are the opposite of the data reported in the main body of the Article. Compl. ¶ 7; Doc 1-1 pp. 21-22; Doc 1-2 p.5. This is correct. However, that does not mean the Supplementary data are right and the data and conclusions in the text are wrong, as GPS seems to assume. The most that such a discrepancy establishes is that a mistake was made in one or the other. GPS does not suggest how it could be defamatory to publish supplementary data that directly contradict the conclusions contained in the text of the Article, let alone how seeming to undermine one's own thesis is defamatory.[13]

2.      The absence of a "counterfactual control." Compl. ¶ 49. This absence was obvious on the face of the Article, and readers can form their own opinions as to whether it matters. The authors' decision not in include a control was a matter of scientific judgment – and moreover, one that preceded the experiment – and cannot be considered defamatory.

3.      The authors' "[choice] to disregard the results from one of the test methods for the compound acetone (the TO-llA method) in favor of the other test method (T0-15) because of purported variation in the concentration of acetone outside of the chamber." Compl. ¶ 49. GPS does not state that the TO-15 data were wrong, or that the authors had any reason to believe those data were wrong.

---

[13]  In fact, the authors have published a Corrigendum to the Article, explaining that the headings in the Supplementary data, of the tables referred to above, were mistakenly transposed, and that the data in the main Article are correct. See Exhibit D hereto. The URL is https://www.sciencedirect.com/science/article/pii/S036013232200155X.

4.    The authors' choice to use their ethanol result based on a "flawed ratio calculation" of interior air to exterior air. Compl. ¶ 49. Here again, the authors' methodology was stated openly and readers could choose to find it persuasive or unpersuasive. Use of a "flawed ratio" is in any case not evidence of defamatory intent.

5.    The authors' failure to repeat either of their experiments. Compl. ¶ 50. Failure to repeat an experiment may be a weakness, as the authors themselves acknowledged:

> This work is not without limitations and future directions for improvement. For one, this work was limited to a small number of field and laboratory experiments of a single bipolar ionization device, without replicates. [14]

But failure to replicate is not defamatory. And the absence of replication was clear to any reader.

6.    Failure to install the GPS machine in accordance with the manufacturer's instructions, thereby "tainting all their results, making it virtually impossible for others to reproduce or assess the data in any meaningful way or use it as a model for real-life conditions." Compl. ¶ 51. This misrepresents the Article. The authors say:

> The goal of this test setup was to deliver ions into the chamber space at an ion concentration that followed our understanding of manufacturer recommendations as closely as possible and at an air change rate with the surrounding environment that was . . . similar to that commonly observed in offices and other commercial buildings.

Doc 1-1, p.3. GPS does not explain how this statement is inaccurate or how what it describes is inappropriate. Furthermore, the "setup" is described in great detail, so that another scientist could indeed reproduce the experiment. None of this is evidence of defamatory intent.

7.    Failure to "achieve a steady state" in the testing environment. Compl. ¶ 51. This too misrepresents what the Article says. In fact, the authors took pains to achieve "reasonably

---

[14] Doc. 1-1, p. 13.

steady-state conditions," as they describe repeatedly in the Article. Exhibit E to Elsevier's motion shows the Article's numerous careful references to the "steady state" issue.

In short, GPS's attacks on the Article itself are (i) in some cases wrong, (ii) in other cases irrelevant as a legal matter, because the alleged flaws in methodology are fully disclosed for any reader to assess, and (iii) in all cases far short of what would be needed to show malice, or indeed even negligence, on the part of the authors.

## V.     Under the Principles of Libel Law, GPS is a Public Figure and Is Required to Plead Facts that Show "Actual Malice" by Defendants.

A public figure may seek redress for allegedly defamatory statements only if the defendant published the statements with "actual malice." *New York Times v. Sullivan*, 376 U.S. 254, 279-280 (1964). That is the standard that applies here, and it makes GPS's allegations against Elsevier – and indeed, against the Article – even more threadbare.

"Actual malice," as the Fourth Circuit has explained, is a legal term of art; in the context of a defamation action "it does not mean ill will or intent to injure but rather that the defendant made the defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021) (*citing New York Times*, 376 U.S. at 279-280).

The Fourth Circuit has defined "reckless disregard" as "harboring a high degree of awareness of . . . probable falsity." *Fairfax*, 2 F.4th at 293 (internal citations omitted). It "requires 'much more than a failure to exercise ordinary care.'" *Hatfill v. New York Times Co.*, 532 F.3d 312, 325 (4th Cir. 2008) (quoting *Ryan v. Brooks*, 634 F.2d 726, 732 (4th Cir. 1980)). Recklessness "'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.' . . . Rather, a plaintiff must prove that 'the defendant in fact entertained serious doubts as to the truth of his publication.'" *Fairfax*, 2 F.4th at 293 (quoting *St.*

17

*Amant v. Thompson*, 390 U.S. 727, 731 (1968)). *See also Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 667 (1989).

As the Fourth Circuit explained in *Foretich v. Capital Cities/ABC*, 37 F.3d 1541 (4th Cir. 1994), the Supreme Court in *Gertz v. Robert Welch*, 418 U.S. 323 (1974), laid out the spectrum of defamation plaintiffs as follows:

> At one end of the spectrum are 'private individuals' and at the other end are 'public officials' and 'public figures,' whom the Court divided into three categories: (1) 'involuntary public figures,' who become public figures through no purposeful action of their own; (2) 'all-purpose public figures,' who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) 'limited-purpose public figures,' who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.

*Foretich*, 37 F.3d at 1551-52 (quoting *Gertz*, 418 U.S. at 345, 351 (citations omitted)).

Plaintiff GPS boasts that it has "earned a reputation as a leader in the air quality/purification industry," that its technology is "trusted by some of the world's leading companies involved in aviation manufacturing, aerospace technology, and performance equipment," and that it has employees who are "prominent members in good standing of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE)" and "regularly lead lectures and speak at ASHRAE meetings." Complaint ("Compl."), ¶¶ 32-34. These allegations, by themselves – particularly the last two – indicate that GPS has made a concerted effort to establish itself as a trustworthy authority on issues of air quality and air purification, and thus has made itself a limited purpose public figure on those broad issues.

In any event, it is clear that GPS is a limited purpose public figure with respect to the narrower issue of which the Article is a part: namely, the quality of its own technology. The "limited purpose public figure" inquiry, as the Fourth Circuit has explained, has two parts: (i) did a public controversy gave rise to the allegedly defamatory statement, and if so, (ii) did the

18

plaintiff's participation in that controversy suffice to establish it as a public figure "within the context of that public controversy." *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001).

To determine this, one must look at the public record. Elsevier is submitting herewith copies of various items posted on the Internet relative to this matter. These exhibits are offered solely to show that the question of air purification as a Covid-19 prevention technique was a matter of widespread public discussion and concern. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2001)).[15]

As the Court will recall, when the Covid-19 pandemic struck the United States in early 2020, public officials and others scrambled to find out how it spread, and to find ways to prevent it from spreading. Indoor spaces were deemed the locations of greatest risk, which led to lockdowns in many parts of the country. On March 9, 2020, mere days after the first wave of Covid lockdowns started to ripple throughout the country, GPS issued a press release carried on Cision PRNewswire, entitled "Indoor Air Quality Technology Company, Global Plasma Solutions, Responds to Coronavirus."[16] In this release GPS said:

> While this epidemic moves closer to a pandemic, industries are wrestling with how to represent the effectiveness of their solutions in helping to control the spread of this outbreak; misinformation is soaring.

The statement went on to say that GPS had arranged for testing of its products "immediately" against a human coronavirus, and would "test COVID-19 upon availability."

---

[15] While the Court may take judicial notice of these items *ex mero motu*, Elsevier intends to file a Motion for Judicial Notice in the near future, with respect to Exhibits F through Q.

[16] See Exhibit F hereto. This appears at https://www.prnewswire.com/news-releases/indoor-air-quality-technology-company-global-plasma-solutions-responds-to-coronavirus-301019802.html

19

The issue of how to make buildings safe began to get attention in both the professional and the popular press. In the May 2020 issue of its publication the *ASHRAE Journal*, the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE") published an article entitled "Guidance for Building Operations during the COVID-19 Pandemic."[17] The ASHRAE article recommended certain changes to HVAC systems, including the adoption of "Merv-13" filtration, but did not recommend or even mention the "needlepoint bipolar ionization" technology that lies at the heart of GPS's products. But GPS was not waiting for any official imprimatur, as may be seen in an article posted on May 12, 2020, on the Atlanta online news service Whatnowatlanta.com. The Whatnowatlanta article, entitled "Red Phone Booth Installs Air Purification, 'Disinfection Technology' In Anticipation of June 1 Reopening," reported that Red Phone Booth, a local bar, had installed GPS equipment to attain the "gold standard" in air purification. This article indicates it was part of a series of articles on how Atlanta businesses were adapting to the coronavirus.[18] It also quotes a GPS press.

Two weeks later, GPS and Brewers at 4001 Yancey, here in Charlotte, issued a joint press release, carried by PRNewsWire, announcing that the brewery had installed GPS equipment on its premises. The release was subtitled, "Mainstay of Charlotte Brewery Scene Partners with Global Plasma Solutions to Provide Clean Air, Safer Environment for Guests and Staff in Wake of COVID-19." In the release, the CEO of the brewery said the installation had been made in

---

[17] See Exhibit G hereto.

[18] See Exhibit H hereto. This article appears at https://whatnowatlanta.com/red-phone-booth-installs-air-purification-disinfection-technology-in-anticipation-of-june-1-reopening/. Note: in this and certain other exhibits, photographs and other graphics have sometimes been cropped or eliminated in order to capture the full text in a static manner.

response to "over 7,000 responses" to a customer survey.[19]  Here again, GPS was injecting itself

into the news – in the words of *Gertz*, thrusting itself "into the vortex" of this public issue – to tout

its technology as a Covid solution.  *Gertz, supra*, 418 U.S. at 352.

Soon after this, GPS went live with its most definitive claim.  In a press release dated June

10, 2020, and carried by BusinessWire, GPS proclaimed:

> Global Plasma Solutions Virtually Eliminates Static SARS-CoV-2 with Proprietary
> NPBI™ Technology.[20]

And for another few months, positive news continued.  *See, e.g.*, Exhibits K, L, M and N

hereto:[21]

- "Pellston Public Schools to install air filter system in schools to help prevent COVID-19"

- "Greensboro Day School Invests in Global Plasma Solutions Air Purification System"

- "Vanbarton Group Installs First High-Rise Bipolar Ionization System in Seattle," and

- "Bipolar Ionization Units installed in Gloucester Co. schools."[22]

---

[19]    See Exhibit I hereto.    This release appears at https://www.prnewswire.com/news-releases/brewers-at-4001-yancey-installing-bi-polar-ionization-system-to-improve-air-quality-and-eliminate-pathogens-in-its-space-301064608.html.

[20]    See Exhibit J.    This item appears at https://www.businesswire.com/news/home/20200610005784/en/Global-Plasma-Solutions-Virtually-Eliminates-Static-SARS-CoV-2-with-Proprietary-NPBI%E2%84%A2-Technology.

[21]  These items are at, respectively:
https://upnorthlive.com/news/local/pellston-public-schools-to-install-air-filter-system-in-schools-to-help-prevent-covid-19,
https://www.yesweekly.com/business/greensboro-day-school-invests-in-global-plasma-solutions-air-purification-system/article_efe491d2-d8ca-11ea-ab18-1fe783e3d10c.html,
https://www.businesswire.com/news/home/20201009005087/en/Vanbarton-Group-Installs-First-High-Rise-Bipolar-Ionization-System-in-Seattle,  and
https://www.wtkr.com/news/bipolar-ionization-units-installed-in-gloucester-co-schools.    The last of these surveys the degree of adoption of various air filtration or purification systems in numerous Virginia school systems.

[22]  On October 27, 2020, at about the same time as the Seattle piece, *Education Week*, a major industry publication, carried an article discussing the pros and cons of air purifiers.  See Exhibit O

21

By this time, GPS was beyond doubt a limited purpose public figure, by virtue of its extensive media campaign in a public health crisis. In *Steaks Unlimited v. Deaner*, 623 F.2d 264 (3d Cir. 1980), the Third Circuit faced a similar issue: whether the plaintiff, by "launching an intensive advertising campaign for the purpose of attracting customers," had transformed itself into a limited purpose public figure. The Court held:

> We have concluded that Steaks' actions were calculated to draw public attention to the company and to stimulate consumer interest in its product. The company thereby voluntarily relinquished whatever protection it may have possessed as a purely private entity and is, in the context of this suit, properly characterized as a public figure within the meaning of *Gertz*.
>
> \*     \*     \*
>
> Consumer reporting enables citizens to make better informed purchasing decisions. Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster the First Amendment goals mentioned above. As the Supreme Court recognized in *New York Times*, "would-be critics . . . may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense having to do so." To the extent this occurs, consumers would be less informed, less able to make effective use of their purchasing power, and generally less satisfied in their choice of goods.
>
> Application of the public figure rule to sellers such as Steaks, which through advertising solicit the public's attention and seek to influence consumer choice, therefore serves the values underlying the First Amendment by insulating consumer reporters and advocates from liability unless they have abused their positions by knowingly or recklessly publishing false information.

*Id.* at 280. The same principles apply here, but with greater urgency.

And as happened to the plaintiff in *Steaks*, GPS' technology also became the subject of public debate. On January 22, 2021, the online news website MassLive published a story with the headline:

---

hereto. It made no mention of GPS's technology, but it observed that ""schools are in desperate need of clear, definitive guidance for reopening buildings safely and maintaining in-person instruction over the long haul." The URL is https://www.edweek.org/leadership/air-purifiers-fans-and-filters-a-covid-19-explainer-for-schools/2020/10.

> Schools are spending millions on ionization technology to fight COVID and there's no good evidence it works.[23]

MsssLive quoted several scientists – none of them associated with the Article – expressing skepticism about the efficacy of the technology. Two days later, on January 24, 2021, a Pennsylvania news website called "The Morning Call" published a story about the Lehigh Valley school system's installation of GPS air purifiers.[24] The story emphasized that GPS's technology had not received any seal of approval for the use to which it was being put:

> Still, the districts all faced a common challenge: Among the sea of products emerging during the pandemic that claim to sanitize and purify, which can be trusted?
> Even the efficacy of bipolar ionization is still under review with a newly formed epidemic task force at the American Society of Heating, Refrigerating and Air-Conditioning Engineers — the industry experts who set standards for HVAC, among other systems.
> 'Convincing, scientifically rigorous, peer-reviewed studies do not currently exist on this emerging technology; manufacturer data should be carefully considered,' the organization states on its website.
> The CDC, too, considers it an emerging technology because, though the process is old, its application to HVAC systems is new. In the past 20 years or so, bipolar ionization has mainly been marketed toward odor-elimination, such as in locker rooms or cosmetology labs.
> 'As with all emerging technologies, consumers are encouraged to exercise caution and to do their homework,' the CDC wrote in response to an ASHRAE inquiry.

In sum, as a result of all of GPS's publicity, the value of GPS's technology had become a full-blown public dispute by the time the Article underlying the Complaint was published – and GPS had become a limited purpose public figure. As such, GPS must meet the exacting standard of "actual malice" in its pleading. It must plead facts showing plausibly that Elsevier Ltd. published the Article with knowledge that it was false, or "harboring a high degree of awareness

---

[23] See Exhibit P hereto. The URL is https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

[24] See Exhibit Q hereto. The URL is https://www.mcall.com/news/education/mc-nws-lehigh-valley-schools-bipolar-ionization-air-purification-20210119-r6tm6plr7ndctf5satiw3pujfi-story.html.

Case 3:22-cv-00034-RJC-DSC   Document 11-1   Filed 04/15/22   Page 23 of 26

of . . . probable falsity." *Fairfax*, 2 F.4th at 292-293. Instead, all it has pleaded against Elsevier is that the peer review process resulting in publication of the Article "should have detected" the alleged flaws in the Article.

## VI. GPS's Claim of Unfair and Deceptive Trade Practices Fails, Both on its Own Merits and Also for the Same Reasons as its Defamation Claim.

North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1 *et seq.*, gives a business a cause of action against another business where "1) the plaintiff-business is in the marketplace acting as a consumer or is otherwise engaged in commercial dealing with defendant, 2) the businesses are competitors, or 3) the conduct giving rise to the cause of action has a negative effect on the consuming public." *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011, 1020 (E.D.N.C. 2015) (internal citations omitted), *aff'd*, 674 Fed. Appx. 250 (4th Cir. 2016). It is plain on the face of the Complaint that Elsevier and GPS are not engaged in any commercial dealings, and are not competitors. As for harm to the consuming public, GPS alleges none, nor is it conceivable that it could allege any, given that a practice is "unfair" within the meaning of the UDTPA only if it "'offends established public policy'" or is "'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C. App. 285, 289, 590 S.E.2d 313, 316 (2004) (quoting *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)). It is unimaginable that the mere publication of a scholarly article by a publisher could be characterized as any of those.

Furthermore, the rules governing GPS's defamation claim must apply here, given that this case arises out of a media publication that is subject to First Amendment protection. GPS cannot make an end run around *New York Times* and *Gertz* by relabeling Elsevier's publication of the Article as an "act or practice in commerce." Courts have routinely denied similar end runs in comparable cases. *See, e.g., Aequitron Med. v. CBS, Inc.*, 964 F. Supp. 704, 710 (S.D.N.Y. 1997)

24

and cases cited therein (applying actual malice standard to media statements accused of "tortious interference"); *Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 618 (Tex. App. 2001) (applying the protections of *New York Times* to a media defendant in a product disparagement case).

Thus, the fact that Elsevier cannot be held liable for statements made by the authors of the Article means it cannot be held liable for those statements under the UDTPA.

## CONCLUSION

GPS's anger at the scientific publishing process comes across clearly in its Complaint, but the same cannot be said of any facts that would support its claims. GPS has failed to plead any basis on which Elsevier Inc. may be held liable for the Article in question. It has failed to plead that Elsevier Ltd., the publisher of the Article in question, had any control whatsoever over the contents of the Article. It has failed to plead any facts from which the trier of fact could find that Elsevier's peer review process was a "sham." Even its attacks on the Article itself misread the Article or ignore the context of what the authors say. Both its claim of defamation and its claim under the UDTPA fail to meet the standards of Rule 12(b)(6) and must be dismissed.

Respectfully submitted this the 15th day of April, 2022,

**WOMBLE BOND DICKINSON (US) LLP**

 *s/ Russ Ferguson*
James P. Cooney III
N.C. State Bar No. 12140
Russ Ferguson
N.C. State Bar No. 39671
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Phone: (704) 331-4900
Fax: (704) 331-4955
Email: Jim.Cooney@wbd-us.com
Email: Russ.Ferguson@wbd-us.com

**Attorney for Defendants**

*Of Counsel*:

s/ *William S. Strong*
William S. Strong
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, Massachusetts 02114
Phone: (617) 227-7031
Fax: (617) 367-2988
Email: wstrong@kcslegal.com
