UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| GLOBAL PLASMA SOLUTIONS,<br><br>*Plaintiff,*<br><br>v.<br><br>ELSEVIER INC. and ELSEVIER LTD.,<br><br>*Defendants.* | Case No. 3:22-cv-00034-RJC-DSC |

**REPLY MEMORANDUM OF DEFENDANTS ELSEVIER INC.
AND ELSEVIER LTD.
IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT
FOR FAILURE TO STATE A CLAIM**

Defendants Elsevier Inc. and Elsevier Ltd. respectfully submit this Reply Memorandum in response to the Opposition filed by plaintiff Global Plasma Solutions, Inc. (hereinafter sometimes "GPS"), to their motion to dismiss GPS's complaint under Fed. R. Civ. P. 12(b)(6).[1]

**INTRODUCTORY STATEMENT**

The two fundamental issues before this Court on the present Motion to Dismiss are:

(1) whether Elsevier can be held liable for the publication of a scholarly article (the "Article") that was written, edited, and reviewed by individuals who were not its employees or otherwise under its control; and

---

[1] For the sake of brevity and convenience, this Reply Memorandum will refer simply to "Elsevier," except in its final section. Such references should be construed to mean only Elsevier Ltd., the actual publisher of the Article.

1

(2)  whether Elsevier can be held liable for the alleged failure of its peer review process to catch errors in the Article.

On the first of these questions, GPS's Opposition essentially concedes that it has not pled anything that would impute the knowledge of the authors, editor, or reviewers to Elsevier. Instead, it attempts to shift the ground by claiming that the Article involves a matter of purely private concern, so that Elsevier is strictly liable for publication of the Article notwithstanding that it had no control over the Article's contents. The suggestion that the safety and effectiveness of equipment sold for use in public buildings is not a public concern is very strange even in the abstract. It is even stranger in the context of the public's attention to issues of indoor air safety during the Covid-19 pandemic, as shown by the substantial publicity Elsevier has submitted with its Motion to Dismiss, some of which was intentionally generated by GPS. The "private concern" cases that GPS cites as, supposedly, analogous to this one involve such things as employee reviews and high school graduation photographs – clearly private matters. Those cases do not help GPS.

Since the subject matter of the Article is in fact of public concern, Elsevier cannot, as a matter of First Amendment law, be held liable unless it is at fault. The fault standard is negligence if GPS is a private figure, or "actual malice" if it is a limited purpose public figure. GPS tries to argue that Elsevier can be held negligent even if it had no control over the contents of the Article because, it claims, the rules of vicarious liability have a hitherto unknown exception for defamation cases involving private plaintiffs. The rules of vicarious liability were expressly applied to publishers in defamation cases by the Supreme Court in *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1974), and neither *Cantrell* nor any other case has ever suggested that there is any exception where the fault standard is negligence – nor is there any logical basis for such an exception. GPS has cited no case in support of this novel idea and the cases it does cite are far off the mark.

2

Case 3:22-cv-00034-RJC-DSC    Document 23    Filed 05/20/22    Page 2 of 16

Thus, even if the Court were to set aside all the evidence Elsevier has submitted to show that GPS is a limited purpose public figure, Elsevier cannot be held liable for the work of the authors, editor, or peer reviewers of the Article. It can only be held liable if it itself committed some act of negligence or actual malice.

As to that, GPS has again, in its Opposition, failed to allege any basis of liability. Its claim boils down to the accusation that Elsevier's peer review process was a "sham" because it "failed to catch" allegedly obvious flaws in the Article. GPS does not deny that "sham" means "hoax," hence fraud, but disclaims any obligation to provide details. It does not claim that Elsevier's stated peer review process is inherently flawed; it does not say that Elsevier failed to implement that policy or interfered with the operation of the policy. Where, then, is the negligence – let alone the actual malice? Elsevier – and the Court – are left to figure it out for themselves. This is not proper pleading. It appears to be a backdoor way of imposing strict liability on Elsevier contrary to law.

On the other issues presented here, GPS has failed to respond with any detail or clarity. Pressed to identify what statements in its Complaint actually constitute defamation, it falls back on conclusory generalities. Pressed to explain why it is not a limited purpose public figure, it attempts to exclude the evidence notwithstanding extensive precedent for judicial notice of such evidence. Pressed to show how a scholarly article that casts doubt on the quality of its products constitutes unfair and deceptive trade practices, it cites a case that bears no resemblance to the present case. Pressed to explain how Elsevier, Inc., which is not the publisher of the Article, is responsible for the alleged defamation, it offers nothing more than conjecture.

In sum, GPS has failed to show how its pleading meets the standards required of it, and this case should be dismissed.

# ARGUMENT

## I. Elsevier Cannot be Held Liable for Defamation Unless It Acted Wrongfully, and GPS Has Failed to Allege any Plausible Basis for such a Finding.

In its Opposition (the "Opposition" or "Opp.") to Elsevier's Motion to Dismiss, GPS attempts to recast the article that is the subject of this lawsuit (the "Article") as merely involving a "private concern," in the hope of imposing strict liability on Elsevier purely by dint of Elsevier's having published the Article. This is disingenuous at best. It is hard to imagine that the quality and safety of machinery sold for public use is a "private concern," and GPS cites no case where such a holding was made. (It is even harder to imagine in the context of the Covid-19 pandemic, in the early stages of which internal air purity became a focus of national attention.) Instead, GPS cites (at Opp. p. 4) cases where the alleged defamation involved about very private, personal matters: derogatory statements about an employee or former employee[2]; graduation photographs doctored to embarrass a high school student.[3]

The "private concern" doctrine was first articulated by the Supreme Court in *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 759 (1985), which held that states could impose strict liability for defamation in cases where the plaintiffs are private persons and the subject matter is "purely private." Courts have rejected attempts to define what is a "public" concern narrowly. In *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009), the Fourth Circuit observed:

> Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. In order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of paramount importance or national scope.

---

[2] *Mutafis v. Erie Ins. Exch.*, 775 F.2d 593, 595 (4th Cir. 1985); *Phifer v. City of Rocky Mount*, No. 5:08-CV-00292-FL, 2010 WL 3834565, at *10 (E.D.N.C. Aug. 12, 2010).

[3] *Araya v. Deep Dive Media*, LLC, 966 F. Supp. 2d 582 (W.D.N.C. 2013).

(internal quotation marks and citations omitted).

The media coverage given to GPS's air purifying equipment during the pandemic, as demonstrated by the exhibits submitted with Elsevier's motion, demonstrate the high level of public interest in its technology to communities around the country. Those exhibits show, among other things, public schools and places of public accommodation touting the installation of GPS's equipment as a safety measure. Indeed, the exhibits show GPS itself striving to make its technology a matter of public discussion by issuing press releases. Thus, GPS's technology is a matter of public concern, like the sinkholes in *Neill Grading & Constr. Co. v. Lingafelt*, 168 N.C. App. 36, 606 S.E.2d 734 (2005), not a private matter like doctored high school graduation pictures in *Araya v. Deep Dive Media*, LLC.

This being so, Elsevier cannot be liable for the alleged defamatory content of the Article unless it was at fault. *Gertz v. Robert Welch*, 418 U.S. 323, 347 (1974). The standard of fault is "actual malice," if GPS is a limited purpose public figure, *New York Times v. Sullivan*, 376 U.S. 254, 279-280 (1964), or negligence, if it is not, *Neill Grading & Constr. Co.,* 606 S.E.2d at 741. GPS has failed to allege the basis for either type of liability.

There is no dispute that the Article was published as a result of Elsevier's peer review process as applied to the journal *Building and Environment* (the "Journal"). The Article was written by independent scholars who were neither employed by Elsevier nor under its control, and reviewed by the Journal's editor, and by peer reviewer selected by the Editor, all of whom likewise were neither employees of Elsevier nor under its control. GPS does not allege otherwise in its Complaint, and does not argue otherwise in its Opposition. Nor could it, since all this is laid out in documents incorporated in its Complaint either directly or by reference. (See Elsevier's Memorandum, Doc. 11-1, at pp. 6-9.)

5

The Supreme Court has held that publishers – like Elsevier – that are not directly aware of defamatory content in their publications can nonetheless be held liable if the authors who wrote the defamatory material were their employees or otherwise under their control. *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974); *see also* the other cases cited in Elsevier's Memorandum at pp. 5-6. GPS tries to argue that *Cantrell* does not apply here. First, it points out that *Cantrell* was not a libel case, technically speaking, but a "false light" invasion of privacy case. However, as the Supreme Court's opinion makes clear, the two sorts of claims are very closely related and the same legal standards of liability generally apply.[4] Second, GPS tries to argue that because Cantrell involved a plaintiff who was a public figure and had to show actual malice to prevail, Cantrell is limited to cases involving public figure plaintiffs. In other words, according to GPS, the rules of vicarious liability do not apply here: they are subject to some sort of special exception where private plaintiffs are concerned. For this highly original notion it can, of course, cite no case. Certainly, the Supreme Court's opinion nowhere suggests that vicarious liability would not have applied had the standard been negligence, and no case since *Cantrell* has done so. The fact is that vicarious liability and "actual malice" are unrelated principles: the latter concerns the degree of *fault*, the former the allocation of *responsibility*.

The cases cited by GPS at page 10 of its Opposition have no bearing on this question. One, *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), involves a private plaintiff and a matter of purely private concern (whether he was the vendor of certain tasteless tee-shirts, as alleged in a prank online posting); liability was thus absolute and had no constitutional dimensions.

---

[4] *See also* the opinion of the court below, noting that "publication was clearly an essential element of the cause of action." *Cantrell v. Forest City Publ'g Co.*, 484 F.2d 150, 155 (6th Cir. 1973), *rev'd on other grounds*, 419 U.S. 245 (1974).

Another, *Lee v. Dong-A Ilbo*, 849 F.2d 876 (4th Cir. 1988), reiterates the time-honored principle that one who repeats a defamatory statement is "as liable as the original defamer." *Id.* at 878, citing *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir. 1981). This is true, but has no bearing on *vicarious* liability; rather, this so-called "republication rule" is based on "the legal fiction that the republisher adopts the defamatory statement as his own." *Id.*[5]

Since Elsevier was not involved in writing, reviewing, or editing the Article, and since the individuals who were involved were not its employees or under its control, the negligence or malice of those individuals, if any, cannot be imputed to it. GPS is free to sue any of those individuals if it so chooses, but it cannot take the shortcut of suing Elsevier based on their actions.

As for what Elsevier itself may have done, GPS suggests (at Opp., p.10) that Elsevier can be held liable based on its "policies," namely its peer review policy, citing *Everhart v. O'Charley's, Inc.*, 200 N.C. App. 142, 153, 683 S.E.2d 728, 737 (2009). How that case bears on this one is a mystery. In *Everhart* the plaintiff alleged that the defendant had a policy of, in effect, stonewalling customer complaints to protect itself from tort liability: the process was deliberately adopted as part of the defendant's tortious way of doing business. GPS's Complaint, by contrast, has failed to point to a single thing in Elsevier's description of its peer review process that is inaccurate or improper. Nor does it allege that Elsevier failed to follow that policy, or in any way deviated from or interfered with that policy in any way, in regard to the Article. Instead, the Opposition merely

---

[5] A third case cited by GPS, *Morgan v. Moug*, No. 3:07CV374-C, 2008 WL 1733623 at *6 (W.D.N.C. Apr. 10, 2008), is a republication case with a bizarre twist. The filmmakers responsible for defamation sued a major TV network that had discussed their film, claiming it was a republisher and was liable to them for contribution. The court found that the network was exempt from liability on other grounds.

7

repeats the conclusory allegation in its Complaint that Elsevier's peer review process was a "sham" because it "failed to catch obvious flaws" in the Article. (Opposition, pp. 8-9.) [6]

The word "sham" means "hoax," i.e., a deliberate fraud, but GPS has failed to allege how such a fraud was perpetrated. It tries to argue that it is not obliged to meet the requirements of F.R.C.P. 9 concerning fraud pleadings because the Fourth Circuit has declined to adopt a heightened pleading standard for defamation. It is of course correct that no heightened pleading standard applies to defamation claims *as such*. But it is GPS's own pleading that has gotten it in trouble here. It cannot allege that Elsevier committed defamation by means of fraud but dodge the pleading requirements for fraud by saying, "But it's only defamatory fraud." And it has offered, in its Opposition, no other meaning of the word "sham" that might extricate itself from its own trap. If "sham" does not mean "hoax," then it has no commonly understood meaning, and thus conveys no information about what Elsevier might have done to be at fault here. It is not the responsibility of this Court, or Elsevier, to try to figure out what GPS is trying to say.[7] And it should not be Elsevier's burden to defend itself against such an amorphous allegation.

GPS makes one telling statement that shows how flawed – and how dangerous – its position is. On page 9 of its Opposition it says:

> Furthermore, a failure to exercise any quality control or fact-checking with respect to the Article is itself negligent.

---

[6] GPS also realleges that Elsevier failed to retract the Article upon demand. However, it offers no case law to refute the cases cited by Elsevier holding that failure to retract is, as a matter of First Amendment law, not actionable conduct. See Elsevier's Memorandum at p.11. All that is left is the allegation of a "sham."

[7] Although GPS does not deny the dictionary definition of "fraud," on page 8 of its Opposition it tries to suggest that a "sham" is equal to negligence, while on page 21 it suggests that a "sham" is equal to "actual malice." This only compounds the ambiguity.

8

On one hand, this acknowledges *sotto voce* that Elsevier did not involve itself in the process of reviewing the Article, and underscores that Elsevier itself had no knowledge of the alleged factual and other errors in the Article. On the other hand, this statement seems to suggest that Elsevier should have injected itself into the editorial process by fact-checking the Article. To go down that road, as Elsevier has noted in its Memorandum (at pp. 9-10) would destroy the scholarly independence on which scientific publishing is built and depends for its credibility. Peer review *is* the quality control that prevails in scientific publishing. Publisher review that could countermand peer review would destroy peer review, period. GPS is, in effect, asking this Court to upend the way science is conducted, to suit its own immediate business interests.

On the topic of the importance of peer review, Elsevier cannot leave uncorrected the mistaken arguments on page 15 of the Opposition. GPS tries to set up a straw man by saying that courts have "declined to extend immunity or privilege to peer-reviewed articles in scientific journals," citing *Hi-Tech Pharmaceuticals, Inc. v. Cohen*, 277 F. Supp. 3d 236, 245 (D. Mass. 2016), *Theodosakis v. Clegg*, 2017 U.S. Dist. LEXIS 13200 at *44-46 (D. Ariz. Jan. 30, 2017), and *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, No. 2016 U.S. Dist. LEXIS 129170, at *18-19 (S.D. Cal. Sep. 21, 2016). Elsevier has not asserted that any immunity or privilege attaches to peer-reviewed articles as such; it simply objects to GPS's attempt to impose liability where liability does not belong. As it happens, in *Hi-Tech* the defendant was not the publisher, but the article's author. He asserted he was entitled to a "scientific debate privilege" of the sort that had been recognized in, *e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013). The court, while expressing theoretical support for such a privilege, found it inapplicable on the

facts of the case.[8]  In *Theodosakis*, the Court dismissed claims arising from a peer-reviewed publication pursuant to the "common interest privilege" that has been held in Arizona and California to apply to scholarly publications addressed to fellow scientists on subjects of common interest.  2017 U.S. Dist. LEXIS 13200, at *42-43.  In *CrossFit* the court, quoting *ONY*, observed that "c]ourts are particularly careful when reviewing causes of action directed toward academic works, because academic freedom is a special concern of the First Amendment." 2016 U.S. Dist. LEXIS 129170, at *18 (internal citations and quotations omitted).  However, although the defendant in *Cross-Fit* was a non-profit organization that published a peer-reviewed journal, the court denied it summary judgment because the trier of fact could find that it was in fact not a neutral publisher but a potential competitor of the plaintiff, and had both fabricated data and interfered in the editorial process by pressuring the authors to include disparaging comments about the plaintiff's fitness program.  Nothing analogous to any of that is alleged here.

> II.   **GPS Has Failed to Show That Any of Its Allegations Identify Defamatory Content.**

On pages 14-17 of its Memorandum, Elsevier identified all the factual allegations in the Complaint that allege possible errors in the Article, to demonstrate that none of them sufficiently alleges actual defamation: the statement of a *false* and injurious *fact*.  GPS has responded not with any detail or rationale that might support a contrary analysis of the Complaint.  Instead, at p. 13 of its Opposition, it merely repeats the conclusory statement that the Article contains "inaccurate,

---

[8] The privilege was created within the context of a Lanham Act case, not a defamation case, and has been so applied by at least one court in this Circuit.  *De Simone v. VSL Pharm., Inc.*, Civil Action No. TDC-15-1356, 2018 U.S. Dist. LEXIS 164806, at *13 (D. Md. Sep. 24, 2018).  It would be premature to ask this Court to extend the privilege or any variant of it to a defamation case at this early stage of proceedings.  Elsevier is comfortable resting its defense on existing law.

misleading, disparaging, and defamatory statements about the characteristics, efficacy, safety, and quality of GPS's products."[9]

Such broad, generalized accusations do not satisfy the pleading requirements set out in *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). They are mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2007).

GPS challenges Elsevier's citation of *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) and *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995), with the sweeping claim that "[s]cientific studies are not in the business of expressing the author's opinions." (Opp., p. 12.) That betrays a misunderstanding of the scientific process. As the Second Circuit said in *ONY*:

> Scientific academic discourse poses several problems for the fact-opinion paradigm of First Amendment jurisprudence. Most conclusions contained in a scientific journal article are, in principle, capable of verification or refutation by means of objective proof. Indeed, it is the very premise of the scientific enterprise that it engages with empirically verifiable facts about the universe. At the same time, however, it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation. Importantly, those conclusions are presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals that warrant that research approved for publication demonstrates at least some degree of basic scientific competence. These conclusions are then available to other scientists who may respond by attempting to replicate the described experiments, conducting their own experiments, or analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from the results.

720 F.3d at 496-97 (internal quotation and citation omitted). This makes it doubly important that GPS identify what *facts* in the Article are allegedly false – something it has not done.

---

[9] This statement comes from Par. 89 of the Complaint. However, the only example given in Par. 89 is one which Elsevier has shown is not in fact false data.

11

### III. GPS Has Failed to Rebut the Evidence that It is a Limited Purpose Public Figure.

Elsevier has submitted substantial documentary evidence that the value and safety of GPS's technology was a very public issue by the time the Article was published. The admissibility of that evidence under judicial notice has been fully addressed in Elsevier's 12(b)(6) memorandum, its Memorandum in Support of Motion for Judicial Notice, and its Reply in Support of Motion for Judicial Notice, and need not be dealt with further here.

On the legal issue of whether GPS qualifies as a limited purpose public figure, GPS cites *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980) and *United States Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914 (3d. Cir 1990). In *Bruno v. Stillman*, the First Circuit declined to treat the plaintiff as a limited purpose public figure solely on the basis that it was a "successful manufacturer-merchant," *id.* at 592, and remanded the case for further findings as to what sort of activity the plaintiff might have engaged in that would qualify it as a limited purpose public figure. The opinion does not identify any evidence in the record comparable to what Elsevier has submitted here. In *United States Healthcare*, the Third Circuit held that comparative advertising by two competitor companies involved commercial speech, and declined to find either of them a limited purpose public figure for fear that "speech of public concern that implicates corporate advertisers -- i.e., typical comparative advertising" would "always be insulated behind the actual malice standard." 898 F.2d at 939. Although the Court did not explicitly say so, the meaning of that appears clear: advertisers should not be insulated by the First Amendment from liability for false comparative advertising. The Third Circuit did not by doing so "undermine" *Steaks Unlimited v. Deaner*, 623 F.2d 264 (3d Cir. 1980), as GPS claims. The Third Circuit specifically cited *Steak*s in *United States Healthcare* with approval; see 898 F.2d at

938. *Steaks*, like the present case, involved commentary by the media, not by a competitor of the plaintiff. That is a critical distinction, and *Steaks* is therefore still good law.

   **IV.**  **GPS Has Failed to State a Claim under the UDPA.**

  GPS cites *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893 (N.C. Ct. App. 2002) for the proposition that defamation can constitute an unfair and deceptive trade practice within the meaning of N.C. Gen. Stat. § 75-1.1(b).[10] *Boyce* was decided more than a decade before the summary of that statute set forth in *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011 (E.D.N.C. 2015) (internal citations omitted), *aff'd*, 674 Fed. Appx. 250 (4th Cir. 2016), and must be understood in light of that summary. As the court in *Exclaim Marketing* observed, "To be entitled to the UDPA's remedies, plaintiff first must show defendant's conduct falls within the statutory framework, including that the conduct was in or affecting commerce." *Id.* at 1020, *citing HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483 (1991). And "[w]hen there is no business, competitive, or consumer relationship between two business entities a business tort only 'affects commerce' where the defendant's actions have a negative effect on the consuming public." *Id.* at 1021.

  The very particular facts in *Boyce* can be understood as meeting these criteria, but they do not provide any basis for application of the UDPA to the present dispute. The principal defendant in *Boyce*, Roy Cooper, and one of the partners in the plaintiff law firm, were attorneys in competition for election as Attorney General of the State of North Carolina. The defendants' falsehoods, of course, could have changed the outcome of a race for public office, causing harm to the electorate. Moreover, the court in *Boyce* was motivated by the fact that defendants accused

---

[10] That statute is variously referred to as the Unfair and Deceptive Practices Act (UDPA) and North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA).

13

plaintiffs of unethical conduct, which is as derogatory a thing as anyone can say about an attorney, and not alleged here.

Nothing like those facts exists here. Elsevier and GPS have no business relationship, and GPS has not alleged any harm to consumers, only harm to itself. As the Court in *Exclaim Marketing* explained, "When no business, competitive, or consumer relationship exists between two parties, the 'commerce' element of the UDPA is met only where defendant's actions have a net negative effect on the market of potential consumers." 134 F. Supp. 3d at 1021. None has been alleged, and it is hard to see how any could be plausibly alleged. GPS's UDPA claim must be dismissed.

## V. <u>GPS Has Failed to State a Claim against Elsevier Inc.</u>

As Elsevier has shown in its Memorandum, the publisher of the Article was Elsevier Ltd., not Elsevier Inc. Since the Complaint is based upon the act of publication, GPS cannot maintain a suit against Elsevier Inc. without articulating some basis for implicating Elsevier Inc. in the act of publication.

GPS tries to justify its inclusion of Elsevier Inc. by suggesting that because it is registered to do business in North Carolina, and shares a common corporate name with Elsevier Ltd., it must have been involved somehow in the publication of the Article in North Carolina. That is pure conjecture, not responsible pleading.

GPS then tries to justify its inclusion of Elsevier Inc. in the Complaint by citing *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2021 U.S. Dist. LEXIS 45331 (D. Md. Mar. 10, 2021), but its reliance is misplaced. In *Jien*, the plaintiffs had amended their complaint so as to "clearly allege" that each corporation had "engaged in each relevant part of the conspiracy." *Id.* at *19. The Court held that if a separate, distinct subsidiary was actually involved, that could be

14

Case 3:22-cv-00034-RJC-DSC     Document 23     Filed 05/20/22     Page 14 of 16

raised at a later date. In the Complaint here, by contrast, GPS has not alleged any specific actions by Elsevier, Inc., it has merely lumped the two Elsevier companies together despite the clear evidence that only one of them was the publisher of the Article.

## CONCLUSION

For whatever reason, GPS has shied away from suing anyone who was actually involved in creating the Article it claims defames it, and has attempted to go after the publisher, Elsevier Ltd. However, it has failed to plead any facts that would make Elsevier liable for the contents of the Article, which was written, edited, and reviewed by people who, the Complaint itself shows, were outside of its control. Elsevier cannot be held vicariously liable for the work of those individuals. The allegation that its peer review process was a "sham," simply because it failed to catch alleged errors in the Article, is vague to start with, and made even more confusing by GPS's attempts to defend it. The Complaint is ill-conceived and fails to meet even the relatively generous standard of "plausibility." It should be dismissed, and GPS should get on with restoring its allegedly damaged reputation by science rather than indiscriminate lawsuits.

Respectfully submitted this the 20th day of May, 2022,

**WOMBLE BOND DICKINSON (US) LLP**

*s/ Russ Ferguson*
Russ Ferguson
N.C. State Bar No. 39671
James P. Cooney III
N.C. State Bar No. 12140
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Phone: (704) 331-4900
Fax: (704) 331-4955
Email: Russ.Ferguson@wbd-us.com
Email: Jim.Cooney@wbd-us.com

**Attorney for Defendants**

*Of Counsel*:

s/ *William S. Strong*
William S. Strong
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, Massachusetts 02114
Phone: (617) 227-7031
Fax: (617) 367-2988
Email: wstrong@kcslegal.com