UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

GLOBAL PLASMA SOLUTIONS,

*Plaintiff,*

v.

ELSEVIER INC. and ELSEVIER LTD.,

*Defendants.*

Case No. 3:22-cv-00034-RJC-DCK

**MEMORANDUM OF DEFENDANT ELSEVIER LTD.
IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT
<u>FOR LACK OF PERSONAL JURISDICTION</u>**

Defendant Elsevier Ltd. respectfully submits this Memorandum in support of its motion for dismissal of the First Amended Complaint filed against it by plaintiff Global Plasma Solutions, Inc. (hereinafter sometimes "GPS"), for lack of personal jurisdiction. Elsevier Ltd.'s contacts with North Carolina are too few and too attenuated to support general jurisdiction, and it has not targeted this forum with respect to the specific subject matter of this action. It is therefore not subject to the jurisdiction of this Court.

<u>**INTRODUCTORY STATEMENT**</u>

This case concerns an article in the scholarly scientific journal *Building and Environment* (sometimes hereinafter the "Journal") published by defendant Elsevier Ltd. The Journal is made available to subscribers in North Carolina not by Elsevier Ltd. but by a third party, Elsevier BV, and Elsevier Ltd. has no control over Elsevier BV's agreements with subscribers. The revenue

1

that Elsevier Ltd. receives indirectly from subscribers to the Journal in North Carolina is miniscule, in absolute terms and also relative to total US revenue from the Journal.

As for the article concerned (the "Article"), it was published online on a passive website, on an "open access" basis, free of any subscription obligations and on terms such that anyone in the world could download it for free. If that is enough to establish jurisdiction in North Carolina, then jurisdiction could be established anywhere.

Given the nonexistent, or at best highly attenuated, contact Elsevier Ltd. has with North Carolina regarding the subject matter of this action, the best that plaintiff Global Plasma Solutions, Inc. ("GPS") could hope to achieve is to satisfy the jurisdictional test first articulated in *Calder v. Jones*, 465 U.S. 783 (1984). But it has failed to plead any facts from which the Court could infer any intent by Elsevier to target this forum. The Article was written by authors who were not employees of Elsevier Ltd. or otherwise under its control, and was published as a result of a peer review process conducted by an editor and outside referees who were likewise not employees of Elsevier or under its control.

For all of these reasons, jurisdiction here should be denied and the case dismissed against Elsevier Ltd.

## **LEGAL STANDARD**

In *Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, No. 3:16-CV-00774-RJC-DSC, 2017 U.S. Dist. LEXIS 162696 (W.D.N.C. Sep. 30, 2017), this Court summarized the issue of personal jurisdiction as follows:

> Because courts have held North Carolina's long-arm statute to extend to the maximum boundaries allowed by the Due Process Clause, the two-tiered analysis essentially folds into one: whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice. To establish minimum contacts, a plaintiff has two options: they may pursue either general or specific jurisdiction. Under specific

jurisdiction, the court exercises its power over a defendant when its contacts within the state are the basis of the plaintiff's cause of action. In analyzing the contacts for specific jurisdiction, courts consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

*Id.* at *6-7 (internal quotation marks and citations omitted).

## ARGUMENT

### I. Elsevier Ltd. is Not "Essentially at Home" in North Carolina.

General jurisdiction requires that a defendant have "continuous and systematic contacts with the forum state" and that those contacts "be so substantial and of such a nature as to render the defendant essentially at home in the forum state." *Ospina v. Baraya*, No. 3:21-CV-00640-FDW-DSC, 2021 U.S. Dist. LEXIS 245041, at *2 (W.D.N.C. Dec. 22, 2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). That profile does not apply to Elsevier Ltd. It is incorporated in the United Kingdom, and has its principal place of business there, as plaintiff acknowledges. (Compl. ¶ 41.[1]) It has no office or personnel in the State of North Carolina. (Declaration of Edward Cassar, ¶ 4.) It has, as GPS recites, published articles by Duke University authors (Compl. ¶ 45), but that is happenstance. If an author who works at Duke decides to submit an article to one of Elsevier's journals, and that article is accepted for publication through Elsevier's editorial and peer review process – which, as more fully discussed below, operates independently of Elsevier Ltd. – Elsevier will execute a contract with that author for publication of the article. (Cassar Decl., ¶ 10.) None of this makes Elsevier "essentially at home" in North Carolina.

---

[1] For the sake of simplicity, GPS's First Amended Complaint is referred to herein as simply the "Complaint," and sometimes abbreviated as "Compl.," except where the context requires otherwise.

3

GPS tries by sleight of hand to establish jurisdiction by lumping Elsevier Ltd. and the other defendant, Elsevier Inc., a Delaware corporation, into a composite it calls "Elsevier," and then alleging that this "Elsevier" is "authorized to do business in North Carolina and maintains a registered agent in Raleigh." (Compl. ¶ 45.) This misrepresents facts that are a matter of public record. Only Elsevier Inc. (a Delaware corporation), is registered to do business in North Carolina and has a registered agent in North Carolina.[2] Elsevier Ltd. is a separate corporation, and as was made clear to GPS during jurisdictional discovery, Elsevier Inc. is neither a parent nor a subsidiary of Elsevier Ltd. nor even a "sister" corporation. (Cassar Decl., ¶ 2.) If GPS has some theory that the corporate veil should be pierced here, it certainly does not provide any allegations that would support such a theory. The "instrumentality" rule, set out in *Glenn v. Wagner*, 313 N.C. 450, 454-55, 329 S.E.2d 326, 330-31 (1985), for piercing of the corporate veil, and adopted by *Copley Triangle Assocs. v. Apparel Am., Inc.,* 96 N.C. App. 263, 266, 385 S.E.2d 201, 203 (1989), for jurisdictional purposes in this state, sets a high bar that GPS does not even attempt to hurdle.

GPS compounds its mistake by claiming that this composite "Elsevier" has contracts with Duke University and Western Carolina University for subscriptions to ScienceDirect, the platform on which the Journal is made available. (Compl. ¶ 45.) Such allegations might have been made in ignorance the first time around, but during discovery it was made clear to GPS that (i) ScienceDirect belongs to a third entity altogether, Elsevier BV (a Netherlands corporation), (ii) Elsevier BV is not a parent or subsidiary of Elsevier Ltd., and (iii) all ScienceDirect subscription contracts are made solely by Elsevier BV. (Cassar Decl., ¶¶ 6-7 and Exh. A.) Elsevier does not

---

[2] This may be seen at the website of the North Carolina Secretary of State, https://www.sosnc.gov/online_services/search/by_title/_Business_Registration. A printout of search results is attached to Elsevier's Motion to Dismiss as Exhibit A.
.

4

believe that such contracts would support general jurisdiction even if it were a party to them, but they certainly do not support jurisdiction given Elsevier's absence from the transactions.

GPS's allegations that this Court has general jurisdiction over Elsevier Ltd. thus have no foundation and should be disregarded.

## II. Elsevier Ltd. is Not Subject to Specific Jurisdiction Here.

Elsevier Ltd. sold no print subscriptions to the journal *Building and Environment* (the "Journal") to North Carolina subscribers for the years 2020 or 2021. (Cassar Decl., ¶ 5.) Thus, the only access North Carolina subscribers had during that period was online, and online access was not directly through Elsevier Ltd. but rather through the website ScienceDirect. That website is owned by Elsevier BV, the Netherlands corporation noted above. Elsevier BV is not a parent, subsidiary, or even a sister corporation of Elsevier Ltd., it is owned through a separate line of corporations by the same ultimate parent, RELX plc. (Cassar Decl., ¶ 6.)

ScienceDirect carries the Journal under a license granted by Elsevier Ltd. to Elsevier BV, but Elsevier Ltd. has no ownership of or control over downstream contracts with subscribers. Subscriptions to the journal on ScienceDirect are made by contract with Elsevier BV, and Elsevier Ltd. has no role in making such contracts or setting their terms. (Cassar Decl., ¶¶ 6-7.)

Moreover, ScienceDirect, as the Court may see by visiting www.sciencedirect.com, is a passive website. It is basically a repository of published materials, some of which can be accessed only by subscription and some of which can be accessed by any visitor to the website. As the Fourth Circuit held in *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 399 (4th Cir. 2003), a passive website cannot be the basis of specific jurisdiction:

> If … the defendant's site is passive, in that it merely makes information available, the site cannot render [a defendant] subject to specific personal jurisdiction in a foreign court.

Thus, Elsevier could not be sued in North Carolina simply because the Article was posted on ScienceDirect, even if Elsevier were responsible for posting it there – which it was not.

The Article as posted was not even behind a paywall and thus no subscription was necessary to access it. At the discretion of the authors, it was published on ScienceDirect on an "open access" basis, meaning that it was available to be read by anyone anywhere from the moment of publication. (See Exh. A to Declaration of William S. Strong, submitted herewith, consisting of excerpted pages from the Deposition of Luaine Bandounas, at pp. 37-38.) The first page of the Article as attached to the Complaint (Doc. 39-1 p. 2), says:

> This is an open access article under the CC BY-ND-NC license.

Under that CC BY-NC-ND license, the content is free for anyone to access, copy, and redistribute, at no charge, free of copyright, although a user may not alter the work or exploit it commercially.[3]

It is apparent, therefore, that jurisdiction exists only if GPS can meet the test established by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, two Florida-based employees of the *National Enquirer* were found to be subject to the jurisdiction of California because their alleged defamation, published in the *National Enquirer*, was targeted at a resident of California, and because they knew it would have potentially devastating effects in that State.

As the Fourth Circuit has observed, *Calder*'s test, generally referred to as the "effects" test, is typically construed to require a plaintiff to establish three factors:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

---

[3] This CC (Creative Commons) license is explained in detail at https://creativecommons.org/licenses/by-nc-nd/4.0/.

*Carefirst,* 334 F.3d at 398 n.7. Even assuming *arguendo* that the brunt of the harm from the defamation alleged here is in North Carolina, as GPS strenuously alleges, the Complaint fails to supply factors (1) and (3) of the *Calder* test.

GPS implicitly acknowledges the burden it faces; it attempts to assert a basis for jurisdiction by claiming that "Elsevier" – which for the sake of clarity will be assumed to refer just to Elsevier Ltd. – "directly targeted North Carolina in its actions and intent." (Compl. ¶ 44.) It then spells out its theory of jurisdiction as follows:

> Specifically, Elsevier (1) made the decision to name GPS and its location in Charlotte, North Carolina in the First Study; (2) published the First Study that intentionally discussed and defamed GPS by name and identifies GPS as a Charlotte, North Carolina company; (3) published the Second Study that again specifically tested GPS's technology and identified GPS by name and its location in Charlotte, North Carolina; (4) manifested an intent to reach North Carolina readers when it published the First Study and Second Study, which discussed the safety and efficacy of a North Carolina product sold in North Carolina by a North Carolina company, on its website and in print in its allegedly peer-reviewed journal, *Building and Environment*, which were accessible in or mailed to North Carolina and for which North Carolina residents and educational institutions purchased the First Study and Second Study individually or through journal subscriptions; and (5) the entire impact and harm of the defamatory statements on GPS's reputation were felt in Charlotte, North Carolina. The First Study specifically stated that the device being tested and written about is a GPS device from "Charlotte, NC USA."[4]

Every one of these allegations, insofar as they relate to the actions and intent of Elsevier, is either contradicted by the known facts, unsupported by any alleged facts, or insufficient as a matter of law. To take them in order:

1. "Elsevier made the decision to name GPS and its location … in the First Study"

This allegation, which is tied to ¶¶ 13 and 73 of the Complaint, is contradicted by GPS's own evidence. GPS took a Rule 30(b)(6) deposition of an Elsevier witness designated to testify on "the decision to name GPS in the Article." In that deposition, GPS introduced as an exhibit an

---

[4] Compl., ¶ 44.

email exchange among some of the Article's authors, from December 2020, that it had obtained through discovery in another case. GPS does not see fit to attach this document to its Complaint, but a copy of GPS's deposition exhibit is attached as Exhibit B to the Strong Decl.[5] GPS purports to summarize the email exchange in the following words:

> Ultimately, Stephens and the authors decide to leave the decision to Elsevier, the publisher.

(Compl. ¶ 73.)

This is an astonishing mischaracterization by GPS of its own deposition exhibit. In fact, here is the chronology of the exchange, which occurred over a 24-hour period on December 15-16, 2020[6]:

12/15/20, 11:05 AM: Brent Stephens reports: "Mohammad [Heidarinejad] and I just got off a call with [Illinois Institute of Technology]'s legal counsel seeking some advice on publishing this. … Safest bet would be to remove the make/model to maximize our protection, but he recognized that there is probably value in mentioning this specific technology. [pp. 10-12.]

12/15/20, [1:14 PM[7]]: Elliott Gall responds, saying he would prefer "not to get sued" and thanking Stephens "for doing the due diligence." He wonders if the impact of the article would be greater if "we do not name the device and refer to it as a 'widely installed NPBI from a leading manufacturer." [pp. 8-9.]

12/15/20, 11:23 AM: Stephens replies, "Good thought," but expresses a concern about naming NPBI: "doesn't GPS have a patent on NPBI?" [p. 8.]

---

[5] It is clear that the Exhibit is the same email exchange as is referred to in Compl. ¶¶ 13 and 73, because the language quoted in Compl. ¶ 13 appears verbatim in the Exhibit, at pp. 5 and 11.

[6] The emails appear on the Exhibit in reverse order of sending, as is typical with email printouts. They are listed here in actual chronological order. The individuals identified here, except for Jeff Siegel, are all co-authors of the Article. Page references are to the pages of Exh. B to the Strong Declaration.

[7] The time-stamp on this particular email is off kilter, for some reason. But the sequence of Gall's email is correct as indicated here because he is clearly responding to Stephens' prior email.

8

| | |
|---|---|
| 12/15/20, 12:33 PM: | Gall responds: "…yes, it seems like GPS has a trademark on the acronym NPBI. … Maybe we could go more generic, and drop neeedlepoint and call it bi-polar ionization generation?" [pp.7-8.] |
| 12/15/20, 2:00 PM: | Delphine Farmer replies: "I was going to suggest making it generic 'bipolar ionization' for exactly this reason. [p. 7.] |
| 12/15/20, 3:42 PM: | Stephens responds: "Talked with an attorney friend of mine and he confirmed the recommendation to … remove make and model and go with 'device marketed and sold in the US' type of language." [p. 6.] |

As things stood at this point, the authors seemed to believe they should remove identifying references to GPS and its equipment. But after a seven-hour hiatus, things took a different turn:

| | |
|---|---|
| 12/15/20, 10:48 PM: | Stephens reports that he had shared their concerns and a copy of the paper with an individual named Jeff Siegel, who had been his PhD advisor, and that Siegel "thinks we should name the device." [p. 5.] |
| 12/15/20, 10:48 PM: | Farmer responds that she "really respects" Siegel and that she "is fine with whatever he says/you decide in terms of naming names." [p. 5.] |
| 12/16,20, 5:38 AM: | Stephens reports that "after sleeping on it, based on what Jeff recommended and also what IIT's attorney recommended (he correctly assumed there was value in mentioning the product by name), I'm leaning towards keeping the make/model in … Mohammad, Elliott, let us know if you feel differently. We could also just get it submitted to [*Building and Environment*] and make the make/model determination later / leave the decision up to an editorial decision." [pp. 4-5.] |
| 12/16/20, 5:38 AM: | Mohammad Heidarinejad replies: "I like your suggestion of keeping the make/model and then refer to it as either 'ionizer' or 'ionization unit.'" [p. 4.] |
| 12/16/20, 11:03 AM: | Gall replies: "Glad to hear Jeff's thoughts on this. I think it's good input, and support moving forward with our edits and naming the device." [p. 4.] |

What this email correspondence establishes beyond doubt is that although the authors of the Article were hesitant at first about naming the "make/model," i.e., GPS and the specific model

9

number of its ionizer, in the end they decided to go ahead and name them. And although Stephens floated the alternative idea of submitting the paper and leaving the naming question up to an editorial decision (not, be it noted, up to Elsevier), Heidarinejad and Gall both agreed with his preference to name the make and model of the devices. GPS's suggestion in the Complaint that it was Elsevier that decided to name the make/model is, at best, wishful thinking.

Demonstrating the true import of the authors' email exchange should be sufficient to scuttle GPS's argument that Elsevier named GPS and its model in the Article. However, stopping there may only prolong this dispute for no good purpose; Elsevier would not want it to be insinuated that it was withholding relevant evidence at this juncture. So to put the matter to rest, Elsevier is submitting herewith a copy of the "Methods" section of the original manuscript submitted to the editors of the Journal on December 17, 2020, one day after the email exchange just described had ended. (Declaration of Luaine Bandounas, submitted herewith, ¶ 5 and Exh. A.) As the Court will see, the manuscript for the Article as originally submitted identified the "make/model": both GPS by name, and the model number of its equipment. In other words, the Article as originally submitted did exactly what the email exchange shows the authors had decided it should.[8]

As for identifying GPS's location in Charlotte, North Carolina, the email string discussed above does not speak to that point. Indeed, it is a little unclear why the specific geographical reference matters, because anyone familiar with GPS would have known where it was located: as GPS itself says at paragraph 64 of its Complaint, the GPS name is "readily associated with GPS

---

[8] For the record, as a matter of policy Elsevier generally opposes the disclosure of pre-edited manuscripts, unless authors themselves choose to disclose them on so-called "preprint servers." It makes a very limited exception here due to the extraordinary and unwarranted accusation against it, and because there is no material variation between the original and the published manuscript in respect of the excerpt disclosed.

and its products when encountered by the public." But again, lest there be any suspicion that Elsevier is hiding something, the Declaration of Luaine Bandounas makes clear that the addition of "Charlotte, NC USA" to the name of GPS and its model number was done by the authors not at Elsevier's suggestion, but at the suggestion of one of the independent peer reviewers of the Article. (Bandounas Decl., ¶ 6 and Exh. B.) [9]

> 2. <u>Elsevier "published the First Study that intentionally discussed and defamed GPS by name and identifies GPS as a Charlotte, North Carolina company."</u>

Of this second element alleged by GPS as the basis for jurisdiction, the first four words are correct: Elsevier did publish the Article. But that by itself does not make Elsevier subject to jurisdiction in North Carolina for defamatory material, if any, in the Article. For Elsevier to have "directly targeted" North Carolina in this matter, as GPS alleges, it would have to have had some direct involvement in the creation of the Article, or in the decision to publish the Article, and to have anticipated its supposed impact in North Carolina. Apart from the false allegation that Elsevier caused GPS to be named in the Article, the Complaint fails to allege any facts that plausibly evidence such involvement.

A publisher is not responsible for defamatory actions by persons who are neither employees nor acting under its direction and control. *See, Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974). *D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001) *Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990); *Price v. Viking Penguin*, 881 F.2d 1426, 1446 (8th Cir. 1989). And the Complaint itself, as well

---

[9] For the record, as a matter of policy Elsevier generally opposes disclosure of peer-review comments and author responses thereto, as there is substantial risk that disclosure will have a chilling effect on the scientific process. It makes a very limited exception in this instance due to the extraordinary and unwarranted accusation made against it, and is limiting the disclosure to the one item relevant here, which does not touch on the substance of the science concerned.

11

as information provided during jurisdictional discovery, shows that no one employed by Elsevier or under its control engaged in any conduct leading to the alleged defamation in the Article.

*First, the authors were all independent of Elsevier*: Exhibit A to the Complaint identifies the authors of the Article as persons who taught at, or were students at, either Illinois Institute of Technology or Portland State College in Oregon. (Doc. 39-1 and Compl. ¶¶ 5, 42-45.) The Complaint does not allege that any of these scholars or students was an employee of Elsevier or otherwise under its control. Therefore, intentional targeting of North Carolina by the authors – if any occurred – cannot be imputed to Elsevier.

*Second, the Editor was independent of Elsevier:* Jurisdictional discovery by GPS established that the editor responsible for overseeing the editorial process for the Article was an academic named Bert Blocken, whose title was Senior Editor. Professor Blocken was the individual who made the initial decision – according to criteria established not by Elsevier but by the Editor-in-Chief[10] – that the Article was good enough to send out for peer review. Professor Blocken was the individual who chose the peer reviewers to whom the Article was sent, and who ultimately approved the Article for publication. (Bandounas Dep., Strong Decl. Exh. A, at pp. 13-16; 18-25; 27-28.) At the time, Prof. Blocken held a dual appointment as professor at the Technische Universiteit Eindhoven, in Eindhoven, Netherlands, and as professor at the Katholieke Universiteit Leuven, in Leuven, Belgium. (Bandounas Decl., ¶ 4.) For obvious reasons, therefore, the Complaint does not allege that Prof. Blocken was an employee of Elsevier, or otherwise under Elsevier's control.

---

[10] At that time the Editor-in-Chief of *Building and Environment* was Qingyan Chen, a retired professor affiliated with Purdue University. (Exh. 2 to the Complaint, Doc. 39-2 at p.2.)

12

*Third, the peer reviewers were independent of Elsevier*: The Complaint acknowledges that *Building and Environment*, the journal in which the Article appeared, is a peer-reviewed journal. (Compl. ¶ 18.) Since plaintiff has cited in the Complaint (at ¶ 18, fn. 2) an Elsevier webpage concerning peer review, it is appropriate to take a closer look at what appears on that web page.[11]

At the cited page, https://www.elsevier.com/reviewers, if one scrolls down and clicks on "The role of a reviewer," one comes to a subpage, https://www.elsevier.com/reviewers/role. This page – reproduced in Exhibit B to Elsevier's motion – explains what reviewers (and editors) do:

> Reviewers evaluate article submissions to journals based on the requirements of that journal, predefined criteria, and the quality, completeness and accuracy of the research presented. They provide feedback on the paper, suggest improvements and make a recommendation to the editor about whether to accept, reject or request changes to the article. The ultimate decision always rests with the editor but reviewers play a significant role in determining the outcome.

This subpage also explains how peer reviewers are chosen. About a third of the way down the subpage one comes to the following text:

> Typically, reviewers are invited to conduct a review by a journal editor. Editors usually select researchers that are experts in the same subject area as the paper. However, if you think you would be a good referee for a specific journal you can volunteer to review on our Reviewer Hub. On the "Volunteer to review" section of the Reviewer Hub, you can search for the journal(s) of your choosing and click on "Review for journal" to indicate your interest. Please note that you should first complete your reviewer profile.[12]

In short, peer reviewers are selected by the editor of a journal (in this case. Prof. Blocken) either because the editor knows of their expertise, or because they have volunteered by signing up on the

---

[11] Compl. ¶¶ 18 n.2. As the Fourth Circuit held in *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. 2011), documents incorporated in a complaint should be evaluated in a motion to dismiss. Here, GPS incorporated the web page by reference.

[12] For their efforts, peer reviewers receive thirty days' free access to two scholarly research services owned by Elsevier, Scopus and ScienceDirect, and discounts for some other Elsevier services. See same subpage under the heading "Recognizing Reviewers."

13

Reviewer Hub.[13] All this was confirmed during jurisdictional discovery. Bandounas Dep., Strong Decl. Exh A, at pp. 27-28. GPS nowhere in its Complaint alleges that the peer reviewers were employees of Elsevier or under its control.

To sum up: the Article was written by people who were under no control by Elsevier, then subjected to an editorial process involving an editor and peer reviewers who were under no control by Elsevier, which process culminated in that editor, Professor Blocken, approving the Article for publication at his own discretion. These simple facts negate the claim that Elsevier "targeted" North Carolina. They allege no volitional conduct by Elsevier; and they fail the test for vicarious liability set down in *Cantrell v. Forest City Pub. Co.* and the other cases cited above.

Given that none of the people involved in writing, reviewing, or editing the Article, or deciding that it should be published, are people for whose acts Elsevier can be held responsible, GPS struggles to articulate any conduct by Elsevier that can be viewed as targeted at North Carolina. In several paragraphs of the Complaint it states that "through its peer review and editorial processes" Elsevier either knew or "or purposely avoided" the Article's alleged flaws. (Compl. ¶¶ 77, 91, 93, 125.) The entire editorial and peer review process is of course set up so that Elsevier does not participate in it – and if that is "purposeful avoidance," as GPS puts it, it comports with the best standards in academic publishing. The allegation boils down to "Elsevier either knew or didn't know" of the alleged falsity. In any event, one cannot target a forum by "purposefully avoiding" knowledge of the contents of a publication, especially where certain

---

[13] Elsevier's peer reviewer information specifically states: "Please be aware that the choice of whether or not to choose a particular referee for a paper is entirely at the discretion of the editor and Elsevier plays no part in this decision."

14

contents – the identity of the subject (GPS) and its location in the forum (North Carolina) – are the entire basis for alleged jurisdiction..

Elsewhere, GPS attacks the peer review and editorial process itself.[14] GPS says:

- "Elsevier's peer review and editorial processes should have detected and corrected this omission." (Compl. ¶ 94.)

- "Elsevier's failure to address even the most elementary flaw with the scientific method demonstrates that its peer review and editorial processes are little more than a rubber stamp without any teeth." (Compl. ¶ 106.)

- "Elsevier's peer review of the First Study, which failed to address or correct any of the issues outlined in this First Amended Complaint, was flawed and reckless." (Compl. ¶ 113.)

But even if GPS were right that the Article is flawed, and that the peer review process should have detected the flaws, these statements identify no predicate acts upon which jurisdiction can be based. Failure to detect flaws does not allege any intent; it alleges a passive error. One cannot target a forum by failing to detect things that might impact that forum.

These statements also suffer from an even more fundamental infirmity. GPS does not allege that Elsevier in any way skirted, subverted or interfered with its peer review and editorial process to advance the Article to publication. Rather, it claims that there must be something wrong with the process itself, because it failed to catch the alleged flaws in the Article. But this is not a products liability case, and the "process" was not some mechanical contraption; it consisted of the

---

[14] Elsevier is focusing here only on the actual factual allegations made under the heading "Factual Background," not on the "Introduction," which includes a number of statements not repeated under "Factual Background." An example of the latter is GPS's accusation that Elsevier's peer review process was a "sham." (Compl. ¶ 22.) That accusation was made in the body of the original Complaint, and Elsevier objected to it on the grounds that the dictionary meaning of "sham" is "fraud" and that GPS had not met the standard for fraud claims. GPS has now moved that allegation to the Introduction to allow it to express indignation without having to meet any pleading standard.

15

cumulative decision-making of the Senior Editor and the peer reviewers. So accusing the "process" of failing to catch alleged flaws is only a roundabout way of saying that the people who were responsible – the independent editor, and the independent peer reviewers he chose – didn't do their jobs as well as GPS thinks they should have. And that leads back to the problem of vicarious liability: Elsevier cannot be held liable for the failings of independent actors, even if failings existed. Even if those independent actors somehow targeted North Carolina – which GPS does not allege – their actions cannot be imputed to Elsevier.

GPS also tries in several places to impute the knowledge of the editor and peer reviewers to Elsevier. In paragraph 103 of the Complaint it says that Elsevier was "put on notice" of the alleged flaws in the Article. In the same vein it alleges that "[t]hrough its peer review and editorial processes, Elsevier knew" of alleged flaws (Compl. ¶ 95) and that "shortcomings were made known to Elsevier during its peer review and editorial processes" (Compl. ¶ 106).[15] But again, the "process" was the editor and the peer reviewers. Imputing to Elsevier the knowledge of an independent contractor (Blocken) and peer reviewers who performed work entirely at his request is no different from imputing their alleged failure to do their jobs; it falls afoul of *Cantrell* and the other cases cited above. It fails to supply the element of volitional conduct by Elsevier that would be required for a finding that Elsevier targeted North Carolina. Whatever knowledge the editor and peer reviewers may have had about the alleged defamatory nature of the Article, and of its possible impact on North Carolina, cannot be imputed to Elsevier.

---

[15] For whatever reason, the alternative that Elsevier "purposely avoided" knowledge of the Article is missing from these paragraphs. How Elsevier might have purposely avoided knowing of some flaws in the Article but not others is not explained.

16

3. <u>Elsevier "published the Second Study that again specifically tested GPS's technology and identified GPS by name and its location in Charlotte, North Carolina."</u>

The third item in GPS's jurisdictional allegations (Compl., ¶ 44) has to do with what it calls the "Second Study" – a second paper on GPS's equipment written by some of the authors of the original Article. Its claim, introduced for the first time in GPS's First Amended Complaint, that the Second Study was defamatory, is barred by the North Carolina one-year statute of limitations on defamation actions, N.C. Gen. Stat. § 1-54(3). The Second Study was published in February, 2022, as acknowledged at Compl. ¶ 25, some fifteen months before the filing of GPS's First Amended Complaint. Thus, allegations concerning the Second Study provide no basis for jurisdiction over such claim and, of course, as a logical matter they provide no basis for jurisdiction over the original claim. Furthermore, the Second Study went through the same independent peer review and editorial process as the Article, and the original manuscript submitted by the authors of the Second Study named GPS and identified its location in Charlotte, North Carolina, so no allegation of targeting of this forum by Elsevier can stand. (Bandounas Decl., ¶ 7 and Exh. C.) [16]

4. <u>Elsevier "manifested an intent to reach North Carolina readers when it published the First Study and Second Study."</u>

Everything said above applies to this fourth element of GPS's jurisdictional claim. The decision to publish the Article was made not by Elsevier but by the Senior Editor, Prof. Blocken, with input from independent peer reviewers. GPS knows that from its own jurisdictional discovery, and does not allege otherwise in the Complaint. Elsevier, as the publisher, manifested no intent to do anything but publish the Article and the Second Study. The only basis for alleging that Elsevier targeted North Carolina lay in GPS's misreading of its own evidence.

---

[16] What is said in footnote 8 above applies equally to this disclosure.

## CONCLUSION

Elsevier Ltd. has no contacts with North Carolina that would support the exercise of general jurisdiction here. The publication of the Article on the passive website ScienceDirect, on an open access basis, was not done at Elsevier's direction and would not in any case support specific jurisdiction here. Elsevier does not itself sell the Journal into North Carolina, and the revenue it derives indirectly from sales of the journal *Building and Environment* are miniscule.

GPS has failed to allege any alternative jurisdictional facts that would satisfy the effects test articulated in *Calder*. The Complaint alleges no basis on which Elsevier could be found to have committed an intentional tort or targeted this forum. Any intent or targeting that may have been in the minds of the authors of the Article cannot be imputed to it, and no intent or targeting can reasonably or logically be inferred from the alleged failure of the editor and peer reviewers to address errors in the Article, as they are not employees of Elsevier or under its control. Nor can any knowledge that the editor and peer reviewers may have had of the alleged defamation, and its possible impact on North Carolina, be imputed to Elsevier. Accordingly, the Complaint should be dismissed as against Elsevier Ltd. for lack of jurisdiction.

Respectfully submitted,

Dated: June 30, 2023     **KOTIN, CRABTREE & STRONG, LLP**

/s/ William S. Strong
William S. Strong
Massachusetts Bar 483520
2223 Washington St.
Newton, MA  02462
Phone: (617) 227-7031
Fax: (617) 367-2988
Email: wstrong@kcslegal.com

**WOMBLE BOND DICKINSON (US) LLP**

James P. Cooney III
N.C. State Bar No. 12140
Russ Ferguson
N.C. State Bar No. 39671
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Phone:  (704) 331-4900
Fax:  (704) 331-4955
Email:  Jim.Cooney@wbd-us.com
Email:  Russ.Ferguson@wbd-us.com

**Attorneys for Defendants**