UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-00034-KDB-DCK

GLOBAL PLASMA SOLUTIONS, INC.,

    *Plaintiff*,

v.

ELSEVIER INC. and ELSEVIER LTD.,

    *Defendants*.

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................3

    A.    The Publication Of *Building and Environment* .......................................3

    B.    GPS's Advertisement Of A New Technology For Air Purifiers ............................4

    C.    The First Study's Analysis Of GPS's NPBI Technology And Call For Further Research ...................................................................4

    D.    GPS's Allegations Targeting Conclusions And Methodology ..............................5

    E.    GPS's Litigation Campaign ............................................................7

LEGAL STANDARD....................................................................................................9

ARGUMENT ...............................................................................................................9

I.    THE FAC SHOULD BE DISMISSED BECAUSE THE ALLEGED FALSE STATEMENTS ARE INACTIONABLE OPINION PROTECTED BY THE FIRST AMENDMENT..................................................................9

    A.    Scientific Conclusions Constitute Nonactionable Opinion And Thus Cannot Give Rise To A Defamation Claim..........................................10

    B.    The First Study's Conclusions Are Not Actionable Under A Traditional Opinion Analysis ...................................................14

        1.    The Tenor Of The Article And Authors' Choice of Words Reflect Opinion ...................................................................15

        2.    The Broader Context And Circumstances Indicate The Statements Are Opinions...........................................................17

        3.    A Reasonable Reader Would Understand The Statements As Opinion ...................................................................18

II.    METHODOLOGICAL DISAGREEMENTS DO NOT GIVE RISE TO A CLAIM FOR DEFAMATION ..................................................22

CONCLUSION............................................................................................................24

i

## Cases

*Abely v. Aeterna Zentaris Inc.*,
  2013 WL 2399869 (S.D.N.Y. May 29, 2013) ..........................................................................23

*Arthur v. Offit*,
  2010 WL 883745 (E.D. Va. Mar. 10, 2010) ...........................................................................12

*Bass v. Weinstein Mgmt., Inc.*,
  56 F.4th 355 (4th Cir. 2022) .......................................................................................................9

*Biolase, Inc. v. Fotona D. D.*,
  2014 WL 12579802 (C.D. Cal. June 4, 2014) ...........................................................12, 23, 24

*Biospherics, Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) ........................................................................2, 15, 20, 21, 22

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) .....................................................................................................15

*RE Carroll Mgmt. v. Dun & Bradstreet, Inc.*,
  706 F. Supp. 3d 535 (M.D.N.C. 2023), *aff'd*, 2025 WL 415743 (4th Cir. Feb.
  6, 2025) ..................................................................................................................... *passim*

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ..................................................................................................10

*Daniels v. Metro Mag. Holding Co., LLC*,
  179 N.C. App. 533 (N.C. Ct. App. 2006) .........................................................................14, 19

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993).....................................................................................................................10

*Demarco v. Charlotte-Mecklenburg Hosp. Auth.*,
  268 N.C. App. 334 (N.C. App. Ct. 2019) .............................................................................22, 23

*Desmond v. News & Observer Publ'g Co.*,
  375 N.C. 21 (2020) ...............................................................................................................10, 22

*Doe v. White Plains Hosp. Med. Ctr.*,
  2011 WL 2899174 (S.D.N.Y. July 8, 2011), *aff'd*, 458 F. App'x 21 (2d Cir.
  Jan. 18, 2012).......................................................................................................................20, 21

*Drager v. PLIVA USA, Inc.*,
  741 F.3d 470 (4th Cir. 2014) .......................................................................................................9

Case 3:22-cv-00034-KDB-WCM    Document 197    Filed 04/17/26    Page 3 of 33

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
    637 F.3d 435 (4th Cir. 2011) ............................................................................................3

*Freyd v. Whitfield*,
    972 F. Supp. 940 (D. Md. 1997) ...............................................................................10, 14, 16

*Funderbunk v. Coley*,
    2015 WL 8179542 (M.D.N.C. Dec. 7, 2015) ....................................................................7

*Gaunt v. Pittaway*,
    135 N.C. App. 442 (N.C. Ct. App. 1999) ......................................................................19

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..........................................................................................................10

*Hartford Cas. Ins. v. Greve*,
    2017 WL 5557669 (W.D.N.C. Nov. 17, 2017), *aff'd*, 742 F. App'x 738 (4th
    Cir. 2018) ...........................................................................................................................9

*Hencely v. Fluor Corp.*,
    120 F.4th 412 (4th Cir. 2024) ..........................................................................................9

*Hoey v. Insmed Inc.*,
    2018 WL 902266 (D.N.J. Feb. 15, 2018) ........................................................................23

*Hopkins v. MWR Mgmt.*,
    2017 WL 2380227 (N.C. Super. May 31, 2017) ...............................................................17

*Immanuel v. CNN*,
    618 F. Supp. 3d 557 (S.D. Tex. 2022) ..............................................................................12

*Joseph v. Springer Nature*,
    2021 WL 1372952 (S.D.N.Y. April 12, 2021) ..................................................................24

*Kingsdown, Inc. v. Hinshaw*,
    2016 WL 661823 (N.C. Super. Feb. 17, 2016)..............................................................16, 19

*Knockout Holdings, LLC v. Kakar*,
    2024 WL 3607443 (E.D. Va. July 31, 2024).....................................................................19

*In re Lowe's Cos., Inc. Fair Lab. Standards Act & Wage & Hour Litig.*,
    517 F. Supp. 3d 484 (W.D.N.C. 2021) ..............................................................................9

*LTL Mgmt. LLC v. Moline*,
    2024 WL 3219683 (D.N.J. June 28, 2024).....................................................................18, 24

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990)...............................................................................................................10

iii

*Mulquin v. Nektar Therapeutics*,
510 F. Supp. 3d 854 (N.D. Cal. 2020) ..................................................................................23

*Nobles v. Boyd*,
2015 WL 2165962 (E.D.N.C. May 8, 2015) .........................................................................15

*Nucor Corp. v. Prudential Equity Grp., LLC*,
189 N.C. App. 731 (N.C. App. Ct. 2008) ...................................................................10, 14, 17

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)................................................................................ *passim*

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
63 F.4th 240 (3d Cir. 2023) ................................................................................ *passim*

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*,
829 F.2d 1280 (4th Cir. 1987) .........................................................................................19, 20

*Redco Corp. v. CBS, Inc.*,
758 F.2d 970 (3d Cir. 1985)...............................................................................................18

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..............................................................................................24

*Saad v. Am. Diabetes Ass'n*,
123 F. Supp. 3d 175 (D. Mass. 2015) ..............................................................................12, 16

*TC Heartland LLC v. Schiffman*,
No. 1:23-cv-665, ECF No. 35 (M.D.N.C. May 5, 2025).....................................................13

*Underwager v. Salter*,
22 F.3d 730 (7th Cir. 1994) .................................................................................................11

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004).................................................................................................10

*In re Versant Props., LLC*,
2011 WL 1131057 (W.D.N.C. Mar. 25, 2011)...................................................................3, 7

## Rules

Fed. R. Civ. P. 10................................................................................................................3

Fed. R. Civ. P. 12................................................................................................................9

iv

## PRELIMINARY STATEMENT

Through this action, Plaintiff Global Plasma Solutions ("GPS") seeks to stifle legitimate scientific debate on critical public health questions by attacking a scientific study published in a peer-reviewed journal. Scientific opinion, like that at issue here, falls within the core of the First Amendment, and courts routinely conclude that it cannot give rise to a claim for defamation. To hold otherwise would strike at the heart of public discourse and iterative experimentation that is instrumental to scientific advancement. The First Amended Complaint ("FAC") should be dismissed and judgment on the pleadings entered for Defendants Elsevier Inc. and Elsevier Ltd.[1]

In 2021, a team of academics from well-respected university departments across the country published a peer-reviewed study in the scientific journal *Building and Environment* (the "Journal") analyzing one of GPS's air purifier products (the "First Study"). The First Study disclosed its methodology, attached the underlying data on which it relied, presented measured and conditional conclusions about what the data indicated, and explicitly noted the need for further study. GPS alleges that Elsevier "publish[ed] a study that falsely concluded that GPS's air cleaning technology is ineffective and produces harmful compounds," FAC ¶ 1, but what the FAC really complains of are GPS's disagreements as to the First Study's design and tentative conclusions. Indeed, GPS has recognized as much—representing to another court that the ███████████

███████████████████████████████████

███████████████████████████████████

Exhibit 1 to the Declaration of Ellyde R. Thompson ("Mot. Ex.") at 15 (emphasis added). GPS's critiques should be raised in a scientific forum, not a courtroom.

---

[1] While Defendants dispute that Elsevier Inc. had any involvement in publishing the Journal, Defendants refer to the entities together as "Elsevier" for ease of reference.

At the threshold, scientific conclusions—grounded in disclosed data and methodology—are quintessential nonactionable opinion under the First Amendment. "[S]tatements of scientific conclusions about unsettled matters of scientific debate cannot give rise to liability for damages sounding in defamation." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 492 (2d Cir. 2013). Numerous courts have recognized the First Amendment protection that applies specifically to scientific opinions, because such opinions necessarily invite debate, replication, and peer review. Here, the First Study did so ***expressly***: "Given the rapid acceleration in the use of these types of electronic air cleaning technologies," "additional work" was needed to "expand and ultimately standardize[] test methods for evaluating the efficacy and potential for byproduct formation of these devices." FAC Ex. A at 13–14. In essence, GPS asks this Court to jettison scientific debate in favor of a judicial determination of what conclusions are fit to print in scientific journals.

That scientific conclusions are not actionable comports with a traditional opinion analysis under the First Amendment, consistent with the law of this Circuit and North Carolina law. "Inclusion of underlying information used, explicit mention of unavailable data, and the lack of a challenge to the accuracy of the specific underlying information also tend to show that a reasonable reader would treat [such] statements as 'opinion of the author drawn from the circumstances related.'" *RE Carroll Mgmt. v. Dun & Bradstreet, Inc.*, 706 F. Supp. 3d 535, 541 (M.D.N.C. 2023), *aff'd*, 2025 WL 415743 (4th Cir. Feb. 6, 2025) (quoting *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998)). The First Study on its face makes apparent that the authors' tentative conclusions are based on the limited study conducted. And the study discloses the basis for that opinion—the methodology and data upon which the authors relied.

That GPS in the FAC criticizes the methodology of the First Study does not remove it from this protected sphere. Any allegation that the authors should have conducted the study differently

2

or weighed the data in a different manner does not render false or defamatory any statement based on the methodology the authors did use. Rather, GPS's complaints about study design and data selection challenge the authors' scientific judgment calls, not verifiable facts. Such allegations cannot support a defamation claim regardless of how GPS characterizes them.

While GPS may disagree with the Study, its methodology, and its qualified conclusions, the FAC fails to identify any actionable false and defamatory statement and should be dismissed.

## BACKGROUND

### A.    The Publication Of *Building and Environment*

Elsevier is "the world's largest scientific publisher." FAC ¶ 1. Defendant Elsevier Ltd. publishes *Building and Environment*, a semi-monthly scientific journal covering, among other topics, "[a]ir quality and airborne infection control in building science and engineering." *Id.* ¶¶ 5, 122;[2] Mot. Ex. 3 at 3. The Journal's readership consists primarily of scientists and academics studying indoor and built environments, and their impact on human health. *See* Mot. Ex. 3 at 2-3.

Manuscripts accepted by *Building and Environment* undergo an anonymized peer review by a minimum of two peer reviewers prior to publication. *See id.* at 6. As the FAC explains, "[t]he peer review system exists to validate academic work" and "Elsevier relies on the peer review process to uphold the quality and validity of individual articles and the journals that publish them." FAC ¶ 108.

---

[2]    The FAC incorporates the following materials, which are integral to the FAC: the First Study (FAC Ex. A); marketing materials advertised on GPS's website (FAC Ex. D); the Corrigendum, Mot. Ex. 2; and key information about the Journal available on the "Guide for authors" section of the website, Mot. Ex. 3. A court "evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. 2011). Because GPS relied on the Journal's website in the FAC, the Court may consider it. *See* Fed. R. Civ. P. 10(c); *In re Versant Props.*, LLC, 2011 WL 1131057, at *3 n.4 (W.D.N.C. Mar. 25, 2011).

**B.      GPS's Advertisement Of A New Technology For Air Purifiers**

GPS develops and sells air purifiers that employ proprietary Needlepoint Bipolar Ionization ("NPBI") technology. *Id.* ¶¶ 47–50. GPS claims that "[a]pproximately 250,000 GPS NPBI™ air purification systems have been installed worldwide," including in hospitals and schools. *Id.* ¶ 58. It further claims that its NPBI technology "cleans the air by introducing ions into the space . . . [and] delivers indoor air that's free of ozone and other harmful byproducts." FAC Ex. D at 1. GPS opines that it "seeks to develop products that meet and exceed industry standards." FAC ¶ 54. In accordance with this goal, "GPS prominently displays the results of tests by third-party labs of its NPBI™ technology on its website." *Id.* ¶ 56.

**C.      The First Study's Analysis Of GPS's NPBI Technology And Call For Further Research**

In March 2021, at the height of the COVID-19 pandemic, *Building and Environment* published a study analyzing one of GPS's air purifier products, GPS-FC48-AC, entitled "Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation" (the "First Study" or the "Study"). *Id.* ¶¶ 5, 73; *see also* FAC Ex. A. The Study's "main author," Brent Stephens, is an "Environmental and Architectural Engineering professor and department chair at" the Illinois Institute of Technology. FAC ¶ 65; *see also id.* ¶ 5. His co-authors are academics affiliated with other academic institutions, such as Colorado State University and Portland State University. *See id.* ¶¶ 78-82.

The First Study examined whether bipolar ionization devices—one of "the most widely used ionization approaches currently in the U.S."—actually improve air quality. FAC Ex. A at 3. It specifically acknowledged that "[t]wo recent studies evaluated the impacts of air ionization on markers of human health" but that "little peer-reviewed literature exist[ed] on byproducts formation in either laboratory or field settings." *Id.* at 3. The authors noted that "the literature

4

remains sparse and limited to a narrow range of technologies" and that they were "not aware of investigations of the effectiveness or potential for byproduct formation of bipolar ionization devices used in realistic settings, which present[ed] a knowledge gap that this work intend[ed] to fill." *Id.* at 2–3.

The First Study details its methodology extensively, including photos of the laboratory setting employed in testing. *Id.* at 3–7. The methodology section identifies the specific device it tested by model number—the First Study's only reference to GPS. *Id.* at 3, 6. It discloses the data from which the provisional conclusions were drawn, including in appendices attached to the article. *See* FAC ¶ 6 (acknowledging "data reported in the appendices"); *see also id.* ¶ 155 (noting "Appendices 1 and 2 contained in the First Study's supplementary data purport to show the complete analyte concentration measurements reported from the lab chamber tests"); FAC Ex. A at 16-26 (supplementary data and appendices).

The First Study's authors opine that the data from their study suggests that NPBI technology could lead to an increase in certain volatile organic compounds ("VOCs"), and the First Study's ultimate conclusion is measured: "Given the rapid acceleration in the use of these types of electronic air cleaning technologies," it called for "additional work" to "expand and ultimately standardize[] test methods for evaluating the efficacy and potential for byproduct formation of these devices." FAC Ex. A at 13.

### D. GPS's Allegations Targeting Conclusions And Methodology

In its FAC, GPS specifically challenges the study's limited conclusions. For instance, GPS alleges that the Study's measured conclusions are "false and fabricated" because they do not match GPS's interpretation of the data and do not consider data that GPS believes should have been considered. *See, e.g., id.* ¶¶ 1, 2, 17, 90. GPS alleges that the First Study "falsely concluded that GPS's air cleaning technology is ineffective and produces harmful compounds," *id.* ¶ 1, such that

5

"First Study's conclusion . . . was false," *id.* ¶ 17, and that "Elsevier, through its peer review and editorial process, knew . . . that the *main conclusion* of the study was false," *id.* ¶ 2. Thus, GPS in the FAC directly attacks the scientific opinion of the Study's authors, alleging that "[t]he First Study's conclusion that operation of the ionizer led to increases in certain VOCs inside the chamber was false." *Id.* ¶ 90. GPS makes these allegations even though it previously recognized and represented to another court that the First Study ███████████████████████████ ████████████████████████████████████████ Mot. Ex. 1 at 15.

GPS also attacks the First Study's methodology, arguing that the authors used improper testing procedures and failed to follow manufacturer recommendations. *See, e.g.*, FAC ¶¶ 74 ("throughout the testing period, air was escaping from inside the chamber to outside the chamber into the lab and vice versa"); 101 ("The scientific method requires that experiments have controls, be replicated, and be reproducible by others in their results. The study here lacked all three."); 105 ("the authors failed to install and utilize the GPS device in the manner recommended by the manufacturer, thereby tainting all their results"); 18 (the "flawed design was readily apparent"). GPS contends that the authors made a faulty methodological choice in electing to rely on certain data rather than other data in developing their tentative conclusions. *See id.* ¶¶ 6–9, 17, 18, 75, 88, 91, 93, 95-96, 119. These allegations stem from the fact that the First Study openly discloses and discusses at length the methodology and data used. *See* FAC Ex. A at 3–7.

In particular, GPS asserts that, although data was collected for a compound using two different detection methods, TO-11A and TO-15, the Study authors elected to consider and include the data for only one detection method for that compound. *See id.* ¶¶ 92, 66. As the authors explained, however (and as GPS has acknowledged, *see id.* ¶ 102), the Study authors made the methodological decision not to consider the TO-11A data because the results contained significant

uncertainty, *see id.* ¶¶ 102–03.  A corrigendum, published on February 23, 2022, explained this decision, noting that the data were excluded from consideration in the First Study because they were "not as accurate" as the reported data.  Mot. Ex. 2; *see also* FAC ¶¶ 97, 99; FAC Ex  B at Tr. 91:25–92:9 (explaining the Study text did not focus on certain data in the appendices because there was "uncertainty with [a] different method").[3]  The authors made a similar decision not to consider a data reading from an "unreliable" air collection bin that was "usually" not considered in their experiments.  FAC Ex. B at Tr. 167:11–21.

### E.  GPS's Litigation Campaign

On April 19, 2021, GPS sued two competitors and an indoor air quality scientist in Texas, asserting a litany of claims related to allegedly false statements made concerning its NPBI technology.  *See Global Plasma Solutions, Inc. v. D Zine Partners, LLC*, No. 3:21-cv-884 (N.D. Tex.); FAC Ex. B at 35 (attaching complaint from Texas action).  Notably, in opposing summary judgment in Texas action, GPS itself recognized the distinction between ███████████

████████████████████████████████████████

████████████████████████████████████████

███████.  Mot. Ex. 1 at 33-35 (discussing *ONY*, 720 F.3d at 498).[4]  GPS also represented that the First Study "████████████████████████████████

████████████████████" and that the "████████████████

---

[3]  The Corrigendum, which the FAC quotes repeatedly, FAC ¶¶ 97–100, may be considered because it is "integral to and explicitly relied on in the complaint." *In re Versant Props.*, 2011 WL 1131057, at *3 n.4.

[4]  GPS filed the summary judgment opposition in August 2022 in the Texas action.  Although this summary judgment pleading predates the FAC, the pleading was filed under seal and Elsevier only learned of it during the course of discovery in this case.  The Court may take judicial notice of this pleading. *See Funderbunk v. Coley*, 2015 WL 8179542, at *1 n.2 (M.D.N.C. Dec. 7, 2015) ("The Court may properly take judicial notice of court documents filed in Plaintiff's previous action.").

████████████████████████████████████████████████████████

████████████████████████████████████████████ ” *Id.* at 15, 35. GPS settled this suit in 2023, following a summary judgment order finding that GPS was a limited purpose public figure. *Global Plasma Solutions, Inc. v. D Zine Partners, LLC*, No. 3:21-cv-884 (N.D. Tex.) at ECF Nos. 417, 563.

Two days after filing the Texas lawsuit, on April 21, 2021, GPS sued an air quality consulting firm in California for publishing an article that questioned the effectiveness of GPS's product. *See Global Plasma Solutions, Inc. v. Iee Indoor Envt'l Eng.*, No. 4:21-cv-2884, ECF No. 1 (N.D. Cal. April 21, 2021). GPS later settled this suit as well. *Id.* at ECF No. 82.

GPS then filed this action on January 26, 2022, asserting claims for defamation and unfair and deceptive trade practices arising out of the publication of the First Study. ECF No. 1. On June 5, 2023, GPS amended its complaint, asserting the same claims. ECF No. 39 ("FAC").

Elsevier moved to dismiss on certain limited grounds on June 30, 2023. ECF Nos. 42, 47. On May 22, 2024, Judge Keesler filed a Memorandum and Recommendation ("M&R") denying dismissal of the defamation claim on the basis that: (1) it was plausible that the domestic Elsevier entity participated in the publication of the article; (2) whether GPS was a limited purpose public figure required further fact development; and (3) the FAC plausibly alleged actual malice. *See* ECF No. 75. The M&R recommended dismissal of GPS's unfair and deceptive trade practices claims. *Id.* The Court accepted the M&R's recommendations in full on July 23, 2025. ECF No. 102. On August 6, 2025, Elsevier filed their Answers. ECF Nos. 103–04. Elsevier then sought leave to amend their Answers, which the Court granted. ECF No. 190. Elsevier filed their Amended Answers on April 7, 2026. ECF Nos. 191–92.

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings is governed by the standard applicable to a motion to dismiss under Rule 12(b)(6)." *In re Lowe's Cos., Inc. Fair Lab. Standards Act & Wage & Hour Litig.*, 517 F. Supp. 3d 484, 493 (W.D.N.C. 2021); *see also Bass v. Weinstein Mgmt., Inc.*, 56 F.4th 355, 358 (4th Cir. 2022) (similar). "A Rule 12(c) motion is designed to dispose of cases when . . . the court can judge the case on its merits by considering the pleadings and any attachments to the pleadings and materials referenced." *Hartford Cas. Ins. v. Greve*, 2017 WL 5557669, at *2 (W.D.N.C. Nov. 17, 2017), *aff'd*, 742 F. App'x 738 (4th Cir. 2018) (cleaned up). Accordingly, the motion should "be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) (quotation omitted). The Fourth Circuit requires the application of *Twombly* and *Iqbal* when reviewing a motion for judgment on the pleadings, meaning that conclusory assertions need not be considered. *See Hencely v. Fluor Corp.*, 120 F.4th 412, 431 (4th Cir. 2024).

**ARGUMENT**

I. **THE FAC SHOULD BE DISMISSED BECAUSE THE ALLEGED FALSE STATEMENTS ARE INACTIONABLE OPINION PROTECTED BY THE FIRST AMENDMENT**

The Court should grant judgment on the pleadings and dismiss the FAC because it attacks scientific conclusions—opinions protected by the First Amendment.

"The First Amendment requires that statements 'be provable as false before there can be liability under state defamation law.'" *RE Carroll Mgmt.*, 706 F. Supp. 3d at 541 (quoting

*Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990)). "Whether a statement is one of actionable fact is a question of law for the court," *id.* at 539, and is properly resolved at the pleading stage, *see Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993) (affirming dismissal when complaint alleged no actionably false statement).

"[A] pure expression of opinion" cannot support a defamation claim "because it fails to assert actual fact." *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 736 (N.C. App. Ct. 2008). This rule reflects bedrock First Amendment principles. As the Supreme Court has recognized, "our profound national commitment to the free exchange of ideas . . . demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *see also Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 65 (2020) (similar).

### A. Scientific Conclusions Constitute Nonactionable Opinion And Thus Cannot Give Rise To A Defamation Claim

The FAC fails to assert any actionable claim for defamation because it attacks statements of scientific conclusion, which fall within the core of First Amendment protection.

As the Supreme Court has observed, "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory" because "[s]cientific conclusions are subject to perpetual revision." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596–97 (1993); *United States v. Mitchell*, 365 F.3d 215, 252 (3d Cir. 2004) ("[A] scientific conclusion—something which is subject to revision—[is] not a 'fact.'"). Indeed, "academic freedom is a special concern of the First Amendment, and . . . the chilling effect of protracted litigation can be especially severe for scholarly journals." *ONY*, 720 F.3d at 496; *see also Freyd v. Whitfield*, 972 F. Supp. 940, 945 (D. Md. 1997) ("[T]he essence of the First Amendment is to shield the free speech of scientists and authors.").

As a result, "as a matter of law, statements of scientific conclusions about unsettled matters of scientific debate cannot give rise to liability for damages sounding in defamation." *ONY*, 720 F.3d at 492, 499; *see also Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 246–47 (3d Cir. 2023) (holding inactionable "tentative scientific conclusions" published in peer-reviewed journal); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation.").

The Second Circuit's decision in *ONY* crystallized these principles into a rule for defamation cases. There, the court explained:

> []It is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision . . . . Importantly, those conclusions are presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals that warrant that research approved for publication demonstrates at least some degree of basic scientific competence. . . . In a sufficiently novel area of research, propositions of empirical "fact" advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts. Needless to say, courts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury.

*ONY*, 720 F.3d at 496–97. The court held that, while scientific hypotheses are theoretically verifiable, they constitute protected opinion for defamation purposes. *Id.* at 496–97. Thus, claims are not actionable "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement." *Id.* at 498.

Decisions evaluating the publication of articles in scientific journals reflect a consistent principle that "the validity of experiments and conclusions published in peer-reviewed scientific journal articles" are better addressed "in the scientific, not legal, realm," and thus are not the appropriate subject of defamation claims. *Biolase, Inc. v. Fotona D. D.*, 2014 WL 12579802, at *4 (C.D. Cal. June 4, 2014) ("[E]ven assuming [plaintiff's] allegations are true, this Court is not

11

the place to resolve them."); *see also Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 179 (D. Mass. 2015) ("[T]he reliability of the data in [defendant's] articles is not fit for resolution in the form of a defamation lawsuit.  Instead, this is a case where 'the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury.'" (citation omitted)); *Immanuel v. CNN*, 618 F. Supp. 3d 557, 564 (S.D. Tex. 2022) ("unsettled matters of scientific or medical treatment that are the subject of ongoing public debate and deep public interest[] cannot give rise to defamation claims"); *Arthur v. Offit*, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) (medical debates not "subject to verification based upon a 'core of objective evidence'").

Applying this widely adopted law, the Court should dismiss the FAC.  As alleged in the FAC, the First Study reflects scientific opinions that interpret the data of the Study.  FAC ¶ 89 ("Based on the data reported, the First Study made the following critical conclusion . . . .").  The Study's authors are a professor of "Environmental and Architectural Engineering" at the Illinois Institute of Technology and other academics affiliated with academic institutions.  FAC ¶¶ 65, 78–82.  The First Study examines a "sufficiently novel area of research," *ONY*, 720 F.3d at 496–97, as demonstrated by the statements in the study itself—the study states that "little peer-reviewed literature exists on byproducts formation in either laboratory or field settings," FAC Ex. A at 3, that "the literature remains sparse and limited to a narrow range of technologies," and that the authors were "not aware of investigations of the effectiveness or potential for byproduct formation of bipolar ionization devices used in realistic settings, which present[ed] a knowledge gap that this work intends to fill," *id.* at 2–3.  The First Study was subject to peer review before publication.  *Id.* ¶¶ 5, 111.  And it was published in a semi-monthly scientific journal covering, among other topics, "[a]ir quality and airborne infection control in building science and engineering," directed primarily at scientists and academics studying indoor and built environments, and their impacts on

12

human health.  FAC ¶¶ 5, 122, Mot. Ex. 3.  The First Study thus presents the quintessential case in which evaluation of the Study's scientific conclusions "plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury."  *ONY*, 720 F.3d at 496–97.

Ample authority from outside and within this Circuit confirms the general applicability of the First Amendment protection for similar scientific conclusions.  For instance, in *Pacira BioSciences*, the Third Circuit addressed a claim regarding an article published in the scientific journal *Anesthesiology*.  In affirming dismissal of the complaint, the Third Circuit explained that "tentative scientific conclusions" in an academic journal were nonactionable opinion.  *Pacira BioSciences*, 63 F.4th at 246.  There, the district court had dismissed the claim with prejudice because "a scientific conclusion based on nonfraudulent data in an academic publication [wa]s not a 'fact' that can be proven false through litigation."  *Id.* at 244; *see also* 583 F. Supp. 3d at 654.

Courts within the Fourth Circuit—including in North Carolina—have followed suit.  In *TC Heartland LLC v. Schiffman*, the Middle District of North Carolina dismissed a defamation claim to the extent statements accurately summarized a scientific conclusion, holding that the defendant's statements about her "research conclusions" that had been published in peer-reviewed journal articles on the health effects of Splenda were nonactionable opinions.  Mot. Ex. 4 (*TC Heartland LLC v. Schiffman*, No. 1:23-cv-665, ECF No. 35 at 1–2 (M.D.N.C. May 5, 2025)).  The court found it "extremely difficult to see how" defendant's "recommendation to consumers that they avoid . . . Splenda" could "be characterized as false," particularly where there was no "plausible inference that [defendant's] research was based on fraudulent data."  *Id.* at 2–3 (citing *Daniels v. Metro Mag. Holding Co., LLC*, 179 N.C. App. 533, 539 (N.C. Ct. App. 2006)) (noting "expressions of opinion not asserting provable facts are protected speech").

Likewise, in *Malone v. WP Company, LLC*, the court dismissed defamation claims against the *Washington Post* for statements that a physician delivered misinformation about COVID vaccines, reasoning that "the statements at issue are part of the scientific debate over the efficacy of COVID-19 vaccine" and "declin[ing] Plaintiff's invitation to pick winners and losers in a scientific debate." 2023 WL 6447311, at \*4–5 (W.D. Va. Sept. 29, 2023) (noting "when an opinion is uttered in the 'marketplace of ideas' such that the statement might be corrected by discussion, the First Amendment will typically protect it"). In sum, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Id.* at 5.

As one court in the Fourth Circuit put it: a "rule requiring scientists and authors to guarantee the 'truth' of their hypotheses would inevitably lead to self-censorship and would stifle the very debate that leads to scientific knowledge." *Freyd*, 972 F. Supp. at 945. Given that "academic freedom is a special concern of the First Amendment," and "the chilling effect of protracted litigation can be especially severe for scholarly journals," *ONY*, 2012 WL 1835671, at \*8 (cleaned up), the Court should grant judgment in favor of Elsevier and dismiss the FAC.

**B.     The First Study's Conclusions Are Not Actionable Under A Traditional Opinion Analysis**

Apart from the widely adopted rule specifically protecting scientific opinions, analysis of the FAC under the generally applicable standard for assessing statements of opinion confirms the FAC fails to plead an actionable claim for defamation.

"[A] pure expression of opinion" cannot support a defamation claim "because it fails to assert actual fact." *Nucor Corp.*, 189 N.C. App. at 736. "[B]ecause the requirement that an alleged defamatory statement be of fact, rather than opinion, flows from the First Amendment . . . the Fourth Circuit's interpretation of the First Amendment controls." *Nobles v. Boyd*, 2015 WL 2165962, at \*9 (E.D.N.C. May 8, 2015). "Whether a statement is one of actionable fact is a

question of law for the court based on a fact-specific analysis of a 'statement's language and context to determine if it could be interpreted as asserting a fact.'" *RE Carroll Mgmt.*, 706 F. Supp. 3d at 539 (quoting *Biospherics*, 151 F.3d at 184). "Inclusion of underlying information used, explicit mention of unavailable data, and the lack of a challenge to the accuracy of the specific underlying information also tend to show that a reasonable reader would treat these statements as 'opinion of the author drawn from the circumstances related.'" *Id.* at 541.

Here, the tenor of the article and the authors' choice of words, the context of a peer-reviewed scientific publication, and the perspective of a reasonable reader all confirm that the First Study's conclusions are protected opinion.

### 1. The Tenor Of The Article And Authors' Choice of Words Reflect Opinion

To start, the tenor of the First Study is to repeatedly use language signaling that its conclusions are limited interpretive judgments, not statements of fact. Throughout the "Results" and "Discussion and conclusions" sections, the authors employ hedging language characteristic of scientific opinion. *See* FAC Ex. A at 7, 10, 12–13. For example, the article repeatedly states that the Study's "results suggest" particular findings—phrasing that indicates that the conclusions represent the authors' interpretation of the data.[5] *Id.*; *see Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) ("The prefatory 'I believe' or 'I think,' for example, conveys that a speaker is sharing a personal belief, not warranting facts"); *RE Carroll Mgmt.*, 706 F. Supp. 3d at 541 (report using "thinks" and "assessment" "signals opinion"). Similarly, the First Study repeatedly states

---

[5]   GPS repeatedly misstates the precise conclusions of the Study, alleging for example that Elsevier "falsely conclud[ed] that GPS's NPBI™ technology led to an increase in harmful byproducts[,]" FAC ¶ 116, omitting that these conclusions begin with "These data suggest," *see, e.g.*, FAC Ex. A at 9. And, as discussed, GPS previously represented to a different court that the ███████████████████████████████ Mot. Ex. 1 at 15.

that certain consequences "may be" occurring and "appeared to" lead to certain results, rather than making a decisive statement. FAC Ex. A at 2, 9–10, 12–13. Such "cautionary language" "suggests a statement of opinion rather than a defamatory falsehood." *Saad*, 123 F. Supp. 3d at 179; *see also Freyd*, 972 F. Supp. at 945–46 (holding "reasonable listener would recognize the[] subjective character" of defendant's statements on scientific matters given his "speculative language" and "qualifying his remarks").

The Study's framing further confirms its tentative nature. The authors explain that the lack of studies on NPBI technology "present[ed] a knowledge gap that this work intend[ed] to fill." FAC Ex. A at 3. This framing—identifying gaps in existing knowledge rather than claiming definitive answers—mirrors language that courts have found indicative of opinion. *See Pacira BioSciences*, 63 F.4th at 247 (study "identifies several 'knowledge gaps for future research,' including improving comparative data for certain metrics" which confirmed that "statements here are tentative scientific conclusions subject to revision"); *see also Kingsdown, Inc. v. Hinshaw*, 2016 WL 661823, at *20 (N.C. Ct. Super. Feb. 17, 2016) (dismissing defamation claim that "merely reflect[ed] Mr. Hood's contrary opinion").

Finally, the authors expressly acknowledge the Study's limitations: "This work is not without limitations and future directions for improvement" and "this work highlights the need to improve and standardize methods of testing air cleaning technologies to capture the net effects of contaminant removal and/or generation on indoor air." FAC Ex. A at 13. Courts consistently treat such express limitations as hallmarks of protected opinion. *See ONY*, 2012 WL 1835671, at *10 ("Rather than presenting the results of their study as conclusive, the authors of the Article acknowledged that the 'study has certain limitations due to the retrospective nature of the database used,' and that additional factors could likely affect the stated conclusions."); *Pacira Biosciences*,

583 F. Supp. 3d at 660 ("While Plaintiff has perhaps identified grounds for legitimate scholarly debate, it cannot breach the legal protection otherwise afforded to scientific conclusions."). Accordingly, the language the authors used in the First Study would be reasonably understood by the reader to convey an opinion drawn from the data and not an objective statement of fact.

### 2. The Broader Context And Circumstances Indicate The Statements Are Opinions

The First Study's publication in a peer-reviewed scientific journal further confirms that its conclusions are opinion. Courts recognize that "the peer-reviewed journal in which the Article was published is directed to a highly specialized group of readers" and, accordingly, the "average reader is thus likely not a novice in the field . . ., but brings a well-developed understanding of the issues facing" their fields. *See ONY*, 2012 WL 1835671, at \*10 (cleaned up); *Nucor Corp.*, 189 N.C. App. at 736 (North Carolina courts "consider how the alleged defamatory publication would have been understood by an average reader"); *Hopkins v. MWR Mgmt.*, 2017 WL 2380227, at \*16 (N.C. Super. Ct. May 31, 2017) (holding statement nonactionable where reasonable reader "clearly understood [it] as expressions of [an] opinion of [defendant's] legal rights").

Here, the First Study was published in *Building and Environment*, a peer-reviewed journal for professionals well-versed in the topic of human interaction with indoor and outdoor built environments. GPS alleges that the Journal's intended audience is "[c]ivil engineers, environmentalists, planners, architects and designers," FAC ¶ 121—a fact Elsevier Ltd. admits, ECF No. 191 ¶ 121—confirming that a reasonable reader of the First Study would be conversant in highly technical subject matters and would understand the conclusions drawn from the disclosed data to be the opinion of the authors. The Journal's sophisticated readership "were provided with the data and methodology on which the statements were based." *Pacira BioSciences*, 63 F.4th at 249 ("the journal's readers were provided the basis for the statements, have the expertise to assess

their merits based on the disclosed data and methodology, and thus are equipped to evaluate the opinions the authors reached"); *LTL Mgmt. LLC v. Moline*, 2024 WL 3219683, at *13 (D.N.J. June 28, 2024) ("analytical tone and tenor" of peer-reviewed journal article "notif[ied] readers that [defendant's] statements should be understood as scientific conclusions that are 'tentative and subject to revision'" where, *inter alia*, methodology and limitations of article were disclosed). Such "readers are specialists in their fields and are best positioned to identify opinions and 'choose to accept or reject [them] on the basis of an independent evaluation of the facts.'" *Pacira BioSciences*, 63 F.4th at 248 (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).

The "circumstances of [the First Study's] issuance" reinforce this conclusion. *See ONY*, 2012 WL 1835671, at *9. The research was conducted in the early days of the global COVID-19 pandemic, when indoor air quality and its effects on human health took on newfound public health importance. *See, e.g.*, FAC ¶ 65 (alleging study author Stephens first proposed the study in May 2020). The First Study sought to add to the public discourse and fill a "knowledge gap" surrounding the effects of NPBI technology on human health, FAC Ex. A at 3—a gap the CDC itself had identified, noting that ionization and similar technologies were "'emerging' technologies 'in the absence of an established body of peer-reviewed evidence showing proven efficacy and safety under as-used conditions.'" *Id.* Publishing research on an "emerging" technology during a public health emergency—in an academic journal dedicated to such issues—inherently marks the work as part of an ongoing, tentative scientific debate rather than a pronouncement of settled fact.

**3.      A Reasonable Reader Would Understand The Statements As Opinion**

Viewing the First Study as a whole, a reasonable reader would understand its conclusions as opinion rather than assertions of proven fact. "[E]ven if allegedly defamatory words pass the threshold test, they may still receive First Amendment protection: a verifiable statement . . . may be protected if it 'can best be understood from its language and context to represent the personal

view of the author or speaker who made it.'" *Knockout Holdings, LLC v. Kakar*, 2024 WL 3607443, at *3 (E.D. Va. July 31, 2024) (quoting *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987)); *see also RE Carroll Mgmt.*, 706 F. Supp. 3d at 541 (similar); *Daniels*, 179 N.C. App. at 541 ("[I]t is clear that Reeves' depiction of the processing of his [insurance] claim is a highly individualized, personal interpretation tainted by his own emotions, rather than a journalistic, factual recounting of events[,]" including "the most basic of plaintiff's actions in processing his claim.").

GPS cherry-picks isolated statements from a lengthy scientific article, but "when properly viewed in context, the statements in question readily appear[] to be nothing more than the author's personal inference from the test results." *Potomac Valve*, 829 F.2d at 1289-90; *Kingsdown*, 2016 WL 661823, at *13 (holding statement to newspaper that pending litigation claims were "reckless" was fairly understood as statements of opinion rather than objective, verifiable facts).

The First Study details the experiments conducted, discloses the underlying data, and expressly states that additional research is needed to better evaluate air purifiers. FAC Ex. A at 13–14. In this context, one "cannot conclude that a reasonable reader of the Article, even one lacking [scientific] acumen, would have concluded that the Article was conveying proven facts about the efficacy of Plaintiff's product." *ONY*, 2012 WL 1835671, at *10. Thus, "viewed in context," the challenged statements in the First Study constitute nonactionable opinion. *Knockout Holdings*, 2024 WL 3607443, at *3 (*quoting Potomac Valve*, 829 F.2d at 1289–90); *see also Gaunt v. Pittaway*, 135 N.C. App. 442, 449 (N.C. Ct. App. 1999) (statements that plaintiff had a practice of ordering unnecessary medical tests were opinion).

In fact, while GPS alleges in the FAC disagreement with the First Study's methodology, the disclosure of the underlying methodology and specific data used reinforces that the First Study

conveys the opinions of its authors. This "[i]nclusion of underlying information used, explicit mention of unavailable data, and the lack of a challenge to the accuracy of the specific underlying information also tend to show that a reasonable reader would treat these statements as 'opinion of the author drawn from the circumstances related.'" *RE Carroll Mgmt.*, 706 F. Supp. 3d at 541 (quoting *Biospherics*, 151 F.3d at 185); *see also Biospherics, Inc.*, 151 F.3d at 185 (internal quotation omitted) (When "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related."); *Potomac Valve*, 829 F.2d at 1289–90 ("The district court ruled that the statement was opinion based on…its context in the article as a whole" which made it clear that the "the statement is merely [defendant's] conclusion from the . . . specific points he outlines in the text of the article."). Put simply, "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Doe v. White Plains Hosp. Med. Ctr.*, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011), *aff'd*, 458 F. App'x 21 (2d Cir. Jan. 18, 2012).

*ONY* illustrates the point. There, the plaintiff did not allege that the study's conclusions were "patently false because there is evidence" contradicting them; instead, the plaintiff claimed the conclusions were "unreliable, and therefore misleading" on the ground that omitted data allowed the authors to "postulate, promote and disseminate false *conclusions*." *ONY*, 2012 WL 1835671, at *9 (emphasis in original). The court rejected this theory. Although the article did not discuss every piece of data the plaintiff deemed relevant, "the authors specifically listed what patient criteria *was* considered" in the study, "the Article reflect[ed] the facts on which the authors' conclusions [were] based," and it did "not imply that undisclosed facts also exist supporting the authors' conclusions." *Id.* at *10. The Second Circuit agreed with the district court that, absent

misrepresentations of the underlying data, allegations "that competent scientists would have included variables that were available to the defendant authors but that were not taken into account in their analysis" do not state a claim for defamation. *ONY*, 720 F.3d at 497.

The FAC suffers from the same defect. GPS "fails to appreciate the difference between 'verifiability' and 'reliability'" when its "allegations boil down to disagreements about the reliability of the methodology and data underlying the statements." *Pacira BioSciences*, 63 F.4th at 247. GPS makes much of allegedly "suppressed" and "excluded" data, but it simultaneously acknowledges that all relied-upon data were disclosed in the article or a link therein. *See* FAC ¶ 124 (defendants "provide[d] the content of the appendices in . . . a link" at the end of the article); FAC Ex. A at 14 ("Supplementary data to this article can be found online at https://doi.org/10.1016/j.buildenv.2021.107750"); *id.* at 16–20 (attaching the Study's supplementary data). Because readers had independent access to the dataset underlying the authors' conclusions, they could evaluate for themselves whether those conclusions followed from the data—the very circumstance that confirms a statement is opinion rather than fact. *See RE Carroll Mgmt.*, 706 F. Supp. 3d at 541 (*citing Biospherics*, 151 F.3d at 185).

*     *     *

In sum, the authors' measured conclusions concerning the observed effects of NPBI air purifiers—published during a global pandemic in a leading peer-reviewed journal—are protected opinion offering commentary in an ongoing debate about the technology. Considering the article's tone, language, disclosed data and context, a reasonable reader would understand the First Study's conclusions as the authors' interpretive judgments drawn from disclosed data—not a declaration of established fact. GPS's disagreement with those interpretations or the applied methodology does not transform opinion into actionable falsehood.

## II. METHODOLOGICAL DISAGREEMENTS DO NOT GIVE RISE TO A CLAIM FOR DEFAMATION

GPS cannot avoid dismissal through disagreement with the methodology and data selection used in the First Study. Alleging that the authors of the First Study should have conducted the study differently, considered different data, or weighed the relied-upon data differently cannot render false or defamatory any statement based on the methodology and data the authors did use. GPS's complaints about study design and data selection challenge the authors' scientific judgment calls, not verifiable facts.

A defamation claim requires "false, defamatory statements." *Demarco v. Charlotte-Mecklenburg Hosp. Auth.*, 268 N.C. App. 334, 343–44 (N.C. App. Ct. 2019). Statements "cannot be the subject of a defamation suit" unless they can "reasonably be interpreted as stating actual facts." *Id.* Statements that "cannot be described as either true or false . . . are not actionable." *Biospherics*, 151 F.3d at 183; *Desmond*, 375 N.C. at 68 (statement is only actionable if it "relates to the defamatory *facts* implied by a statement." (emphasis added)).

*First*, GPS's allegations as to the methodology and relied-upon data fail to give rise to an actionable defamation claim because these scientific judgments—how to design the study and which data to consider—are part-and-parcel of the protected scientific opinion. Here, GPS asserts the laboratory results are inaccurate because the test was conducted "in direct contravention of the manufacturer guidance" and without "consult[ing] GPS regarding how to install the GPS device in the chamber." FAC ¶ 74. GPS also alleges that the study lacked controls, failed to replicate experiments, and was otherwise "fundamentally flawed." FAC ¶¶ 17, 101–05. But "mere disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood." *Pacira Biosciences*, 63 F.4th at 247; *see also Hoey v. Insmed Inc.*, 2018 WL 902266, at *10 (D.N.J. Feb. 15, 2018) ("[C]ourts throughout the country have consistently rejected"

22

attempts to render scientific studies actionable "by attacking [their] underlying methodology."); *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 868 (N.D. Cal. 2020) ("It is insufficient to allege that the challenged statements . . . were false or misleading because the Defendants did not use Plaintiffs' preferred statistical methodology."); *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at \*8 (S.D.N.Y. May 29, 2013) (statement not actionable where "plaintiff's critiques all go toward the design of the study"). As discussed *supra*, at 17–18, readers of the First Study "were provided with the data and methodology on which the statements were based" and "have the expertise to assess their merits based on the disclosed data and methodology, and thus are equipped to evaluate the opinions the authors reached." *Pacira BioSciences*, 63 F.4th at 249.

*Second*, and independently, GPS never alleges that the First Study failed to employ the described methodology or that the relied-upon data were falsified. As a result, GPS neglects to plead the existence of any "false, defamatory statements," as required under North Carolina law. *Demarco*, 268 N.C. App. at 343–44. The authors' decisions on where and how to conduct the study are disclosed, FAC Ex. A at 3–7, and GPS does not allege that the data supporting the Study's conclusion were fabricated, *see, e.g.*, FAC ¶ 95—only that the authors could have designed the study differently or relied more heavily on different data. That is not enough. *See Biolase*, 2014 WL 12579802, at \*4 (dismissing claim where plaintiff did not allege the "studies described in the articles weren't actually performed or that they didn't produce the findings described" but rather claimed the "methodologies used in the studies . . . are unreliable"). Any such assertion "is alleging that Defendants should have used different . . . methodologies, not that Defendants misrepresented the results they obtained from the methodologies they employed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012).

*Finally*, while GPS complains that the authors should have relied on different data, that likewise fails to plead any falsity. Allegations that an author "failed to consider certain data, or to draw a 'correct' conclusion based on the data . . . are nonactionable." *LTL Mgmt.*, 2024 WL 3219683, at *9 n.13; *see also Pacira BioSciences*, 63 F.4th at 247 (allegation that articles "disregarded studies" and "failed to consider a relevant procedure . . . cannot create an actionable falsehood"). Indeed, "a scientific conclusion need not account for every piece of data that was not relied on to receive protection." *Pacira Biosciences*, 583 F. Supp. 3d at 660.

Every empirical study requires judgment about which data to credit—excluding outliers, selecting among scientific methods, assessing instrument reliability. And here, by repeatedly using phrases such as "these data suggest," rather than making categorical assertions about NPBI technology, *see, e.g.*, FAC Ex. A at 9, 13, the authors confined their conclusions to the disclosed dataset. No reasonable reader would understand these statements to claim that the conclusions hold regardless of what other data might be considered. *See ONY*, 720 F.3d at 497–98; *Biolase*, 2014 WL 12579802, at *5; *cf. Joseph v. Springer Nature*, 2021 WL 1372952, at *7 (S.D.N.Y. April 12, 2021) (dismissing libel claim where conclusion "is ultimately a critique of a scientific work").[6]

## CONCLUSION

For the foregoing reasons, Elsevier respectfully requests that the Court dismiss the First Amended Complaint with prejudice.

Dated: April 17, 2026

---

[6] Publication of a corrigendum to clarify the methodological choice does not alter this conclusion. *See LTL Mgmt.*, 2024 WL 3219683, at *11 (noting publication of "erratum does not plausibly demonstrate that she fabricated or falsified data").

QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ *Rachel E. Epstein*

Rachel E. Epstein
N.Y. Bar No. 4795092
(*admitted pro hac vice*)
rachelepstein@quinnemanuel.com
Ellyde R. Thompson
N.Y. Bar No. 4729687
ellydethompson@quinnemanuel.com
(admitted *pro hac vice*)
JP Kernisan
N.Y. Bar No. 4817045
jpkernisan@quinnemanuel.com
(admitted *pro hac vice*)
Nicholas A. LoCastro
N.Y. Bar No. 5477286
nicholaslocastro@quinnemanuel.com
(admitted *pro hac vice*)
295 5th Avenue
New York, New York 10016-7103
Phone: (212) 849-7485

**POYNER SPRUILL LLP**

/s/ *Andrew H. Erteschik*

Andrew H. Erteschik
N.C. Bar No. 35269
aerteschik@poynerspruill.com
Paul M. Cox
N.C. Bar No. 49146
pcox@poynerspruill.com
John Michael ("J.M.") Durnovich
N.C. Bar No. 47715
jdurnovich@poynerspruill.com
N. Cosmo Zinkow
N.C. Bar No. 53778
nzinkow@poynerspruill.com
P.O. Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-2895

*Counsel for Defendants*

25

## <u>AI Certification</u>

I certify that no artificial intelligence was employed while conducting the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. I further certify that every statement and every citation to an authority contained in this document has been checked by an attorney in the case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 17th day of April, 2026.

/s/ *Rachel E. Epstein*
Rachel E. Epstein

## Certificate of Word Count Compliance

Pursuant to the Pretrial Order and Case Management Plan (ECF No. 168), I certify that the annexed Memorandum of Law is no more than 25 pages, inclusive of caption but excluding signatures and certificates of counsel.

This the 17th day of April, 2026.

/s/ *Rachel E. Epstein*
Rachel E. Epstein

## Certificate of Service

I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

This the 17th day of April, 2026.

/s/ John Michael Durnovich
John Michael ("J.M.") Durnovich