**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| GLOBAL PLASMA SOLUTIONS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>ELSEVIER INC. and ELSEVIER LTD.,<br><br>*Defendants*. | Civil Action No. 3:22-cv-00034-KDB-WCM |

**<u>PLAINTIFF'S OPPOSITION TO ELSEVIER'S MOTION TO EXCLUDE PUBLISHING EXPERT EVIDENCE AND TESTIMONY</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. FACTUAL AND PROCEDURAL BACKGROUND .......... 3

A. Case Background .......... 3

B. Wasserman's Opening Opinions .......... 4

C. Marks's Opinions .......... 5

D. Wasserman's Rebuttal .......... 7

E. Dr. Storey's Rebuttal Opinions .......... 8

III. LEGAL STANDARD .......... 9

IV. ARGUMENT .......... 10

A. Wasserman has sufficient expertise from decades of experience in publishing to offer opinions in this action. .......... 10

B. Both Wasserman and Dr. Storey appropriately rely on their experience and applicable industry standards in forming their opinions. .......... 16

V. CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Blackjewel L.L.C.*,
643 B.R. 128 (Bankr. S.D.W. Va. 2022) ....................21

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
144 F.4th 238 (4th Cir. 2025) ....................14

*Brasko v. First Nat'l Bank of Pa.*,
700 F. Supp. 3d 354 (D. Md. 2023) ....................15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................2, 9, 21

*JFJ Toys, Inc. v. Sears Holdings Corp.*,
237 F. Supp. 3d 311 (D. Md. 2017) ....................14

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ....................9

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig*,
892 F.3d 624 (4th Cir. 2018) ....................10

*M-Edge Accessories LLC v. Amazon.com Inc.*,
No. CIV.A. MJG-11-3332, 2015 WL 403164 (D. Md. Jan. 29, 2015) ....................20

*Melendez-Diaz v Massachusetts*,
557 U.S. 305 (2009) ....................17

*Oglesby v. Gen. Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ....................14

*In re Pella Corp. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
269 F. Supp. 3d 685 (D.S.C. 2017) ....................18

*Rowedder v. Primal Vantage Co., Inc.*,
No. CV 2:22-2371-RMG, 2024 WL 3424724 (D.S.C. July 15, 2024) ....................16

*United States ex rel. Shepherd v. Fluor Corp.*,
No. 6:13-cv-02428-JD, 2026 WL 105724 (D.S.C. Jan. 14, 2026) ....................15

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ....................15

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ....................10, 13

*United States v. Aman*,
748 F. Supp. 2d 531 (E.D. Va. 2010) ....................17

*United States v. Graham*,
No. 4:23-CR-00006, 2024 WL 688256 (W.D. Va. Feb. 20, 2024) ....................17

*United States v. Wilson*,
484 F.3d 267 (4th Cir. 2007) ....................10, 16

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ....................9

*Wiener v. AXA Equitable Life Ins. Co.*,
481 F. Supp. 3d 551 (W.D.N.C. 2020) ....................9

*Williams v. Sig Sauer, Inc.*,
799 F. Supp. 3d 470 (E.D.N.C. 2025)....................14

*Zellers v. NexTech Ne., LLC*,
533 F. App'x 192 (4th Cir. 2013) (per curiam) ....................14

*Zp No. 332, LLC v. Huffman Contractors, Inc.*,
No. 2:24-CV-611, 2025 WL 3174929 (E.D. Va. Nov. 13, 2025) ....................18

**Other Authorities**

Fed. R. Evid. 702 ....................2, 9, 16

# I. INTRODUCTION

In March of 2021, Defendants Elsevier Inc. and Elsevier Ltd. ("Elsevier" or "Defendants") published a false and defamatory article in their journal *Building and Environment* ("BAE") titled "Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation" (the "First Test"). Elsevier then advertised the First Test as rigorously verified by peer review, even though two of the three peer reviewers did not accept the First Test for publication, and the third who accepted the article requested a significant change that was never implemented.

Elsevier's misconduct in publishing the First Test was at best reckless at every step of the process. It assigned the First Test to an overworked editor who had long been complaining to Elsevier that he was being assigned too many articles to review and his quality and the quality of submitted articles was declining. He noted that Elsevier was "driven by profits" and expressly told his boss at Elsevier that the publisher was putting "quantity over quality" and that his work quality had steadily declined, preventing him from adequately reviewing the articles assigned to him. Elsevier had actual knowledge of and ignored the fact that two of the three peer reviewers did not accept the First Test for publication directly in contravention of Elsevier's own internal guidelines and policies. It also ignored that the authors failed to make a significant change to the article requested by the only peer reviewer who accepted the article. Elsevier nevertheless published the First Test as being "peer reviewed."

GPS retained Steve Wasserman, an expert with decades of publishing experience including serving as editor-at-large for Yale University, to opine regarding publishing industry standards and how they apply to this case. Elsevier, in turn, attempted to rebut Wasserman's publishing opinions with the opinions of its expert Jayne Marks. Wasserman responded to Marks' opinions, as did another of GPS's experts, Dr. John Storey, based on his significant experience with the peer review

process from both a peer reviewer and a session organizer's (which is analogous to an journal editor) perspective. Elsevier now asks the Court to exclude the publishing opinions of Wasserman and Dr. Storey entirely (Doc. 271) (the "Motion").

Wasserman's and Dr. Storey's opinions are plainly admissible under Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Both have highly relevant expertise gained through their professional experiences. And they appropriately identify and apply recognized industry guidelines where relevant and appropriate, and for aspects of the First Test's publication process where no guideline is on point, appropriately apply their experience to explain why the First Test should never have been published. While Elsevier disagrees with their opinions, the proper recourse is for it to (1) rigorously cross examine GPS's experts; (2) offer Marks's conflicting opinions (which, as is appropriate in this field, are similarly significantly experience-based rather than being tied to a specific standard); and (3) argue to the jury why it should credit Marks and not Wasserman and Dr. Storey. The Motion should therefore be denied.[1]

[1] Elsevier asserts in a footnote that if the Court does not exclude Wasserman's and Dr. Storey's opinions, then it plans to "challenge the relevance of these opinions to the defamation claim through a motion *in limine*" because "[d]etermining whether Elsevier did or did not comply with publishing industry standards is therefore not the relevant inquiry; what matters is whether Elsevier published the First Study knowing the allegedly defamatory statements contained within were false or with a reckless disregard for their truth." Doc. 272 at 3 n.1. While this challenge is not before the Court, Elsevier's compliance with relevant industry standards is highly relevant. At the outset, Elsevier's blatant disregard for publishing standards made it highly likely that false articles would make it to publication, yet Elsevier published the First Test anyway with reckless disregard to its falsity. Moreover, Elsevier violated publishing standards by ignoring the peer reviewers who pointed out the significant problems with the First Test, despite those peer reviewers putting it on notice that the First Test was deeply flawed and drew invalid conclusions. Finally, the Court has not yet decided whether actual malice or negligence is the relevant standard for GPS's defamation claim. GPS maintains negligence is the appropriate standard, and whether Elsevier complied with publishing industry standards is obviously relevant to a negligence inquiry.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Case Background

On March 7, 2021, Elsevier, the largest scientific publisher in the world, published the false and defamatory First Test, which purported to test GPS's needlepoint bipolar ionization ("NPBI™") device and falsely claimed it produced harmful chemicals in the air. Doc. 233 ("SAC") ¶ 1; *see also* SAC Ex. A (First Test). Elsevier advertised the First Test as having been subject to a "rigorous peer review process" that "maintain[s] the highest standards of quality." SAC ¶ 121. These representations and advertising to the public were false. Instead, the First Test was an attempted product test with manipulated and falsified data that failed to meet even basic scientific standards. *Id.* ¶¶ 73-78. The authors of the First Test used Elsevier to achieve a commercial hit-job knowing Elsevier would fast-track publication with minimal to no review. Elsevier in fact rushed publication of the First Test as part of its overall strategy of maximizing profit over quality.

Elsevier assigned the article to an overworked editor who had long been pulling the alarm about Elsevier's declining quality. The editor then solicited peer reviewers for the First Test, with three ultimately agreeing to review it. *Id.* ¶ 124. Not a single one of these three peer reviewers approved the First Test for publication when it was originally submitted, with one saying it should be rejected outright and two others saying it needed to be revised, with one reviewer saying it needed "major" revisions. *Id.* Elsevier completely disregarded the recommendation of the reviewer who recommended the First Test should be rejected outright and cut him out of the remainder of the process entirely, never asking him to review any subsequent revised versions of the First Test prior to publication, contrary to Elsevier's own procedures. *Id.* Of the remaining two peer reviewers, one failed the article in every major category after the first revision and required "major revisions," and the third peer reviewer "accept[ed]" the article but asked for a significant revision

that was ignored by the authors and Elsevier. *Id.* Elsevier published the First Test against its own guidelines and industry standards.

## B. Wasserman's Opening Opinions

Wasserman has decades of publishing experience across numerous types of publications, including as deputy editor of the daily op-ed page and weekly opinion section of the *Los Angeles Times*, editorial director of New Republic Books, editorial director of Times Books at Random House, editor at large for Yale University Press, and publisher of Heyday, an independent nonprofit press. Wasserman Opening Rep. (Doc. 276-1) at 1.[2] His opinions draw on this significant publishing experience, including experience with the peer review process from his time at Yale University Press, where all manuscripts were assessed by blind peer review. *Id.* at 5. Wasserman also draws on industry guidelines published by the Committee on Publication Ethics ("COPE") where relevant and appropriate. *Id.* at 5-8.

Wasserman's opening report offers four principal opinions based on his experience and his resulting familiarity with publishing industry standards. First, the First Test should have been treated with appropriate care by Elsevier because it was a commercial product test that attacked GPS by name. *Id.* at 10-12. Given the significant risk the First Test posed to GPS's business and given the product-test nature of the article, Wasserman opines that industry standards impose on Elsevier "an obligation to share its findings with GPS to solicit its response or comment before rushing to print." *Id.* at 12. Wasserman next opines that Elsevier violated industry standards by assigning the First Test to editor Bert Blocken despite knowing he did not have expertise in the First Test's subject matter and had raised significant concerns about his workload, including telling the Elsevier employee responsible for managing BAE that his "workload has become

---

[2] Citations to reports previously filed on the docket refer to the report's original pagination as opposed to the pagination automatically applied by the ECF system.

unsustainable" and that "the "quality of at least [his] work for the journal has been declining, due to the constant overload of papers coming in." *Id.* at 10-11 & n.41. Third, Wasserman opines that Elsevier violated industry standards by ignoring the concerns its peer reviewers raised regarding the First Test and the failure of Elsevier to obtain at least majority acceptance from the reviewers. *Id.* at 12. Finally, Wasserman opines that by publishing the First Test with only one out of three peer reviewers accepting the First Test, Elsevier violated both its own publishing standards and those of the industry as a whole. *Id.* at 10, 13.

**C. Marks's Opinions**

Elsevier retained Marks to respond to Wasserman's opinions regarding the First Test's publication process. Ex. 1,[3] Marks Opening Rep. ¶ 1. She bases her opinions on her "experience in the field of scientific publishing and the documents [she] reviewed in this matter." *Id.* ¶ 45. In responding to Wasserman, Marks criticizes Wasserman for his lack of experience in Scientific, Technical, and Medical ("STM") publishing, *id.* ¶ 19, but fails to identify any STM-specific standard that would apply to this case. She instead states that STM is driven by the two "lodestars" of "editorial independence" and "peer review," never even attempting to explain why these concepts are somehow STM-specific as opposed to being applicable throughout the publishing industry. *Id.* ¶ 25. In doing so, she implicitly admits there is no specific STM standard and never cites to one. Thus, despite Mark's suggestion that STM publishing is different, the label STM just designates the subject matter of the journals.

Nor could Elsevier's own expert articulate any unique STM standard when pressed in her deposition. In fact, Marks admitted she applied no real standard at all except to say, "[t]he standard is that it is down to the editor to use their judgment. That's what the editor is there for." Ex. 2,

[3] Unless otherwise stated, exhibits refer to the exhibits to the Declaration of Hannah K. Caison, filed contemporaneously herewith.

Marks Dep. Tr. 222:4-6. Marks doubled down on this position that there is no real standard, stating "it's always an option for an editor to make their own judgment on the full peer review." *Id.* 227:4-6. Marks's opinions therefore articulate no real standard, much less any standard established in STM publishing.

Marks's opinions are also directly at odds with Elsevier's own internal guidelines for peer review. Elsevier's own guidelines require the editor to send the next revision of the article back to the peer reviewer who made that decision in order to get a final decision from that peer reviewer. Wasserman Opening Rep. (Doc. 276-1) at 10; ELSEVIER_00010670 (Doc. 210-2) at 10673. Elsevier has not contested that Blocken failed to send the further-revised First Test manuscript back to the reviewer who maintained the First Test needed further "major revisions." Marks simply answered "I don't know" as to why Blocken would do that despite Elsevier's guidelines. Ex. 2, Marks Dep. Tr. 231:19-233:3. Marks also admitted she had no substantive understanding of any reviewer recommendations, *id.* at 95:2-13, so she would not have been able to evaluate whether the authors actually addressed the areas needing major revision or whether Blocken's decision not to send the First Test back for the reviewer to make that assessment himself was proper. Similarly, when asked about the impact of a peer reviewer requiring "major revision," Marks speculated that these labels are just "one piece" of the review and thus play little role in the editor's ultimate determination. *Id.* 199:23-200:1. Accordingly, Marks's opinion minimizes a peer reviewer's decision of "major revision" and suggests an editor can unilaterally disregard that decision despite Elsevier's own policies. Ex. 1, Marks Rep. ¶ 87.

Similarly, Elsevier's guidelines require an article be rejected if it receives both a "reject" and "major revision" decision, like the First Test did here. Wasserman Opening Rep. (Doc. 276-1) at 10; ELSEVIER_00010670 (Doc. 210-2) at 10673. Yet Marks opines that the peer review of

the First Test functioned in accordance with "industry standards" and Elsevier's prior practice, opining that it was appropriate for Blocken to ignore Reviewer #2's reject recommendation because it did not contain detailed comments from the reviewer. Ex. 1, Marks Rep. ¶¶ 17, 75, 79. Again, Marks had no substantive understanding of any reviewer recommendations, Ex. 2, Marks Dep. Tr. 95:2-13, so she is not qualified to opine regarding whether Reviewer #2's comments could be properly ignored. Instead, she merely adopted Elsevier's position in the lawsuit.

In sum, Marks cites no STM-specific standard as discussed above, opines the editor has full discretion, and ignores Elsevier's own guidelines in favor of adopting Elsevier's litigation position and espousing her personal opinion.

**D. Wasserman's Rebuttal**

Wasserman substantially disagreed with Marks's opinions. First, he rejected her characterization of STM and academic publishing as materially different. Wasserman Rebuttal Rep. (Doc. 276-3) at 1-6. He then explained that, while Marks had attempted to undermine his opinion that the First Test required additional care by saying that there is no special "high-risk" category of articles in STM publishing, this was a mischaracterization of his overarching opinion that the First Test was a product test of a commercial product and therefore the "proposed article posed risks that should have raised red flags, red flags that should have been compounded given the deep reservations expressed by at least two of the three peer reviewers who examined the First Study prior to publication." *Id.* at 6-7. He further emphasized that while Marks downplayed the level of alarm that Blocken had raised regarding his workload and quality, Blocken's repeated emphasis that his workload was unsustainable should have prevented his assignment as editor. *Id.* at 11-12. And he notes that Blocken appeared to have a conflict of interest and a relationship with a GPS competitor, making his assignment as editor even more alarming. *Id.* at 12-13. Finally, he observed the inherent contradiction in Marks's opinions that an editor like Blocken can exercise

significant judgment regarding which reviewer opinions to credit and which to ignore while still allowing Elsevier to rely on (and advertise) the peer review process as providing credibility to the First Study and insulating Elsevier from liability. *Id.* at 13. He observed that the First Test's publication was deficient at every step and that Elsevier was ultimately responsible for those deficiencies. *Id.* at 16.

**E. Dr. Storey's Rebuttal Opinions**

GPS's expert Dr. Storey also offered opinions to rebut Marks. Dr. Storey holds a Ph.D. in environmental chemistry and spent his career as a researcher at Oak Ridge National Laboratory. Storey Opening Rep. (Doc. 286-2) at 1. He has authored more than two hundred peer-reviewed articles and abstracts and sixty-six journal papers. Storey Rebuttal Rep. (Doc. 276-5) at 15. He has also served as a peer reviewer on dozens of journal papers and oversaw the peer review process in his role as a session organizer for the Society of Automotive Engineers. *Id.* The role of session organizer was the equivalent to being a journal editor, Ex. 3, Storey Dep. Tr. 49:10-15, a role Marks has never served in. Based on this significant experience with the peer review process, Dr. Storey explained that a reviewer who recommends a major revision should be invited to re-review a further revision. Storey Rebuttal Rep. (Doc. 276-5) at 15-16. Dr. Storey further explained that rather than disregarding a reviewer's recommendation for a purported lack of sufficient comments, an editor should either work to understand the recommendation by reaching out to the reviewer or should invite another reviewer if needed rather than going without that review. *Id.* at 16. He further opined that a reviewer who rejects a manuscript should still be given the opportunity to review any further revisions to the manuscript. *Id.* Finally, he opines that it is not standard for an editor to make the final decision to publish an article without at least two accept recommendations and that it was therefore inappropriate to characterize the First Test as peer reviewed rather than editor-approved. *Id.*

## III. LEGAL STANDARD

Rule 702 creates a "gatekeeping role for the judge" to ensure that an "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 592). "A witness's qualifications to render an expert opinion are 'liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education.'" *Wiener v. AXA Equitable Life Ins. Co.*, 481 F. Supp. 3d 551, 558 (W.D.N.C. 2020) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)). The purpose of the Rule 702 inquiry is ultimately to make certain that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

*Daubert*'s gatekeeping role is "flexible," *id.* at 158, and courts have "broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved," *Westberry*, 178 F.3d at 261. Importantly, the "trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig*, 892 F.3d 624, 631 (4th Cir. 2018).

## IV. ARGUMENT

### A. Wasserman has sufficient expertise from decades of experience in publishing to offer opinions in this action.

Elsevier argues that Wasserman should be disqualified because he has no experience in STM publishing. Doc. 272 at 11.[4] However, as discussed in detail below, Wasserman is qualified based on his relevant experience, there are no specific STM publishing standards applied by Elsevier's own expert that are relevant to the facts of this case, and there is no STM-specific standard for defamation cases.

The Fourth Circuit has made clear that "experience alone" can provide a "sufficient foundation for expert testimony." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). To be qualified by experience, a purported expert's experience in the relevant field need only be "satisfactory." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989). Wasserman more than meets this standard. He has nearly five decades of publishing experience across multiple disciplines, including in academic, peer-reviewed publishing. Wasserman Opening Rep. (Doc. 276-1) at 1. He explains that his deep familiarity with the publishing field means he is, of course, familiar with standards in that field. *Id.* at 1-2. And he opines as to how those standards applied to Elsevier's conduct at issue in this case. *Id.* at 3. That is the heartland of what an experiential expert does, and Wasserman's testimony therefore plainly has a sufficient foundation.

Elsevier's arguments that Wasserman should be disqualified because he has no experience in STM publishing are a red-herring. Elsevier's own expert, Marks, does not put herself forward as a scientific expert nor is she a scientist. Ex. 2, Marks Dep. Tr. 17:15-16. Indeed, Marks admitted in her deposition that she cannot opine on the substance of any of the decisions made by the editor

[4] Citations to Elsevier's brief refer to the page numbers originally appearing on the page generated by Microsoft Word as opposed to the pagination automatically applied by the ECF system.

or peer reviewers in this case, as she's not a scientist or subject-matter expert in the scientific field. *Id.* at 17:15-18:21, 93:17-94:5, 217:7-218:5. Nor has Marks ever served as a peer reviewer or academic journal editor. The basis for the experiential opinions she offers is that, just like Wasserman, Marks has been involved with publishing and the peer review process.

Notably, Wasserman does not purport to be an expert on "scientific peer review" in particular; to the contrary, as he emphasized in his rebuttal there are no standards that apply to "scientific peer review" specifically rather than the publishing industry as a whole. Wasserman Rebuttal Rep. (Doc. 276-3) at 1-6. Elsevier's entire argument for exclusion therefore rests entirely on its position that Mr. Wasserman cannot opine on general publishing standards because of the false distinction Elsevier draws between STM publishing and other types of publishing, like academic or book publishing. Doc. 272 at 11-12.

At the outset, Elsevier's arguments fail because they have not identified any distinct legal standard that applies to defamation cases regarding STM articles as opposed to articles of another subject matter. Nor does one exist. Accordingly, the jury will assess this case as it would any other defamation case, so Wasserman's general publishing experience is applicable to the question for the jury: what is the applicable standard for publishing. Elsevier's attempted distinction fails based on that basis alone.

Moreover, as discussed above, STM simply stands for "Scientific, Technical, and Medical" and merely signifies the subject matter of the articles being published. Elsevier offers no argument as to why publishing standards differ based on the subject matter of the articles being published. It simply asserts that "STM journal publishing … follows its own industry standards." Doc. 272 at 13. But as noted above, Marks fails to identify any specific STM standards applicable to the First Test's peer review process. Mr. Wasserman, on the other hand, opines at length as to why the

standards applicable in STM publishing and other types of publishing are *not* distinct—regardless of subject matter, publishers conduct peer review, tailor publications based on their audience, must be mindful of timeliness, and must ensure editors are unbiased and conflict-free. Wasserman Rebuttal Rep. (Doc. 276-3) at 1-5. And, Mr. Wasserman opines, publishers in all fields have the same key functions that Marks identified for STM publishing. *Id.* at 5-6. Elsevier is free to interrogate Wasserman's opinion that publishing standards are the same across subjects on cross examination, but it is not a reason for exclusion. Wasserman's significant experience with publishing and peer review is appropriate and relevant to this case in giving his opinions related to publishing standards.

Elsevier's remaining arguments rely on selectively quoting from Wasserman's deposition and wholly ignoring portions of his experience. For example, while Elsevier does make a passing reference to Wasserman's wide-ranging experience in "newspapers, magazines, and general-interest books," it tries to minimize that experience by characterizing it as work on only "obscure books" that are "not peer reviewed." Doc. 272 at 12. That is simply incorrect. Wasserman's reference to two specific titles he has published—"The Curious World of Seaweed" and the "California Field Atlas"—was in response to Elsevier's counsel questioning him regarding whether he has published any "environmental and climate" books in his *current* position with Heyday Books, where he has been since 2016. Ex. 4, Wasserman Dep. Tr. 37:22-38:11; Wasserman Opening Rep. (Doc. 276-1) at 14. As Wasserman confirmed, he does, in fact, publish such books in his current role. Of course, Wasserman's experience with the publishing industry and publishing standards is not limited to his current role with Heyday—to the contrary, as he testified, he was involved in scholarly and often peer-reviewed publications throughout his career,

including while at Yale University Press and the Los Angeles Times. Ex. 4, Wasserman Dep. Tr. 39:6-22.

Elsevier also similarly mischaracterizes Wasserman's familiarity with the topics about which he actually offers expert opinions. For example, it claims that Wasserman "concedes that determining whether publishing industry standards actually give rise to the obligations that he claims Elsevier failed to uphold in this case is outside of his own expertise." Doc. 272 at 5. That broad statement is not what Wasserman stated at the cited portion of his deposition. Instead, he was asked a specific question regarding whether he knew of a *specific* STM journal that "requires seeking comment as a matter of practice" and he answered that he was "not [a] regular reader of STM journals." Ex. 4, Wasserman Dep. Tr. 253:21-254:9. But whether Wasserman knows the specific requirements any one STM journal imposes does not mean he is unqualified to testify that, as a standard across the publishing industry, publishers of product tests should seek comment from a manufacturer prior to publishing an article naming a specific company and claiming that company's products are harmful.[5] *See Lorillard*, 878 F.2d at 799 ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion."). Moreover, both Marks and Wasserman examine and analyze Elsevier's specific guidelines for BAE. When asked about her knowledge of other specific journal guidelines, Marks similarly testified she did not know. Ex. 2, Marks Dep. Tr. 56:5-9

Similarly, Elsevier's argument that Wasserman concedes he is "just 'a layperson' when it comes to understanding the processes and metrics applied by publishers of peer-reviewed,

---

[5] Elsevier's statement that "in his role as a publisher, Wasserman has never sought comment on a publication," Doc. 272 at 6 n.3, similarly mischaracterizes his testimony. Wasserman testified that as a publisher he "urged" others to seek comment from the subject of an article or book and that if the reporter covering the subject had in fact failed to seek comment despite his urging he "would not have hesitated to do so" himself. Ex. 4, Wasserman Dep. Tr. 245:21-246:11.

scientific journals," Doc. 272 at 5, again mischaracterizes Wasserman's testimony. He testified that he was a "layperson" as to the journal "impact factors" included in a BAE informational document. Ex. 4, Wasserman Dep. Tr. 197:19-198:19. But at no point does Wasserman purport to be an expert on journal impact factors; indeed, the term never even appears in his reports. That Wasserman is a layperson as to a topic on which he does not offer an opinion has no bearing on his expertise as to the topic on which he *does* actually opine—publishing standards.

These cherry-picked points by Elsevier do not support disqualification of Wasserman. Elsevier's cases do not say otherwise. For example, in *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238 (4th Cir. 2025), the Fourth Circuit found that a purported expert's general experience in "international business and contracting" was insufficient to qualify him as an expert in "patent renewal services," a topic on which he admitted he had no experience whatsoever. *Brainchild*, 144 F.4th at 254. By contrast, here, GPS seeks to qualify Wasserman as a publishing expert based on his significant experience in publishing.

Elsevier's other cases similarly and uncontroversially hold that an expert with experience in one area cannot testify as an expert regarding an entirely different and often highly specialized area, points which do not support Wasserman's disqualification in the instant case. *See Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 197 (4th Cir. 2013) (per curiam) (neurologist with no training in toxicology could not provide expert testimony as to toxicity); *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 323 (D. Md. 2017) (purported expert who did not sell rocket toys could not provide testimony regarding the rocket-toy market or the likelihood of brand confusion when the term "stomp rocket" was used); *Williams v. Sig Sauer, Inc.*, 799 F. Supp. 3d 470, 482 (E.D.N.C. 2025) (purported expert's lack of experience with allegedly defective product at issue warranted exclusion because he had only done "limited work" on a different product with

several material differences from the at-issue product); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247-49 (4th Cir. 1999) (purported expert with no experience with particular automobile part could not testify regarding part's operation); *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 393 (D. Md. 2001) (purported expert with "no professional experience with respect to the design, manufacture, operation, or safety of outdoor power equipment, including snow throwers" could not testify regarding the "safe design and operation of snow throwers"); *Brasko v. First Nat'l Bank of Pa.*, 700 F. Supp. 3d 354, 368 (D. Md. 2023) (purported expert without experience implementing, monitoring, or auditing RESPA program could not offer expert testimony regarding "RESPA compliance safeguards").

Notably, many of Elsevier's examples are product cases where an expert must testify as to the specifics of how a particular product works; accordingly, a lack of familiarity with that particular product was unsurprisingly fatal to the expert's qualification. Others are cases where an expert sought to testify regarding a specific, often highly technical topic within a broader field where the expert, despite having other experience in the field, had no familiarity with the specific topic. These examples were not, as is the case here, instances where an expert with experience in a particular field is providing testimony regarding that field's generally applicable standards. Indeed, as one of Elsevier's cases confirms, while an "expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering," he can no doubt testify regarding "general engineering principles." *Shreve*, 166 F. Supp. at 392.

Accordingly, unlike the cases Elsevier cites, Wasserman's opinions regarding generally applicable publishing standards are well within his "demonstrated professional domain." *United States ex rel. Shepherd v. Fluor Corp.*, No. 6:13-cv-02428-JD, 2026 WL 105724, at *4 (D.S.C.

Jan. 14, 2026) (expert with "experience overseeing logistics operations, materials accountability, and supply systems" qualified to testify as an expert regarding "logistics and inventory-management concepts"); *see also Rowedder v. Primal Vantage Co., Inc.*, No. CV 2:22-2371-RMG, 2024 WL 3424724, at *2 (D.S.C. July 15, 2024) (despite not being an engineer, because of his experience and familiarity with the industry, expert could testify as to "what he believes constitute best practices for a manufacturer or importer of products such as Primal and how Primal did not live up to those standards considering the evidence adduced in this case and cited in his report").

Wasserman is therefore sufficiently qualified based on his significant publishing experience and his opinions should not be excluded.

**B. Both Wasserman and Dr. Storey appropriately rely on their experience and applicable industry standards in forming their opinions.**

Elsevier next argues that both Wasserman's and Dr. Storey's publishing opinions should be excluded because they fail to employ a reliable methodology. But both experts rely on an acceptable methodology—their personal experience regarding publishing standards, Wasserman from the perspective of a publisher with decades of experience and Dr. Storey from the perspective of both a peer reviewer himself and his role managing the peer review process in his role as a session organizer. That is entirely proper. Indeed, in "certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. To be sure, "there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *Wilson*, 484 F.3d at 274. But courts are clear that experience is a sufficiently reliable methodology; an expert seeking to be qualified by experience need only "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.*

That is precisely what both Wasserman and Dr. Storey do. Elsevier argues that Wasserman and Dr. Storey fail to meet this standard because their opinions that Elsevier failed to adhere to publishing standards are based on Wasserman's "judgment" or on what "seems 'appropriate" to Dr. Storey. Doc. 272 at 14-15. But that is precisely what an experiential expert does—explain the relevant standards garnered from their experience and provide their expert judgment regarding whether that standard was satisfied. *See United States v. Aman*, 748 F. Supp. 2d 531, 541 (E.D. Va. 2010) (collecting cases demonstrating that "experts across various fields routinely must rely on the exercise of judgment in their work, and this fact alone does not prevent them from offering reliable, admissible opinions in court"); *United States v. Graham*, No. 4:23-CR-00006, 2024 WL 688256, at *7 (W.D. Va. Feb. 20, 2024) ("[A]n expert's qualitative final judgment is not a smoking gun that precludes a finding of testability or reliability."). Notably, Elsevier's expert fails to identify or apply any STM standard and testifies based only on her alleged experience in publishing that the editor, Blocken, has full discretion to ignore peer reviewer decisions. And unlike Marks, Dr. Storey actually has direct experience in the role of a session organizer, which is analogous to an academic editor, and as a peer reviewer for a scientific journal.

To be sure, Elsevier is free to explore the exercise of GPS's experts' judgment on cross examination. *See Melendez-Diaz v Massachusetts*, 557 U.S. 305, 320 (2009) ("At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination."). But merely exercising judgment regarding whether Elsevier's conduct met certain publishing standards is not a reason for exclusion.

Elsevier's main argument asserts that certain written standards exist in publishing, like those published by COPE. At the outset, the mere fact that an expert does not expressly rely on existing written standards that are potentially relevant to his opinions does not render his

methodology unreliable. *See Zp No. 332, LLC v. Huffman Contractors, Inc.*, No. 2:24-CV-611, 2025 WL 3174929, at *8 (E.D. Va. Nov. 13, 2025) (expert testimony admissible where expert "does [not][6] cite to any recognized industry standards, but he does rely on his own industry experience and the Contract Documents").

And even if experts were required to cite to written industry standards to support their experiential opinions (and they are not), GPS's experts do so where relevant. For example, Wasserman expressly cites to COPE's Principles of Transparency and Best Practice in Scholarly Publishing to explain how Elsevier fell short of COPE's requirements that it take its "'duties of guardianship over the scholarly record extremely seriously,' support[] its editors, 'maintain[] the integrity of the scholarly record,' and ensur[e] 'that best practice is followed in its publications.'" Wasserman Opening Rep. (Doc. 276-1) at 5-7, 11. Similarly, Dr. Storey noted that the First Test's publication process did not align with the standards used for session organizers and explained that these standards were the same as those that applied to other peer-reviewed journals. Ex. 3, Storey Dep. Tr. 267:17-269:6.

More importantly, however, Elsevier argues that Wasserman and Dr. Storey fail to support certain of their opinions with citation to specific industry standards without asserting whether a specific "'guideline' that addresses the precise task they were trying to accomplish" even exists. *In re Pella Corp. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 269 F. Supp. 3d 685, 700-01 (D.S.C. 2017). To be sure, both sides acknowledge the existence of the COPE guidelines, which provide general guidance on publishing ethics issues. *See* Wasserman Opening Rep. (Doc. 276-1) at 5-6;

[6] The opinion text appears to obtain a typographical error that omits the word "not," although it is clear from context that the referenced expert relied on his own experience rather than written standards, unlike other experts at issue who relied on "industry standards from the American Institute of Architects … and the Construction Specifications Institute" or "Project Management Institute" standards. *Huffman Contractors*, 2025 WL 3174929, at *8.

Ex. 1, Marks Rep. ¶¶ 51, 54-56. But especially where there is no COPE standard directly on point, it is obviously necessary for a publishing expert like Wasserman or Dr. Storey to rely on standards gleaned from experience. Notably, while Elsevier asserts that GPS's publishing experts should have cited a written standard to support certain of their opinions, it fails to present any written guideline it contends contradicts GPS's experts.

Indeed, it is telling that Elsevier's expert mostly offers experience-based opinions without citing a written standard like the COPE guidelines. For example, to support her view that it was appropriate for Blocken to completely disregard one of the peer reviews the First Test received, Marks states without citation to any written standard that "I would expect based on my experience that an editor would critically evaluate each peer review and assess the weight it should be given. Thus, in my opinion, it would be standard practice for a journal to afford little or no weight to a recommendation that is conclusory or unsupported by a reviewer's substantive reasoning." Ex. 1, Marks Rep. ¶ 39. Similarly, to counter Wasserman's opinion that Elsevier violated publishing standards by assigning the First Test to an editor who was overworked and had repeatedly told Elsevier so, Marks stated that "based on my experience, Professor Blocken's workload was relatively standard in the STM journal publishing industry and there is no indication that his workload represented a deterioration in the standards or quality of the articles accepted by *Building and Environment*," with no citation to any written guideline regarding editor workload (or any other written guideline) to support that assertion. *Id.* ¶ 64. Her opinion also contradicts Blocken's own communications regarding his workload at the time. *See* Wasserman Opening Rep. (Doc. 276-1) at 10. And she opines that rather than the onus being on Elsevier to decline to assign the First Test to an overworked editor, "if Professor Blocken felt he did not have the time necessary to devote to the article, industry custom would be for Professor Blocken to decline the assignment,"

without identifying any written standard that forms the basis for that "custom." Ex. 1, Marks Rep. ¶ 71. And of course, Blocken did not decline the assignment despite his own admission that he did not have the time to properly review the article.

Marks further opines, without citing a written industry standard, that it was appropriate for Blocken to decline to submit the second revised draft of the First Test to the reviewer who maintained it still needed a "major revision" after it had been revised once, opining that "[a]t this juncture, the editor is typically in a position to evaluate a re-submitted manuscript and make a final decision on publication." *Id.* ¶ 84. Similarly, she opines without citation to a written standard that "it is common in the STM industry for an editor to accept a manuscript after a second round of revision without sending the final version back to peer reviewers. This is particularly true where an editor believes the authors have adequately addressed the reviewers' remaining comments." *Id.* ¶ 89. Similar experiential opinions without citation to specific industry standards abound in Marks' report.

Elsevier therefore cannot credibly argue that GPS's publishing experts should be excluded because they "failed to apply the facts of this case to the industry standards that they themselves claim applied to Elsevier's actions when publishing the First Study," Doc. 272 at 16-17, because their own expert similarly fails to cite to a COPE standard (or other recognized industry guideline) for most of her opinions. Elsevier's own expert therefore confirms that the publishing industry is simply a field where, for certain principles, "the only 'way in which [the] expert [could] gain meaningful knowledge about [the matters in question] ... is through personal experience.'" *M-Edge Accessories LLC v. Amazon.com Inc.*, No. CIV.A. MJG-11-3332, 2015 WL 403164, at *15 (D. Md. Jan. 29, 2015) (alterations in original) (admitting expert testimony over plaintiff's objection that expert did not cite "texts, articles, or written standards against which his conclusions could be

tested" and noting that plaintiff "does not present any standard text or other authority that it contends Mr. Koenigsberg should have relied on").

Finally, Elsevier only briefly attempts to argue as to why, even if its attacks on GPS's experts had any merit (and they do not), the proper remedy is exclusion rather than vigorous cross examination. *Daubert* is clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. All of the attacks Elsevier levies at GPS's publishing experts are appropriate subjects of cross examination and contrary evidence, not reasons for exclusion. Elsevier can examine GPS's experts regarding the support for their experience and how they derived the standards they opine Elsevier failed to follow. And it can present contrary opinions from its publishing expert, Marks (who GPS will, in turn, similarly vigorously cross examine).

Elsevier does not meaningfully argue otherwise. It cites one case for the proposition that where an expert fails entirely to connect his "opinions to any methodology" that is "not something that can be rehabilitated by cross examination at trial." Doc. 272 at 16 (citing *In re Blackjewel L.L.C.*, 643 B.R. 128, 140 (Bankr. S.D.W. Va. 2022)). But in that case, the purported expert calculated a valuation without following any recognized methodology or mathematical formula and instead divined a monetary figure based on "experience" with bidders. *See Blackjewel*, 643 B.R. at 139. But that is worlds away from what Wasserman and Dr. Storey do here—GPS's experts are not pulling a number that should be calculated using formulas from thin air, they are explaining how their experience leads them to recognize certain standards in publishing and applying those standards to the events at issue in this case. Unlike *Blackjewel*, which represents the rare instance where an expert's methodology is so far outside the bounds of admissibility that cross examination

is an insufficient remedy, Elsevier has made no showing that cross examination is not the proper procedure versus the extreme measure of excluding an expert. Exclusion is therefore unwarranted.

## V. CONCLUSION

For the foregoing reasons, GPS respectfully requests that the Court deny the Motion in its entirety.

Date: August 28, 2026


**McGuireWoods LLP**

By: /s/ *Robert A. Muckenfuss*
Robert A. Muckenfuss (SBN #28218)
Kelly Warlich (SBN #51053)
Hannah K. Caison (SBN #59260)
Zachary L. McCamey (SBN #53540)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2052
Fax: (704) 444-8707
rmuckenfuss@mcguirewoods.com
kwarlich@mcguirewoods.com
hcaison@mcguirewoods.com
zmccamey@mcguirewoods.com

Lucy Jewett Wheatley (*pro hac vice*)
Claire Hagan Eller (*pro hac vice*)
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-4320
Fax: (804) 698-2017
lwheatley@mcguirewoods.com
celler@mcguirewoods.com

Peter J. Wright (NC Bar # 62879)
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
Tel: (919) 755-6600
Fax: (919) 755-6699
pwright@mcguirewoods.com

*Attorneys for Plaintiff Global Plasma Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August, 2026, that the foregoing document was filed electronically with the Clerk of Court for the Western District of North Carolina by using the CM/ECF system. Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Robert A. Muckenfuss*