# EXHIBIT 3

Planet Depos
We Make It Happen™

# Transcript of John M. Storey, Ph.D.

**Date:** June 9, 2026
**Case:** Global Plasma Solutions -v- Elsevier, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

- - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| GLOBAL PLASMA SOLUTIONS, INC., | : | |
| Plaintiff, | : | Case No. |
| v. | : | 3:22-cv-00034-KDB-WCM |
| ELSEVIER INC. AND ELSEVIER LTD., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - x

Videotaped Deposition of JOHN M. STOREY, Ph.D.
Charlotte, North Carolina
Tuesday, June 9, 2026
9:14 a.m.

Job No.: 633966
Pages: 1 - 281
Reported By: Cindy A. Hayden, RMR, CRR

2

Deposition of JOHN M. STOREY, Ph.D., held at the offices of:

McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, North Carolina 28202
704.343.2000

Pursuant to notice, before Cindy A. Hayden, Notary Public in and for the State of North Carolina.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

ROBERT MUCKENFUSS, ESQUIRE
HANNAH K. CAISON, ESQUIRE
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, North Carolina 28202
704.343.2000

ON BEHALF OF DEFENDANTS:

NICHOLAS LoCASTRO, ESQUIRE
Quinn Emanuel Urquhart & Sullivan, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
212.849.7000

AND

TARA SRINIVASAN, Ph.D., ESQ.
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street
22nd Floor
San Francisco, California 94111
415.875.6600

4

A P P E A R A N C E S  C O N T I N U E D

ALSO PRESENT: JACK DUNN, VIDEOGRAPHER


Case 3:22-cv-00034-KDB-WCM Document 298-4 Filed 08/28/26 Page 3 of 7

49

**A. So it would be things like similar types of questions to what the Elsevier ones were -- you know, is this a commercial promotion -- is this -- of a product? Or is this -- is this good science? Is this -- you know, is the engineering sound? That kind of thing.**

Q. Okay. So it was questions that were asked of peer reviewers, this checklist?

**A. Yeah.**

Q. Okay. You've never been an editor for a scientific journal; is that correct?

**A. That's correct.**

Q. Okay.

**A. But the function I had, again, as a session organizer was very similar to that.**

Q. Well, how do you know how similar the conference function was to being an editor if you've never been an editor yourself?

**A. Because I had colleagues that were editors for journals.**

Q. Which journals?

**A. "Journal of Catalysis," "Applied Catalysis B" come to mind immediately, but...**

Q. Okay. So people told you at the time, "Hey, what we're doing seems similar to my own

50

editorial role"?

**A. Yes.**

Q. Okay. But you yourself have never been in that role. Fair?

**A. Fair.**

Q. When you were supervising the peer review process for the conference papers, what, if any, publishing industry standards did you apply to that task?

**A. I don't understand. What do you mean by "publishing industry standard"?**

Q. Yeah, sure.

So are you aware that there are, like, guidelines, such as the COPE, C-O-P-E, guidelines? Is that something that you're familiar with?

**A. No, I haven't -- I don't know what that is.**

Q. Okay. Are you familiar with any publishing industry guidelines or standards?

**A. Well, we had our -- we had publishing guidelines at -- at the Society of Automotive Engineers. And so there was a requirement to have, you know -- we also had a major, minor, and reject -- major revision, minor revision, reject criteria. We had to have two accepts to publish.**

51

**And so those are the kinds of things I'm -- I'm familiar with.**

Q. Okay. But you don't know how the Society of Automotive Engineers' criteria compares to any industry standard that's out there. Is that fair?

**A. Yes, that's fair.**

Q. And you don't know how the Society of Automotive Engineers' criteria compares to, let's say, Elsevier's own internal criteria. Is that fair?

**A. As a function of -- of reviewing stuff for this case, I looked over some information about Elsevier and -- and their peer review process, as I've said, and -- and it's -- it's very similar to -- to what we did.**

Q. Let me ask you this: Are you aware -- because I didn't see it cited in either of your reports.

Are you aware that there is a guide for editors of "Building and Environment" that was in place at the time the first study was submitted for publication?

**A. No, I was not aware.**

Q. Okay. So that's not something that you

52

considered in forming your opinions in this case. Fair?

**A. Yeah, I -- I didn't -- I wasn't aware of it.**

Q. And because you weren't aware of that document, you've never compared that Elsevier guide with the Society of Automotive Engineers' publishing criteria. Fair?

**A. Yes.**

Q. Okay. In your rebuttal report, if you go to Page 15 -- let me know when you're there.

**A. Yeah.**

Q. In the middle of that first large paragraph, under the Heading H, there's a clause that reads here that certain aspects of the first study's publication were improper, right?

**A. Page 15?**

Q. Yeah. So kind of midway in that first large paragraph, you say that: Contrary to Mark's opinions --

**A. Okay. Yeah.**

Q. -- the following aspects of the first study's publication process were improper.

Do you see that?

**A. Yeah.**

265

your rebuttal report, is that because you don't dispute the background information she set forth within those paragraphs?
**A. Not necessarily, but -- but likely, yeah.**
Q. Okay. So, I guess, Dr. McNeill has a technology background section, and she also has a background section on the first study at issue. And I'll represent to you that you only expressly responded to a small handful of those paragraphs.
Would it be fair to say that if there was some scientific agreement [sic] that you had with whatever Dr. McNeill was saying in her background section, you would have pointed that out in your rebuttal report?
**A. A scientific agreement or disagreement?**
Q. Disagreement.
**A. Yeah, it would have been fair to say that I would have.**
Q. Okay. So if there's something set forth in Dr. McNeill's background section and you don't specifically rebut it, it would be fair to say you agree with the basic principle of science that she sets forth?
**A. I don't know if that's fair to say.**

266

**I -- you know, I didn't spend a lot of time on that -- that section of the report.**
Q. Let me ask you this question: The areas of disagreement with Dr. McNeill that you formed an opinion on, those areas of disagreement are all set forth in the rebuttal report; is that right?
**A. That -- yes.**
MR. LoCASTRO: Okay. Pending anything from you, Hannah, I don't have anything else for Dr. Storey, and thank him for his time.
MS. CAISON: Okay. I think we'll take five maybe.
MR. LoCASTRO: Okay.
MR. MUCKENFUSS: Let's take ten.
THE VIDEOGRAPHER: Stand by. We are going off the record at 15:33.
* * *
(Whereupon, there was a recess in the proceedings from 3:33 p.m. to 3:53 p.m.)
* * *
THE VIDEOGRAPHER: We are back on the record. The time is 15:53.
* * *
EXAMINATION

267

BY MS. CAISON:
Q. Thank you, Dr. Storey. I just have a little bit more for you.
I want to go back to one of the first lines of questioning that Elsevier's counsel covered with you.
I believe he was asking you some questions about your experience as a session organizer for the Society of Automotive Engineers. Do you remember that line of questioning?
**A. Yes. Yeah.**
Q. You were saying -- I think you testified that, in your role as a session organizer, you would -- you would engage in the peer review process and in reviewing papers.
**A. That's correct, yeah.**
Q. Were there standards that you had to follow in that role as a session organizer?
**A. Yes. Yeah. SAE had a prescribed set of standards for the peer review process.**
Q. And does the Society of Automotive Engineers also publish journals, peer-reviewed journals?
**A. Yes, they publish several peer review journals.**

268

Q. Is it your understanding that they -- there are standards that apply to those journals as well?
**A. Yes.**
MR. LoCASTRO: Object to form.
BY MS. CAISON:
Q. And are those the same standards that would apply to the -- the articles that would be published in your role as a session organizer, are those the same standards that would apply to SAE's peer-reviewed journals?
MR. LoCASTRO: Object to form.
THE WITNESS: There are -- there are standards that are -- that are followed for the journal that include sending the paper out again for peer review. So it's an additional peer review process.
BY MS. CAISON:
Q. Sitting here today, do you have any reason to believe that the standards that you followed in your role as a session organizer for SAE don't meet accepted standards in STM publishing?
MR. LoCASTRO: Object to form.
THE WITNESS: No, not at all. I

believe that they're pretty standard across scientific publishing.
BY MS. CAISON:
Q. And just to clarify, is S -- is SAE a STM journal?
**A. Absolutely, yeah.**
Q. I think Elsevier's counsel asked you a lot of questions about whether there were specific industry standards you could -- you were relying on to inform your opinions that the -- that the peer review process here was -- I think you used the word "improper." Do you remember that line of questioning?
**A. Yes.**
Q. Did Elsevier's counsel ever show you a specific industry standard that contradicted your opinions?
MR. LoCASTRO: Object to form.
THE WITNESS: No, they did not. They did not show me that.
BY MS. CAISON:
Q. Sitting here today, are you aware of any industry standard that contradicts your opinion that the publication process for the first study was improper?



MR. LoCASTRO: Objection to form.
THE WITNESS: I -- I did not -- no, I do not believe that.
BY MS. CAISON:
Q. I believe Elsevier's counsel asked you some questions about what the authors said and didn't say in the first study about the increase in VOCs. Do you remember that line of questioning?
**A. Yes.**
Q. I believe he asked you if the authors of the first study ever said that the increase observed in the first study was harmful -- increased VOCs to a harmful level. Do you remember that?
**A. Yes.**
Q. I think you said that, no, the -- the first study didn't state that anywhere; is that correct?
**A. That's correct.**
Q. Did the first study ever state the opposite, that the increases observed were not harmful?
**A. No. They never said that.**
Q. And you are aware that at, you know, certain levels, VOCs can be harmful. I think we



looked at an EPA data sheet.
**A. Right. Right.**
Q. If you were a layperson and not told one way -- one way or the other whether an increase was dangerous, do you think it would be reasonable to be concerned when you were seeing an increase in VOCs reported?
MR. LoCASTRO: Objection to form.
THE WITNESS: Yeah. I mean, that -- I think that happens a lot with -- with environmental pollution in general, is -- emissions and stuff, is that people hear that there's a -- that there's an increase, they think that it's automatically not okay.
BY MS. CAISON:
Q. And in your experience, including being involved with GPS during this time, is that, in fact, how people perceived the first study?
**A. Yeah, very much so.**
MR. LoCASTRO: Objection to form.
THE WITNESS: Yeah. That's clear from -- to me from the "Wired" article and from hearing reports about meetings with school boards and -- and the like that the GPS personnel had.
BY MS. CAISON:



Q. Thank you.
I think we talked some about electron volt potential and -- and the level at which GPS devices operate. Do you remember that line of questioning?
**A. Yes. Yeah.**
Q. I think you had said it was your -- it was your testimony that you believed GPS's devices operated at below 12.0 eV.
**A. Yes.**
Q. Elsevier's counsel showed you a number of documents -- I think it was Exhibits 11 and 12, and I'm happy to -- happy to show them to you again -- where GPS personnel -- I believe it was Mr. Waddell and then a GPS salesperson -- stated that GPS's technology operated at exactly 12.0 eV.
**A. Yes.**
Q. I believe Elsevier's counsel asked you whether you had ever seen any documentation or testing supporting your belief that GPS's technology operated at below 12 eV?
**A. Yeah.**
Q. I believe you said you hadn't.
**A. Yeah.**
Q. Are you aware of any documentation or

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, CINDY A. HAYDEN, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for or related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of June 2026.

My commission expires April 7, 2027.

NOTARY PUBLIC IN AND FOR
THE STATE OF NORTH CAROLINA