**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| GLOBAL PLASMA SOLUTIONS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>ELSEVIER INC. and ELSEVIER LTD.,<br><br>*Defendants*. | Civil Action No. 3:22-cv-00034-KDB-WCM |

**PLAINTIFF'S OPPOSITION TO ELSEVIER'S MOTION TO EXCLUDE DAMAGES EXPERT EVIDENCE AND TESTIMONY OF MICHAEL SPINDLER**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 2

III. ARGUMENTS .......... 3

A. Mr. Spindler Reliably Links GPS's Diminution in Value to the First Test .......... 3

1. Mr. Spindler Gave Extensive Consideration to Alternative Causes .......... 5

2. Mr. Spindler Was Not Required to Perform a Regression Analysis or Event Study .......... 8

3. Mr. Spindler's Use of a "Market-Wide" Benchmark and 2020 Revenue Base Is Sound .......... 9

4. Elsevier's Cited Cases Are Distinguishable .......... 10

B. Mr. Spindler's "Derivative Works" and "Competitive Forces" Analyses Reflect Reliable Methodology .......... 13

1. Elsevier Distorts Mr. Spindler's References to "Derivative Works" and "Competitive Forces" .......... 14

2. The "Competitive Forces" Category Reflects Sound Economic Reasoning .......... 14

3. The "Derivative Works" Category Is Supported by Record Evidence .......... 16

C. Mr. Spindler's Opinions Rest on a Reliable Foundation, Not Cherry-Picked Evidence .......... 19

1. Mr. Spindler Did Not "Cherry Pick" Evidence .......... 21

2. Mr. Spindler's Qualitative Analysis Is Corroborated by Independent Evidence .......... 23

3. The Cases Elsevier Cites Are Readily Distinguishable .......... 24

IV. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Meyers (In re Infinity Business Group, Inc.)*,
612 B.R. 76 (Bankr. D.S.C. 2019) ....................12, 13

*Bank of America, N.A. v. Jericho Baptist Church Ministries, Inc.*,
No. 21-cv-2209, 2022 WL 11112695 (4th Cir. Oct. 19, 2022) ....................18

*Bresler v. Wilmington Trust Co.*,
855 F.3d 178 (4th Cir. 2017) ....................18, 20

*Bunting Graphics, Inc. v. Whiting-Turner Contracting Co.*,
No. 1:19-cv-02, 2022 WL 14664724 (D. Md. Oct. 25, 2022) ....................18

*Matter of Coeymans Marine Towing, LLC*,
No. 1:23-cv-697, 2026 WL 1630207 (E.D. Va. 2026) ....................18

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ....................4, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................... *passim*

*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2015) ....................24

*Foster v. Legal Sea Foods, Inc.*,
No. 03-cv-2512, 2008 WL 2945561 (D. Md. July 25, 2008) ....................13

*Garner v. Global Plasma Solutions, Inc.*,
No 1:21-cv-00665 (D. Del. May 7, 2021), ECF 1 ....................7

*Globus Med., Inc. v. Jamison*,
No. 2:22CV282, 2024 WL 4711947 (E.D. Va. Nov. 7, 2024) ....................19

*Hernandez Reid v. Geo Group, Inc.*,
No. 3:24-cv-309, 2026 WL 1365021 (E.D. Va. May 15, 2026)....................25

*Hien Nguyen v. Taylor*,
219 N.C. App. 1, 723 S.E.2d 551 (2012)....................7

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)....................21

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018) ....................2, 13, 21, 24

*Lowes Foods, LLC v. Burroughs & Chapin Co., Inc.*,
No. 4:16-CV-00354-RBH, 2019 WL 2454570 (D.S.C. Apr. 17, 2019)....................4, 8

*Miller v. Asensio & Co., Inc.*,
364 F.3d 223 (4th Cir. 2004) ....................9

*NuVasive, Inc. v. Kormanis*,
No. 18-cv-282, 2019 WL 9633645 (M.D.N.C. Mar. 18, 2019)....................24, 25

*PBM Products, LLC v. Mead Johnson Nutrition Co.*,
No. 3:09-cv-269, 2010 WL 56072 (E.D. Va. Jan. 4, 2010)....................3, 12

*Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*,
182 F. App'x 267 (4th Cir. 2006) ....................12

*Pinnix v. SSC Silver Stream Operating Co. LLC*,
No. 7:14-cv-161, 2017 WL 818275 (E.D.N.C. Mar. 1, 2017)....................4

*Ramaco Resources, LLC v. Federal Insurance Co.*,
No. 2:19-cv-703, 2026 WL 1695017 (S.D. W. Va. June 11, 2026) ....................25

*Rembrandt Social Media, LP v. Facebook, Inc.*,
22 F. Supp. 3d 585 (E.D. Va. 2013) ....................19

*Ruffin v. Shaw Industries, Inc.*,
149 F.3d 294 (4th Cir. 1998) ....................19

*Silicon Knights, Inc. v. Epic Games, Inc.*,
No. 5:07-cv-275, 2011 WL 6748518 (E.D.N.C. Dec. 22, 2011)....................3

*SMD Software, Inc. v. EMove, Inc.*,
945 F. Supp. 2d 628 (E.D.N.C. 2013)....................4

*In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liab. Litig.*,
2023 WL 6794318 (D. Md. Oct. 12, 2023) ....................14

*Sommerville v. Union Carbide Corp.*,
149 F.4th 408 (4th Cir. 2025) ....................25

*Tyger Construction Co. v. Pensacola Construction Co.*,
29 F.3d 137 (4th Cir. 1994) ....................11

*United States v. Crisp*,
324 F.3d 261 (4th Cir. 2003) ....................8

*Verisign, Inc. v. XYZ.COM LLC*,
848 F.3d 292 (4th Cir. 2017) ....................................................................................11

*Viamedia, Inc. v. Comcast Corp.*,
No. 16-cv-05486, 2025 WL 2972666 (N.D. Ill. Oct. 14, 2025) ........................................8, 16

*Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Virginia, Inc.*,
685 F. App'x 277 (4th Cir. 2017) ..................................................................................7

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) .....................................................................................2, 4

*Ziegler v. Polaris Industries, Inc.*,
No. 1:23-cv-112, 2024 WL 482212 (W.D.N.C. Feb. 7, 2024) .............................................19

**Statutes**

Lanham Act..................................................................................................................7

**Other Authorities**

Fed. R. Evid. 702 ..........................................................................................2, 3, 8, 14

## I. INTRODUCTION

Plaintiff Global Plasma Solutions, Inc. ("GPS") respectfully submits this Brief in Opposition to Defendants Elsevier Inc. and Elsevier Ltd.'s (collectively, "Elsevier") Motion to Exclude the Damages Expert Evidence and Testimony of Michael Spindler. The motion should be denied.

Michael Spindler is an eminently qualified damages expert—a CPA, Certified Fraud Examiner, Certified in Financial Forensics, and Accredited in Business Valuation—with over 40 years of forensic accounting experience. His valuation was developed in accordance with AICPA Statement on Standards for Valuation Services (SSVS No. 1) and the Business Valuation Standards of the American Society of Appraisers. Dkt. 277-1 (Spindler Opening Rep.) at 203, App. 8. He has never been excluded as an expert. Ex. 1 (Spindler Dep. Tr.) at 35:6-11. His opinion that GPS suffered at a minimum approximately $1.051 billion in diminution of equity value from the First Test is grounded in well-accepted valuation methodologies, supported by extensive factual analysis, and corroborated by three independent analytical approaches converging on approximately the same figure.

Elsevier's motion identifies no actual methodological deficiency in Mr. Spindler's analysis. Instead, Elsevier attacks his *conclusions*—his judgment about which factors caused GPS's decline, how he categorized alternative causes, and which customer communications he emphasized. These are classic disputes about weight, not admissibility. As the Supreme Court recognized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).Elsevier has its own expert, Dr. Arnold, who disagrees with Mr. Spindler's conclusions—precisely the sort

of battle of experts juries are empaneled to resolve. The Fourth Circuit has made clear that "the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018). Defendants' motion does not come close to meeting that high bar.

## II. LEGAL STANDARD

Under Federal Rule of Evidence 702, a qualified expert may testify if: (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert reliably applied those principles to the facts. Fed. R. Evid. 702. *Daubert* established the trial court's gatekeeping role, but that role is not "intended to serve as a replacement for the adversary system." *In re Lipitor*, 892 F.3d at 631.

Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rules reflect a "liberal thrust" and a "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588. The inquiry into whether an expert's opinion is admissible focuses on the expert's *methodology*, not the correctness of his *conclusions*. *Id.* at 595. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. "Rule 702 requires the court merely to determine whether the proposed expert testimony is sufficiently reliable and relevant to assist the trier of fact." *Westberry*, 178 F.3d at 261. Disputes about an expert's factual basis, analytical gaps, or failure to account for particular evidence generally go to *weight*, not admissibility. *Id.* at 265-66.

## III. ARGUMENTS

### A. Mr. Spindler Reliably Links GPS's Diminution in Value to the First Test

Elsevier primarily argues that Mr. Spindler's damages analysis fails to establish a "causal link between the First Study and the diminution he calculated." Defs.' Br. at 15. According to Elsevier, Mr. Spindler's opinion is "entirely lacking" a causation analysis because he did not perform a regression analysis or event study to isolate the First Test's impact from other potential causes of GPS's decline. *Id.* at 14-16. These arguments misunderstand the legal standard under *Daubert* and Rule 702 and the substance of Mr. Spindler's analysis.

Mr. Spindler employed a discounted cash flow ("DCF") analysis—one of the most widely used methodologies in business valuation. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 144-148. DCF measures business value by discounting projected future cash flows to present value. *Id.* ¶¶ 198-202 (describing calculation of debt-free net cash flow, terminal value, and weighted average cost of capital). Mr. Spindler valued GPS immediately before the First Test's publication (February 28, 2021) and as of October 31, 2025, then calculated the difference to determine the diminution in equity value attributable to the First Test. *Id.* ¶ 147. To project GPS's but-for revenues, Mr. Spindler applied air purifier industry growth rates from a contemporaneous BCC Research report (February 2021) to GPS's actual 2020 revenue base. *Id.* ¶¶ 188-191.

There is no dispute that Mr. Spindler's DCF analysis is a generally accepted methodology for calculating a decline in business value, and Elsevier makes no such argument here. *See also, e.g.*, *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-cv-275, 2011 WL 6748518, at *7 n.17 (E.D.N.C. Dec. 22, 2011) (recognizing DCF method of using comparable companies as established valuation methodology that was capable of "'controlling' in a rough way for market factors") (quoting *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 180 (S.D.N.Y. 2006)); *PBM*

*Products, LLC v. Mead Johnson Nutrition Co.*, No. 3:09-cv-269, 2010 WL 56072, at *6-7 (E.D. Va. Jan. 4, 2010) (admitting damages testimony based on "a recognized economic approach with sufficient evidentiary support"). Elsevier does not challenge the methodology itself—only whether Mr. Spindler sufficiently analyzed potential alternative causes.

Elsevier argues that Mr. Spindler was required to calculate and deduct a dollar value for potential alternative causes. Defs.' Br. at 14-15. That is not the law. To be admissible, a damages expert must apply a reliable methodology and give adequate consideration to causation. *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 641 (E.D.N.C. 2013) (denying *Daubert* challenge to damages expert who considered alternative factors explaining revenue deviations; critiques of methodology proper for cross-examination, not exclusion). The expert need not calculate the precise harm attributable to each potential factor or affirmatively disprove every alternative cause. As the Fourth Circuit has explained, an expert's opinions "should not be excluded because the expert has failed to rule out every possible alternative cause." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (opinion should be excluded only where expert "utterly fails" to consider alternative cause). Courts may exclude expert causation testimony only when the expert "utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause." *Westberry*, 178 F.3d at 265-66. Where an expert has applied a recognized methodology and given meaningful consideration to alternative causes, disputes about the conclusions he reached are proper subjects for cross-examination but do not warrant exclusion. *Pinnix v. SSC Silver Stream Operating Co. LLC*, No. 7:14-cv-161, 2017 WL 818275, at *4-5 (E.D.N.C. Mar. 1, 2017) (admitting expert opinion because expert considered potential alternate causes); *Lowes Foods, LLC v. Burroughs & Chapin Co., Inc.*, No. 4:16-CV-00354-RBH, 2019 WL 2454570, at *2-3 (D.S.C. Apr. 17, 2019) (admitting expert damages

opinion and ruling that defendants' arguments that lost sales might be due to alternative factors was an issue for cross-examination, not a ground to exclude).

Mr. Spindler considered potential alternative causes, applying methodologically sound principles. Elsevier's arguments lack merit.

### 1. Mr. Spindler Gave Extensive Consideration to Alternative Causes

Elsevier's central attack is that Mr. Spindler "utterly fails to consider alternative causes" because he assigned no dollar amount to any alleged alternative factor. Defs.' Br. at 14-15, 17 (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202-03 (4th Cir. 2001)). But Mr. Spindler's but-for DCF methodology does not require explicit apportionment. It does something more rigorous: it uses GPS's actual 2020 revenues (which already incorporate the effects of any pre-existing market forces) as the but-for baseline, and projects forward using industry-wide BCC growth rates that automatically absorb post-pandemic normalization and market-level dynamics. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶¶ 109, 119. Any alternative cause predating the First Test is baked into the 2020 baseline, and any cause affecting the entire air purifier industry is absorbed by the BCC benchmark. What remains is the incremental harm attributable to the First Test—precisely what the damages methodology isolates.

Elsevier identifies five categories of alleged alternative causes: (1) the Offermann and Trane Articles; (2) CDC/ASHRAE guidance; (3) the Open Letter and Boeing Study; (4) the Garner class action; and (5) post-pandemic normalization. Mr. Spindler considered each and explained why none requires separate apportionment. It is important to note that the First Test is the only published test ever performed where it was claimed that GPS's technology produced harmful byproducts. The only other tests, (such as described in the Trane Article), showed that GPS's technology did not produce harmful byproducts. After the First Test was published, the so-called "alternative causes" all cited the First Test.

*Pre-existing publications and guidance.* The Offermann Article (November 2020), Sterile-Air Article (February 2020), and guidance from ASHRAE (October 2019) and the CDC (July 2020)—none of which specifically named GPS—all predated the First Test, and, notably, GPS achieved peak monthly sales of [redacted] in November 2020 *despite* them. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶¶ 46-50. Mr. Spindler's 2020 baseline "already included" any impact of these publications; they cannot explain GPS's post-First Test collapse. *Id.* ¶ 50 ("*de minimis*, if any, impact"). The same is true of CDC guidance, which had stated as early as July 2020 that "*many of the earlier potential safety concerns are reportedly now resolved*." *Id.* ¶ 47. The Trane Article (January 2021) demonstrated that ionization was effective at inactivating pathogens in the air, a finding that helped GPS's claims with regard to SARS-CoV-2. *Id.* ¶ 49. The Trane Article also found that VOCs were not increased by ionization, a finding actually favorable to GPS compared to the First Test's conclusion. *Id.* ¶ 49; Dkt. 277-1 (Spindler Op. Rep.) ¶ 46. These publications, then, were "competitive forces" and critiques of GPS's technology that were already embedded in the baseline measurements of GPS's market value; they were not independent alternative causes.

*Derivative works and subsequent events.* The Open Letter, Boeing Study, and Garner class action all postdate the First Test and cite or rely on it. The Open Letter was "prepared with the cooperation of the authors of the First Study " and "cites the First Study as its first reference" and then extensively throughout. *Id.* ¶¶ 52-53. In fact, of all 23 references in the Open Letter, the First Test is the reference cited most. Ex. 2 (Open Letter). The only published test cited by the Open Letter that pertains to GPS's technology is the First Study. *Id.* The Boeing Study likewise cites the First Test but then concludes that GPS's technology does not produce harmful byproducts. Dkt. 277-1 (Spindler Op. Rep.) at 21, ¶ 45(24). The Boeing Study only tested surface pathogens and did not conclude the NPBI produced harmful byproducts, in fact it concluded the opposite. Dkt.

277-1 (Spindler Opening Rep.) ¶ 45(24). The *Garner* class action's claims "were substantially derived from the scientific conclusions presented in the First Study." Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 74; *see* ; Class Action Complaint, *Garner v. Global Plasma Solutions, Inc.*, No 1:21-cv-00665 (D. Del. May 7, 2021), ECF 1. These are not independent causes; they are downstream consequences of Elsevier's defamation and false advertising. Harm that flows directly from the wrongful act is not an "alternative cause" requiring separate apportionment; it is exactly what a but-for analysis captures. *See, e.g.*, *Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Virginia, Inc.*, 685 F. App'x 277, 278 (4th Cir. 2017) (Lanham Act damages available for harms caused by false statement); *Hien Nguyen v. Taylor*, 219 N.C. App. 1, 10, 723 S.E.2d 551, 559 (2012) (defamation damages include, inter alia, direct and indirect pecuniary loss as well as damages for injury to reputation).

*Pandemic normalization.* Elsevier argues that GPS's decline simply reflects post-COVID normalization. Defs.' Br. at 4. The empirical evidence refutes this. Mr. Spindler compared GPS to ten Guideline Public Companies in the HVAC and indoor air quality industry: those GPCs "experienced average market capitalization growth of 60.2%" between February 2021 and October 2025, while "GPS's equity declined [redacted] over the same period." Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 97. Similarly, 29 "Pandemic Boom" companies across eight industries achieved an average 11% CAGR post-COVID; GPS achieved [redacted] CAGR. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 135-142. Even Peloton—which faced a major product recall, CEO turnover, supply chain disruptions, and a product-related fatality—maintained revenues 172% above pre-COVID levels. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 125. GPS, facing none of those headwinds, collapsed to [redacted] of its 2020 peak. *Id.* If pandemic normalization were the cause, GPS's industry peers would have declined too. They did not.

Critically, the BCC industry benchmark already incorporates "ordinary market forces, post-pandemic normalization, and company-specific factors unrelated to the First Study." Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 109. This benchmark projected a substantial post-pandemic decline of nearly 30% in 2022 to account for expected demand normalization. Dkt. 277-1 (Spindler Opening Rep.) ¶ 193 (projecting revenue growth of 7.0% in 2021, -29.9% in 2022, 12.3% in 2023, 10.8% in 2024, and 8.5% in 2025). Post-pandemic normalization was incorporated into this benchmark; GPS's collapse far exceeded these projected industry-wide declines. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 109. The damages methodology "quantifies the incremental diminution in GPS's equity value attributable to the First Study, above and beyond any decline that would have occurred" from market-wide factors. *Id.*

In addition to considering potential alternative causes, Mr. Spindler conducted corroborative analyses. Three independent methodologies converged on approximately $1.051 billion in damages, demonstrating reliable isolation of the First Test's impact. Dkt. 277-1 (Spindler Opening Rep.) ¶ 148 Table 17. Elsevier's critiques go to weight, not admissibility. *Lowes Foods*, 2019 WL 2454570, at *2-3 (damages opinion should be admitted where potential alternative causes were considered).

### 2. Mr. Spindler Was Not Required to Perform a Regression Analysis or Event Study

Elsevier's insistence that Mr. Spindler was required to perform a regression analysis or event study finds no support in the law. Rule 702 does not prescribe specific analytical techniques. *Daubert* focuses on whether the expert employed reliable principles—not whether he employed the specific technique the opposing party prefers. *Daubert*, 509 U.S. at 593-95; *United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003) (*Daubert* factors are "illustrative, not exhaustive"); *see also Viamedia, Inc. v. Comcast Corp.*, No. 16-cv-05486, 2025 WL 2972666, at *15 (N.D. Ill.

Oct. 14, 2025) (arguments that different analysis would better estimate damages "can best be borne out by cross-examination").

Elsevier's arguments further lack merit because an event study or regression analysis would not produce reliable results here. A traditional event study measures abnormal changes in stock price around some disclosure date, requiring a traded price series. GPS is privately held with no publicly traded stock—making an event study impossible. Elsevier's reliance on *Miller v. Asensio & Co., Inc.*, 364 F.3d 223 (4th Cir. 2004), is misplaced; that case involved a publicly traded issuer, simply reflecting the proper context in which an event study might provide reliable and helpful information. *Id.* at 225-26, 232-33.

Elsevier's suggestion that Mr. Spindler should have performed a regression analysis is similarly unavailing. Here, a regression would analyze monthly net sales, but the candidate exploratory events occurred within an overlapping 14-month period. Estimating separate coefficients for that many events across a small number of monthly sales figures would yield highly imprecise results. Mr. Spindler's choice to employ a well-established approach rather than an event study or regression is not grounds for exclusion.

**3. Mr. Spindler's Use of a "Market-Wide" Benchmark and 2020 Revenue Base Is Sound**

Elsevier challenges Mr. Spindler's use of BCC Air Purifier Industry growth rates as a benchmark and GPS's 2020 revenue as a base year. Defs.' Br. at 3-4, 15. Neither objection warrants exclusion.

*Industry Benchmark.* Elsevier argues the BCC benchmark is inappropriate because it absorbs market-wide effects rather than any effects specific to GPS. *Id.* at 15. That characterization misunderstands the methodology Mr. Spindler used. The BCC industry projections supplied the forward growth rate, but the GPS-specific content of the model came in through the company-

specific revenue base to which Mr. Spindler applied the projections. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶¶ 40-44. And Elsevier mischaracterizes Mr. Spindler's explanation for why this methodology absorbs "ordinary market forces" and "company-specific factors"—because as Elsevier points out, competitor marketing material and other publications about GPS's technology existed prior to and in 2020 and the effects thereof are accounted for in GPS's 2020 revenue. Defs.' Br. at 15; Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 109. Indeed, Mr. Spindler's methodology properly captures GPS-specific factors because "within [the overall industry growth rate], you're going to have some companies that are increasing market share and those that are losing market share." Ex. 1 (Spindler Dep. Tr.) at 66:5-11.

*2020 Revenue Base.* Elsevier suggests that Mr. Spindler improperly calculated the diminution in value using 2020 revenue as the base year, rather than February 2021. Defs.' Br. at 3-4. However, this choice was a conservative decision that reduced GPS's damages calculation. Had Mr. Spindler built the model on the twelve-month period leading up to February 2021 (as Elsevier suggests), GPS's base valuation would have been significantly higher: [redacted] rather than [redacted], and the estimated damages would have increased in turn. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 156-157 & Table 18. Mr. Spindler's choice to use the twelve-month period of 2020—including the months before GPS's accelerated growth coinciding with COVID—was methodologically sound and resulted in a lower damages opinion. This conservative approach favors Elsevier, not GPS.

**4. Elsevier's Cited Cases Are Distinguishable**

The cases Elsevier cites do not support exclusion. These decisions excluded expert testimony where the expert made foundational errors—assuming facts contradicted by the record, relying on fabricated data, or offering conclusions utterly disconnected from evidentiary support. None of those circumstances is present here.

The Fourth Circuit cases Elsevier relies upon illustrate that expert assumptions must have some evidentiary foundation, but they do not require exhaustive quantification of every conceivable alternative cause. In *Tyger Construction Co. v. Pensacola Construction Co.*, 29 F.3d 137 (4th Cir. 1994), the expert's assumptions were affirmatively contradicted by uncontested record evidence—he assumed a lack of sand caused delay and harm, but the record showed a sand stockpile existed and other factors caused the delays. *Id.* at 142-43. Here, Mr. Spindler's causal analysis is supported by—not contradicted by—documentary evidence: customer communications referencing the First Test, sales data showing a [redacted] decline among affected customers (Table 14), media coverage identifying seven national outlets covering the First Test, and quantitative comparisons showing GPS's trajectory diverging dramatically from industry peers. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 111-143.

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001), actually supports GPS's position. The Fourth Circuit affirmed exclusion because the medical expert "utterly fail[ed] to consider alternative causes" and "did not explain how he ruled out smoking and other potential causes." *Id.* at 202-03. But the court articulated the governing standard: "a medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause," and "alternative causes suggested by a defendant normally affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Id.* at 202. Unlike the expert in *Cooper*, Mr. Spindler did not "utterly fail" to consider alternative causes—he identified them, analyzed them, and explained why each was de minimis or already incorporated into his baseline.

The remaining cases are equally inapposite. In *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300-01 (4th Cir. 2017), the expert offered nothing other than a temporal link—no data, no

analysis, no evidence of causation. Mr. Spindler goes far beyond temporal correlation, analyzing specific customer communications identifying the First Test as the reason for lost business, tracking sales decline on a customer-by-customer basis, assessing media coverage, and using industry benchmarks to project GPS's trajectory absent the First Test. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 111-143. In *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 182 F. App'x 267, 272-73 (4th Cir. 2006), the expert offered a speculative lump-sum with no attempt to connect damages to specific conduct. Mr. Spindler's but-for methodology was designed to isolate the First Test's impact and inherently accounted for many potential alternative causes—he valued GPS before and after the First Test, applied industry benchmarks, and analyzed alternative causes to explain why they did not independently drive the decline or require separate apportionment beyond GPS's 2020 base revenue. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 111-148. His methodology connects the damages calculation directly to the alleged wrongful conduct.

*PBM Products, LLC v. Mead Johnson Nutrition Co.*, No. 3:09-cv-269, 2010 WL 56072 (E.D. Va. Jan. 4, 2010), supports GPS. The court in *PBM Products* excluded a damages calculation resting on an arbitrary 5% assumption with no factual basis, but admitted testimony based on "a recognized economic approach with sufficient evidentiary support." *Id.* at *6-7. Mr. Spindler's DCF analysis with an industry benchmark is precisely the established approach *PBM Products* approved.

The cases involving foundationally deficient data are likewise distinguishable. In *Anderson v. Meyers (In re Infinity Business Group, Inc.)*, 612 B.R. 76 (Bankr. D.S.C. 2019), the court rejected damages testimony because the plaintiff "failed to prove that [the debtor] would not have remained in operation . . . absent [defendant's] actions," *id.* at 158, and the expert based calculations on the debtor's own fraudulent financial statements—documents described as

"deficient, false and misleading." *Id.* at 163. The expert also made no attempt to account for numerous intervening factors. *Id.* at 159-60. Here, Mr. Spindler relied on GPS's actual revenues and contemporaneous industry projections, not fabricated data. He analyzed and addressed each alleged alternative cause. *Anderson*'s concern—an expert blindly accepting unreliable data and ignoring obvious intervening causes—is simply not present here.

*Foster v. Legal Sea Foods, Inc.*, No. 03-cv-2512, 2008 WL 2945561 (D. Md. July 25, 2008), is also distinguishable. *Foster* involved a product liability claim where plaintiffs alleged they contracted Hepatitis A from undercooked mussels. The court excluded causation testimony because experts failed to "rule in" the defendant's product—there was no evidence the batch was contaminated, and epidemiological data showed HAV in mussels was "extremely low or nonexistent." *Id.* at *10-13. Here, there is no question that the First Test caused customers to decide against purchasing GPS products, or that the First Test's conclusions were damaging to GPS.

In sum, the cases establish that an expert must have some evidentiary basis for causation conclusions and must not "utterly fail" to consider alternative causes. Mr. Spindler satisfies that standard. Elsevier's complaint is not that Mr. Spindler used an unreliable methodology; they complain that he reached the wrong conclusions. But while Elsevier may believe that Mr. Spindler should have attributed more weight to alternative causes, used a different analytical model, or reached a different damages figure, those are arguments for cross-examination, not exclusion. *Daubert*, 509 U.S. at 596; *In re Lipitor*, 892 F.3d at 631.

## B. <u>Mr. Spindler's "Derivative Works" and "Competitive Forces" Analyses Reflect Reliable Methodology</u>

Elsevier next argues that Mr. Spindler's categorization of certain publications as "derivative works" and prior articles as "competitive forces" lacks a reliable methodology. Defs.'

Br. at 17-20. Elsevier's arguments ignore the extensive factual record supporting Mr. Spindler's conclusions.

**1. Elsevier Distorts Mr. Spindler's References to "Derivative Works" and "Competitive Forces"**

Elsevier's argument misunderstands the nature of Mr. Spindler's analysis. Elsevier suggests that Mr. Spindler created novel categories to classify articles. *Id.* at 17-20. But Mr. Spindler did not use the phrases "derivative works" and "competitive forces" as terms of art, but simply as colloquial references to describe certain pieces of evidence he considered in conducting his valuation analyses. *E.g.*, Dkt. 277-1 (Spindler Opening Rep.) ¶ 115 n.173; Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 59. Contrary to Elsevier's suggestion here, Mr. Spindler's use of adjectives to reference various evidence is not subject to the methodological scrutiny required by Rule 702 and *Daubert*. *See In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liab. Litig.*, 2023 WL 6794318, at *11 (D. Md. Oct. 12, 2023) (expert's use of "unapproved" did not by itself require exclusion because expert was using the term in a "vernacular"—not specialized—manner).

**2. The "Competitive Forces" Category Reflects Sound Economic Reasoning**

Mr. Spindler's so-called "competitive forces" classification is a straightforward application of the but-for framework that is grounded in the actual market data. The Offermann Article (November 2020) and Steril-Aire Article (February 2020) both predate the First Test. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶¶ 45-50. Critically, GPS's 2020 revenue (including peak sales of approximately [redacted] per month in November 2020) was achieved *despite* the existence of the Offermann and Steril-Aire articles. *Id.* ¶ 46. The market had already digested and priced in whatever impact these publications had. GPS's actual financial performance in the face of these publications demonstrates that they did not prevent GPS from achieving extraordinary growth. *Id.* ¶ 50. The record evidence establishes that the Trane Article (January 2021) was another instance

of competitor "negative selling" against GPS—a routine marketplace dynamic that GPS had successfully navigated before. Jim Mangini, an employee of Hoffman & Hoffman (one of GPS's largest distributors), testified at deposition that the Trane Article was an example of Trane "negative sell[ing]" against GPS. Ex. 3 (Mangini Dep. Tr.) at 19:6-14; 156:1-9, 174:3-6. The Trane Article, moreover, "proclaimed that the technology demonstrated efficacy for air" and "showed no production of VOCs"—notably different conclusions from the First Test's findings. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 49.

Mr. Spindler testified at deposition that competitive criticism, such as competitors "sniping at each other" with white papers and presentations, is a routine marketplace dynamic that GPS had successfully navigated before the First Test. Ex. 1 (Spindler Dep. Tr.) at 112:6-13, 155:24-156:6. The Trane Article, while critical of NPBI for surfaces, "proclaimed that the technology demonstrated efficacy for air" and "showed no production of VOCs." Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 49. The Offermann Article "was published near the beginning of the month prior (November 5, 2020) to when GPS's monthly sales were [redacted] in December 2020, and GPS's contemporaneous forecast in January 2021 clearly did not anticipate any impact from the Offermann Article." *Id.* GPS's own management projected [redacted] in 2021 revenues as of January 2021—*after* all pre-First Test factors Elsevier now identifies as alternative causes. *Id.* ¶ 37. Sophisticated GPS insiders with full knowledge of every alleged alternative cause projected continued growth.

Mr. Spindler also addressed the ASHRAE and CDC guidance Elsevier claims he ignored. Defs.' Br. at 11. As he explained, "the ASHRAE guidance relevant to GPS's sales in 2020 and 2021 was published in October 2019, and the CDC guidance as of at least July 2020 stated that '*many of the earlier potential safety concerns are reportedly now resolved*.'" Dkt. 277-5 (Spindler

Rebuttal Rep.) ¶ 47. The market had over a year to contemplate these statements before GPS's monthly sales peaked at [redacted]. The guidance merely "stated that bi-polar ionization was still an emerging technology and that its efficacy had not yet been tested to the extent of more established technologies"—it did not recommend against NPBI. *Id.* Neither the government guidance nor the Offermann Article nor the Trane Article prevented GPS from achieving [redacted] year-over-year revenue growth in 2020. *Id.* ¶¶ 49-50; Dkt. 277-1 (Spindler Opening Rep.) ¶ 39.

Mr. Spindler's reference to "competitive forces" reflects sound economic principles about baseline measurement and is not a reason to exclude his opinions. *Viamedia*, 2025 WL 2972666, at *15 (where assumptions are supported by evidence, critiques about methodological application go to weight, not admissibility).

**3. The "Derivative Works" Category Is Supported by Record Evidence**

Mr. Spindler's "derivative works" classification is supported by specific record facts. The Open Letter explicitly cited the First Test as primary scientific support for its criticisms, and the First Test was the only basis for connecting the Open Letter's most damaging claim (production of harmful chemical byproducts) to GPS. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 52. The evidentiary link runs deeper: the first page of the Open Letter lists three First Test authors—Drs. Gall, Farmer, and Stephens—as those who "[r]eviewed and supported" the Open Letter. *Id*. Mr. Spindler reasonably concluded that "this positioning indicates that the persuasive force and credibility of the Open Letter were substantially derived from the scientific conclusions presented in the First Study as a claimed peer reviewed study." *Id.* The Boeing Study similarly cites the First Test. Dkt. 277-1 (Spindler Opening Rep.) ¶ 45 at 24).

Mr. Spindler explained his reasoning at deposition: "to the extent that there is no first study, that there is no peer-reviewed journal or publication, the impact of any of these other things would

not have had an effect. It would have been similar to all the other competitive forces that we had described previously, where you've just got a competitor that is sniping at another competitor." Ex. 1 (Spindler Dep. Tr.) at 112:6-14. This reflects a reasonable causal analysis: the Open Letter, Boeing Study, and related publications derived their scientific credibility from the peer-reviewed status of the First Test. Mr. Spindler's Rebuttal Report elaborates: "absent the First Study, the Open Letter would have consisted primarily of allegations, or a 'smear piece,' from a competitor rather than assertions supported by purported scientific evidence that was labeled as peer reviewed. In that sense, the First Test served as the scientific predicate underlying the Open Letter's impact." Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 53. This is not arbitrary labeling—it is traceable causal analysis based on document citations, author relationships, and market evidence.

The causal logic is further supported by asymmetry in media coverage and academic indexing. The First Test was indexed on Science Direct, ResearchGate, Semantic Scholar, Google Scholar, and the EPA's HERO database, with 48 to 54 citations including 10 "Highly Influential Citations." Dkt. 277-1 (Spindler Opening Rep.) ¶ 119. Mr. Spindler "was unable to identify similar indexing for either the Offermann Article or the Trane Article" or "peer-reviewed articles citing" them. *Id.* The First Test and its authors were featured in at least 7 mainstream national media outlets—Fast Company, Wired, Mother Jones, KFF Health News, NBC, CNN, and Axios—while Mr. Spindler found no comparable coverage of the Offermann or Trane Articles. *Id.* This asymmetry explains the First Test's uniquely devastating impact: it carried peer-review imprimatur, achieved widespread academic citation, and received national media amplification. None of the alleged "alternative causes" had that reach.

Elsevier emphasizes that Mr. Spindler gave varying descriptions of the Offermann Article's categorization at deposition. Defs' Br. at 8-9. But this colloquy demonstrates precisely

the nuanced expert judgment properly explored on cross-examination, not excluded at the gatekeeping stage. *See Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 200 (4th Cir. 2017) (disputes about expert's reasoned assumptions and analysis "may be attacked by a defendant through cross-examination or through the presentation of contrary evidence"). Mr. Spindler explained that the Offermann Article had limited reach and did not drive GPS's decline. Ex. 1 (Spindler Dep. Tr.) at 93:1-9, 94:21-23. Regardless of labeling, the substance of his analysis was consistent: pre-existing articles were absorbed in the 2020 baseline, and GPS achieved [redacted] monthly sales despite them. Semantic quibbles do not render his damages opinion inadmissible.

These are not arbitrary classifications. They reflect Mr. Spindler's expert judgment about causal pathways: specifically, that certain subsequent publications derived credibility and impact from the First Test. As he explained, it is "the fact that there was a peer-reviewed study that underpins these issues" that makes the First Test causally distinct. Ex. 1 (Spindler Dep. Tr.) at 112:18-19. He testified: "I think it is the only one out there." *Id.* at 112:24-25. Whether a jury agrees is a question of *weight*, not *admissibility*. *Bresler*, 855 F.3d at 195.

The cases Elsevier cites are inapplicable. In *Bank of America, N.A. v. Jericho Baptist Church Ministries, Inc.*, No. 21-cv-2209, 2022 WL 11112695, at *2 (4th Cir. Oct. 19, 2022), the court excluded testimony about a banking industry standard of care from someone who had worked briefly at a bank prior to 1985. Mr. Spindler, by contrast, explained in detail how he identified derivative works (tracing citations and examining co-authorship), how he categorized competitive forces (examining timing relative to baseline performance), and how his methodology incorporated these classifications. Similarly, the experts in *Bunting Graphics, Inc. v. Whiting-Turner Contracting Co.*, No. 1:19-cv-02, 2022 WL 14664724, at *9-10 (D. Md. Oct. 25, 2022), and *Matter of Coeymans Marine Towing, LLC*, No. 1:23-cv-697, 2026 WL 1630207, at *4 (E.D.

Va. 2026), offered no methodology at all—one could identify no scientific method and the other's opinion was based on nothing more than *ipse dixit* to assign value to a tug boat. Mr. Spindler identified and applied specific criteria for his classifications: publications that cited the First Test or were co-authored by First Test authors were categorized as derivative works; pre-existing publications that did not prevent GPS from reaching peak sales were categorized as competitive forces already reflected in the baseline.

Elsevier's remaining cited cases are even further afield. *Ziegler v. Polaris Industries, Inc.*, No. 1:23-cv-112, 2024 WL 482212, at *10 (W.D.N.C. Feb. 7, 2024), excluded testimony because the expert stated conclusions with no explanation. *Rembrandt Social Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594 (E.D. Va. 2013), is a patent damages case applying the "smallest salable patent-practicing unit" doctrine, which has no application to defamation damages. And in *Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 297-99 (4th Cir. 1998), the expert's method of testing a carpet sample for biological or irritant substances was unreliable because it had never been independently replicated or subjected to peer review. Mr. Spindler's analysis of competitive forces and derivative works as part of his but-for/DCF methodology, by contrast, is one of the most widely used and well-established approaches in business valuation and commercial damages. *E.g.*, *Globus Med., Inc. v. Jamison*, No. 2:22CV282, 2024 WL 4711947, at *4 (E.D. Va. Nov. 7, 2024) (business damages often calculated using methodologies that compare values before and after event at issue).

### C. <u>Mr. Spindler's Opinions Rest on a Reliable Foundation, Not Cherry-Picked Evidence</u>

Finally, Elsevier accuses Mr. Spindler of selectively reviewing customer communications and ignoring documents that contradict his conclusions. As purported proof, Elsevier points to

exhibits contending Mr. Spindler overlooked documents showing customers raised concerns about sources other than the First Test. This cherry-picking argument is meritless for multiple reasons.

To start, Elsevier's attack on Mr. Spindler's review of 29 customer communications must be understood in context. Mr. Spindler's valuation of GPS's damages rests on a comprehensive damages methodology using widely accepted DCF and Guideline Public Company approaches, quantitative comparisons to 29 "Pandemic Boom" companies across eight industries and 10 Guideline Public Companies in the HVAC industry, and analysis of GPS's sales data, financial projections, and market performance. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 125-143, 179-202. At the beginning of his analysis, Mr. Spindler reviewed 29 customer communications referencing the First Test and/or related coverage. *Id.* ¶¶ 114-116. As he noted, the purpose of this exercise was "to gain a qualitative understanding of the potential impact the First Study may have had on GPS's business." *Id.* ¶ 114. These communications represent customers accounting for [redacted] million—fully [redacted]—of GPS's total sales between 2020 and 2025, and sales to these customers declined [redacted] from 2020 to October 2025. *Id.* ¶¶ 121-122. Elsevier's cherry-picking argument, even if it had merit, would go only to the weight of this qualitative support, not the admissibility of Mr. Spindler's broader damages opinion grounded in DCF analysis, industry benchmarks, and quantitative market comparisons. *See Bresler*, 855 F.3d at 195. Moreover, Mr. Spindler reviewed 15 additional communications Dr. Arnold identified, explaining in his rebuttal report why they did not affect his analysis. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶¶ 55-60. Notably, 11 of those 15 predated the First Test, and several involved routine competitive forces "were, and always have been, present in GPS's market." *Id.* ¶ 59.

Elsevier's argument fails on its own terms. The Fourth Circuit has made clear that "cherry-picking" warranting exclusion requires a "[r]esult-driven analysis" that "undermines principles of

the scientific method." *In re Lipitor*, 892 F.3d at 634. Exclusion is warranted if an expert reports favorable test results but not unfavorable results. *Id.* at 634-35. However, "[i]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**1. Mr. Spindler Did Not "Cherry Pick" Evidence**

Mr. Spindler's approach is the opposite of cherry-picking. Elsevier's own exhibits prove the point. Elsevier cites 6 documents (Exhibits T through Y) as communications Mr. Spindler purposely did not consider. Defs.' Br. at 21. But Mr. Spindler's Opening and Rebuttal Reports reference and analyze several of these documents. An expert cannot be accused of ignoring evidence he affirmatively reviewed and cited. Elsevier's Exhibit T (GPS-WDNC-01-00036988) is cited in Mr. Spindler's Rebuttal Report at footnote 45 in his analysis of the Daikin Applied South Florida communication. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 59(6) & n.45 (citing GPS-WDNC-01-00036988 at -6989). There, Mr. Spindler analyzed the communication and concluded that it "primarily involves the negative press (such as the First Study) GPS was receiving" and that "Daikin Applied South Florida is the only rep in North America that has sold less through June of 2021 than they had sold through June of 2020"—suggesting that the First Test's impact was geographically concentrated in that market. *Id.* Similarly, Elsevier's Exhibit U (GPS-WDNC-01-00034141) is also reviewed in his rebuttal report. *See* Dkt. 277-5 (Spindler Rebuttal Rep.) § 5.4, Table 1. That Elsevier cites these very documents as proof of cherry-picking—when Mr. Spindler affirmatively analyzed them—undermines their entire argument.

Second, Mr. Spindler's analysis shows that he did not purposely include or exclude documents based on any perceived "favorability." As he explained at his deposition, he requested "any and all emails from customers with respect to concerns" from "the date of the first study," with no qualifiers as to whether those communications would reference additional potential causes. Ex. 1 (Spindler Dep. Tr.) at 116:12-24. He then reviewed "all the emails that had been produced to us" in putting together his opinions. *Id.* at 76:20-25. Mr. Spindler's request was not limited to documents supporting a particular result—he asked for everything and reviewed what he received. Similarly, Mr. Spindler was transparent about what he found. His Opening Report explicitly acknowledged that some communications "also reference other sources in addition to the First Study and/or derivative works." Dkt. 277-1 (Spindler Opening Rep.) ¶ 115. Far from hiding inconvenient data, Mr. Spindler disclosed that even among the 29 communications he analyzed, some referenced factors other than the First Test. Specifically, two reference the Offermann Article, two reference the Boeing Study (which itself cites the First Test), one references the Trane Article, and five reference the Open Letter and/or Dr. Zaatari (which were derivative of the First Test). *Id.* This candor is the hallmark of reliable expert methodology—not cherry-picking.

Finally, the 29 communications are economically significant. They represent customers accounting for [redacted]—fully [redacted] of GPS's total customer sales between 2020 and 2025. Dkt. 277-1 (Spindler Opening Rep.) at Table 14, ¶¶ 121-122. Sales to these customers declined [redacted] between 2020 and the last twelve months ending October 2025. *Id.* This substantial portion of GPS's customer base refutes any suggestion that Mr. Spindler selected a narrow subset to achieve a predetermined result.

### 2. Mr. Spindler's Qualitative Analysis Is Corroborated by Independent Evidence

Mr. Spindler's qualitative analysis of the 29 communications is corroborated by multiple independent data points. His media analysis found that 7 mainstream media outlets—including Fast Company, Wired, Mother Jones, KFF Health News, NBC, CNN, and Axios—covered the First Test, while he found no comparable mainstream coverage of the Offermann or Trane Articles. Dkt. 277-1 (Spindler Opening Rep.) ¶ 119. The First Test was cited 48-54 times in academic literature by December 2025, including 10 "Highly Influential Citations," while the Offermann and Trane Articles were not academically indexed at all. *Id.* ¶¶ 118-119. This asymmetry in both media and academic reach explains why the First Test had a uniquely devastating impact: it carried the imprimatur of Elsevier's peer-reviewed *Building and Environment* journal, achieved widespread academic citation, and received national media amplification. None of the alleged "alternative causes" had that reach.

Mr. Spindler's quantitative comparisons provide further corroboration. He compared GPS's post-COVID revenue trajectory to 29 "Pandemic Boom" companies across eight industries. *Id.* ¶¶ 130-143. While those companies achieved an average 11% CAGR in the four years following their COVID peak, GPS experienced a [redacted] CAGR. *Id.* ¶¶ 135-142. Similarly, GPS's 10 Guideline Public Companies achieved an average 9% CAGR post-COVID, while GPS's revenues collapsed. *Id.* ¶¶ 125-129. Even Peloton—facing a product recall, CEO turnover, supply chain disruptions, and a fatality—maintained fiscal 2025 revenues 172% above pre-COVID levels. Dkt. 277-5 (Spindler Rebuttal Rep.) ¶ 125. GPS, facing none of those headwinds, reported 2025 revenues only [redacted] above its pre-COVID baseline. *Id.* The divergence between GPS's trajectory and every available market comparison is explained by the First Test, not post-pandemic

normalization. The qualitative customer communications corroborate what the quantitative data independently establish: the First Test caused GPS's catastrophic decline.

**3. The Cases Elsevier Cites Are Readily Distinguishable**

The cases Elsevier cites on cherry-picking are distinguishable. In *EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015), the expert ignored data from "hundreds, if not thousands" of relevant job applicants, included only 19 of nearly 2,000 background checks, and omitted data from half of the relevant branch offices. *Id.* at 466-67. That distorted data selection, coupled with "a 'mind-boggling' number of errors and unexplained discrepancies" in the data base led the Fourth Circuit to affirm the expert's exclusion. *Id.* at 467-68. Similarly, the cherry-picking discussion in *In re Lipitor*, 892 F.3d 624 (4th Cir. 2018), concerned an expert who selectively chose to include the results of some calculations but not others—reflecting a "[r]esult-driven analysis" that "undermines principles of the scientific method." *Id.* at 634-35. Mr. Spindler's situation is the polar opposite. He requested "any and all" customer communications, reviewed a large set of data including the very documents that Elsevier complains he ignored, analyzed a sample representing [redacted] of GPS's total customer sales, and transparently reported all of his results—including acknowledgment that some communications referenced other sources. While Elsevier points to a few additional documents, Elsevier has not argued (nor could it) that the sample of customer communications Mr. Spindler reviewed is not largely representative of the relevant communications. Mr. Spindler applied the scientific method—he did not manipulate data to reach a predetermined result.

Elsevier's other cited cases are likewise inapposite. In *NuVasive, Inc. v. Kormanis*, No. 18-cv-282, 2019 WL 9633645 (M.D.N.C. Mar. 18, 2019), the expert blindly accepted his client's self-serving representations that a non-descript Excel file contained the client's sales data, without any independent verification, despite her own testimony that the generally acceptable method is to rely

on shareholder or annual reports, with sales data coming directly from the company. *Id.* at *1-2. Similarly, in *Ramaco Resources, LLC v. Federal Insurance Co.*, No. 2:19-cv-703, 2026 WL 1695017 (S.D. W. Va. June 11, 2026), the expert had relied on a limited set of documents that contained a wide range of assumptions, and which resulted in a set of loss calculations that the expert conceded would have been different if he had been provided and used the company's board-approved financial documents. *Id.* at *3. The court found that the assumptions set forth in the documents the expert had reviewed were contradicted by undisputed facts, rendering the expert's opinion unsupported by the record. *Id.* at *5-6. And in *Hernandez Reid v. Geo Group, Inc.*, No. 3:24-cv-309, 2026 WL 1365021 (E.D. Va. May 15, 2026), the court excluded an expert opinion estimating economic loss by a prisoner where the expert used demonstrably incorrect key facts such as incarceration dates and prison wages. *Id.* at *5-6. The court excluded the opinion because it was built on "factual errors that are neither minor nor peripheral, but instead constitute significant inputs to every calculation that he performed." *Id.* at *5. Each of these cases is inapposite, however, because here there is no challenge here to the authenticity of the documents Mr. Spindler considered, and there is no suggestion that the communications Mr. Spindler analyzed are incorrect or false. Mr. Spindler cross-referenced the customer communications with GPS's actual sales data, media coverage, and industry benchmarks to verify the causal link. Dkt. 277-1 (Spindler Opening Rep.) ¶¶ 118-143. In all, Mr. Spindler's foundational facts are supported by the record. There is no basis to exclude his opinions on this basis. *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 426 (4th Cir. 2025) (improper "cherry picking" did not occur where expert included data that he determined was more appropriate for analysis).

## IV. **CONCLUSION**

For the foregoing reasons, GPS respectfully requests that the Court deny Elsevier's motion.

Date: August 28, 2026

**McGuireWoods LLP**

By: /s/ *Robert A. Muckenfuss*
Robert A. Muckenfuss (SBN #28218)
Kelly Warlich (SBN #51053)
Hannah K. Caison (SBN #59260)
Zachary L. McCamey (SBN #53540)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2052
Fax: (704) 444-8707
rmuckenfuss@mcguirewoods.com
kwarlich@mcguirewoods.com
hcaison@mcguirewoods.com
zmccamey@mcguirewoods.com

Lucy Jewett Wheatley (*pro hac vice*)
Claire Hagan Eller (*pro hac vice*)
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-4320
Fax: (804) 698-2017
lwheatley@mcguirewoods.com
celler@mcguirewoods.com

Peter J. Wright (NC Bar # 62879)
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
Tel: (919) 755-6600
Fax: (919) 755-6699
pwright@mcguirewoods.com

*Attorneys for Plaintiff Global Plasma Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August, 2026, that the foregoing document was filed electronically with the Clerk of Court for the Western District of North Carolina by using the CM/ECF system. Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Robert A. Muckenfuss*