UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-00034-KDB-WCM

GLOBAL PLASMA SOLUTIONS, INC.,

*Plaintiff*,

v.

ELSEVIER INC. and ELSEVIER LTD.,

*Defendants*.

**DEFENDANTS ELSEVIER INC. AND ELSEVIER LTD.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO PARTIALLY EXCLUDE THE EXPERT OPINIONS OF DR. V. FAYE MCNEILL**

**TABLE OF CONTENTS**

**Page**


PRELIMINARY STATEMENT ....................1

BACKGROUND ....................2

A. The First Study ....................2

B. Dr. Storey's Opinions ....................4

C. Dr. Sobek's Opinions ....................5

D. Dr. McNeill's Opinions ....................5

LEGAL STANDARD ....................8

ARGUMENT ....................8

II. GPS'S MOTION RESTS ON MISCHARACTERIZATIONS OF DR. MCNEILL'S OPINIONS ....................8

A. GPS Ignores That Dr. McNeill's Reading Of The First Study's Language Is Grounded In Scientific Convention ....................8

B. GPS Mischaracterizes Dr. McNeill's Discussion Of GPS's Marketing Materials As Narrative Despite Her Application Of Chemistry Expertise ....................14

C. GPS Improperly Recasts Dr. McNeill's Evaluation Of The Study's Design As Speculation About The Authors' Motives ....................17

D. GPS Omits the Literature Underlying Dr. McNeill's Background Statements Before Calling Them Unsupported ....................21

III. IN ANY EVENT, GPS'S MOTION SHOULD BE DENIED BECAUSE IT APPLIES THE INCORRECT LEGAL FRAMEWORK ....................24

CONCLUSION ....................25

## TABLE OF AUTHORITIES

*Bresler v. Wilmington Trust Co.*,
855 F.3d 178 (4th Cir. 2017) ....................12, 19

*In re C.R. Bard, Inc.*,
2018 WL 4220602 (S.D.W. Va. Sept. 5, 2018) ....................16

*Choi v. Kyu Chul Lee*,
312 F. App'x 551 (4th Cir. 2009) (per curiam) ....................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................8, 10, 17, 18, 23

*EarthKind, LLC v. Lebermuth Co.*,
2021 WL 2226492 (W.D.N.C. June 2, 2021) ....................25

*Funderburk v. S.C. Elec. & Gas Co.*,
395 F. Supp. 3d 695 (D.S.C. 2019)....................25

*G.W. Aru, LLC v. W.R. Grace & Co.-Conn.*,
2025 WL 1068581 (D. Md. Apr. 9, 2025) ....................23, 24, 25

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................9

*Huskey v. Ethicon, Inc.*,
29 F. Supp. 3d 691 (S.D.W. Va. 2014)....................11, 12

*Kopf v. Skyrm*,
993 F.2d 374 (4th Cir. 1993) ....................8, 12

*Plyler v. Cox*,
145 F.4th 501 (4th Cir. 2025) ....................8

*Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*,
829 F.2d 1280 (4th Cir. 1987) ....................10

*SAS Inst., Inc. v. World Programming Ltd.*,
125 F. Supp. 3d 579 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017)....................13, 15, 16

*Sommerville v. Union Carbide Corp.*,
149 F.4th 408 (4th Cir. 2025) ....................10

*TFWS, Inc. v. Schaefer*,
325 F.3d 234 (4th Cir. 2003) ....................19

*United States v. Benkahla*,
530 F.3d 300 (4th Cir. 2008) ....................22

*United States v. Bynum*,
604 F.3d 161 (4th Cir. 2010) ....................8, 9, 24

*United States v. Dorsey*,
45 F.3d 809 (4th Cir. 1995) ....................13, 14

*United States v. Wilson*,
484 F.3d 267 (4th Cir. 2007) ....................13

*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) ....................23

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ....................8, 19

**<u>Other Authorities</u>**

Fed. R. Evid. 403 ....................17

Fed. R. Evid. 702 ....................2, 8, 10, 13, 19, 23

## PRELIMINARY STATEMENT

This Court should deny the motion of Plaintiff Global Plasma Solutions, Inc. ("GPS") to exclude four opinions of Dr. V. Faye McNeill, a chemical engineering professor at Columbia University with over two decades of experience in air quality research, who Defendants Elsevier Inc. and Elsevier Ltd. (collectively, "Elsevier") retained to respond to the criticisms of the First Study[1] by GPS's experts, Dr. John Storey and Dr. Edward Sobek.

At the threshold, GPS's arguments ignore the unique role of rebuttal experts, who are permitted to criticize the methodology and opinions of opposing experts without offering an alternative methodology. GPS does not challenge Dr. McNeill's qualifications and provides no legitimate basis for excluding her criticism of GPS's retained experts—both of whom have close ties to GPS that pre-date this litigation. GPS instead seeks to exclude opinions it does not like, drawn from the same text and record on which its own experts rely, which the law does not allow.

Under any standard, however, Dr. McNeill's opinions are proper. GPS treats Dr. McNeill's opinion that the First Study's conclusions were qualified, not categorical, as a matter any lay reader could resolve, but it is the product of her own training regarding how scientists in her field describe uncertain findings. And her testimony provides key evidence about the context of the relevant statements—a necessary inquiry in considering the defamatory nature of a statement.

Likewise, GPS casts Dr. McNeill's discussion of GPS's own marketing materials and its founder's testimony as improper narrative, but she applies her own chemistry expertise to interpret those materials and reach an independent conclusion about the scientific validity of the mechanism the First Study proposes. Interpreting scientific statements relying on specialized knowledge is widely recognized as proper expert testimony.

---

[1] ECF 280-2, hereinafter referred to as the "First Study."

And GPS reduces Dr. McNeill's opinion on the type of scientific inquiry the First Study represents to speculation about the authors' motives, even though it reflects her own evaluation of the study's specific experimental design choices, corroborated by the authors' testimony rather than derived from it. Rule 702 permits such assessment of a study's design features when, as here, it draws on an expert's scientific training.

Finally, GPS ignores the basis for the two statements in the background section of Dr. McNeill's report that it seeks to exclude. Dr. McNeill's opinions that there were contemporaneous concerns in the field about ion-induced byproduct formation, and that First Study co-author Dr. Delphine Farmer is a recognized expert specifically in the soft-ionization mechanism at the center of the parties' dispute, are not "unsupported observations." ECF 286 (GPS Mot.) at 5. Rather, each rests on specific literature and citations, and Dr. McNeill independently supplies such support in her report.

The motion should be denied in its entirety.

## BACKGROUND

### A. The First Study

The First Study explains that "there has been an unprecedented level of interest and investment in indoor air cleaning technologies" following the COVID-19 pandemic and large-scale wildfire smoke events, and that "many electronic air cleaning technologies are not evaluated by any federal agency or industry standards organizations for their efficacy or their potential for unintended consequences, including the generation of chemical byproducts." First Study at 1. The authors noted that guidance on ionization technology was split at the time and that the CDC described such technologies as "emerging" in "the absence of an established body of peer-reviewed evidence showing proven efficacy and safety under as-used conditions." *Id.* at 2. The authors state: "We are not aware of investigations of the effectiveness or potential for byproduct

formation of bipolar ionization devices used in realistic settings, which presents a knowledge gap that this work intends to fill." *Id.*

To fill that gap, the authors analyzed GPS's needlepoint bipolar ionization ("NPBI™") device (model GPS-FC48-AC) in two settings: a controlled chamber furnished with aged materials at the Illinois Institute of Technology and a field site inside an occupied office building in Oregon. *Id.* at 2, 5. In the chamber, the NPBI device raised ion concentrations to roughly 1,400–2,000 ions/$cm^3$, which the First study describes as "consistent with the manufacturer recommended target of 1500–2000 ions/$cm^3$ in spaces in which they are installed." *Id.* at 3. The First study measured, among other things, the levels of volatile organic compounds ("VOCs") and reported: "Both the chamber and field tests suggested that the use of the tested bipolar ionization unit led to a decrease in some hydrocarbons (e.g., xylenes) among the lists of compounds we were able to analyze, but an increase in others, most prominently oxygenated VOCs (e.g., acetone, ethanol) and toluene." *Id.* at 1 (Abstract).

The study proposes a chemistry-based mechanism to explain that observed increase in VOCs. It states that "the ionization process appears to have led to partial decomposition of some hydrocarbons, resulting in the observed increases in some oxygenated VOCs." *Id.* at 8. It explains the proposed reaction as follows: once a VOC molecule is charged by the ionizer, "[t]he resulting ion-molecule cluster (e.g., [VOC·O2]+) could then undergo a rearrangement to form a carbonyl group (C=O), producing the observed enhancements in some oxygenated VOCs (oVOCs)." *Id.* at 9. Put simply, the study proposes that the ionizer's charge on a VOC molecule is not the end of the reaction: that charged molecule could go on to react with other constituents already present in the air, resulting in potential degradation and rearrangement into a smaller compound (i.e., chemical byproducts). ECF 286-4 (McNeill Rep.) ¶ 100.

The First Study describes its overall findings in qualified terms: "Both the laboratory and field data collected herein suggest that other unintended byproduct formation (e.g., of smaller, potentially oxidized VOCs) is likely occurring." First Study at 12. It also discloses that "this work was limited to a small number of field and laboratory experiments of a single bipolar ionization device, without replicates," and states that "additional work should strive to expand and ultimately standardize[] test methods for evaluating the efficacy and potential for byproduct formation of these devices." *Id.*

**B. Dr. Storey's Opinions**

GPS retained Dr. John Storey, a chemist who served on GPS's own Scientific Advisory Board from 2021 to 2024, to evaluate the First Study. ECF 286-2 (Storey Opening Rep.) at 1–2. Dr. Storey states that he was "not aware of any studies prior to the First Study that claimed bipolar ionization or GPS's NPBI™ technology caused any increase in VOCs," and opines that the First Study's "statements that GPS's device led to increases in VOCs are false." *Id.* at 3–4.

Central to Dr. Storey's opinion is his view of an underlying mechanism. He explains that "[h]igh energy ionization, or hard ionization, leads to fragmentation" of compounds whereas GPS's device uses "low voltage, or soft ionization," which "cannot lead to an increase of VOCs." *Id*. at 9–10. According to Dr. Storey, low voltage "would result in no molecular rearrangement or fragmentation." Ex. A[2] (Storey Tr.) at 230:7–11. Dr. Storey further calls attention to First Study co-author, Dr. Delphine Farmer, noting that she "cites the ionization potential as a reason for molecular rearrangement into acetone and other products," and concluding that "the authors are conflating hard ionization . . . with soft ionization." Storey Opening Rep. at 10.

During his time on GPS's Scientific Advisory Board, Dr. Storey acknowledged that GPS's

[2] Exhibits are attached to the Declaration of Tara Srinivasan, filed contemporaneously herewith.

founder, Charles Waddell, "would be an authority on how his company's technology operates," and confirmed that Mr. Waddell described the device as imparting "an energy field of 12.0 eV" to "break down the bonds below 12.0 eV." Storey Tr. 133:11–134:4. Dr. Storey was also involved in GPS's marketing efforts following the First Study's publication, testifying that he and others sought to "focus marketing and education around soft ions and low energy ionization" and to "educate the sales force." *Id.* at 162:19–163:8.

### C. Dr. Sobek's Opinions

GPS also retained Dr. Edward Sobek to evaluate the First Study. ECF 286-3 (Sobek Opening Rep.) at 1. Dr. Sobek previously served as GPS's Chief Science Officer, reporting directly to GPS's founder, Charles Waddell, and testified that the two "had talked quite a bit about the capabilities of the technology, and then trying to refine our understanding of those capabilities, like mechanisms and things like that," during his tenure. Ex. B (Sobek Tr.) at 27:24–28:3.

Like Dr. Storey, Dr. Sobek rejects the First Study's expressly qualified language outright. He opines that the study "is not presented as observational research" but instead "includes the conclusions that the GPS ionizer generates volatile organic compounds that are known to be harmful to human health," and that, despite purporting to rest on "a controlled experiment," the First Study "fails to employ replicates, is not controlled, suffers from a lack of objectivity and ignores principles of bias mitigation"—failures he says "should have precluded its publication." Sobek Opening Rep. at 3. On that basis, he concludes that the study's published VOC conclusion "is not supported by the study's design, procedures, or data and is therefore false." *Id.*

### D. Dr. McNeill's Opinions

Dr. McNeill, Elsevier's retained expert, holds a Ph.D. in chemical engineering from the Massachusetts Institute of Technology and is a Professor of Chemical Engineering at Columbia University with more than twenty years of experience in atmospheric and indoor air chemistry.

McNeill Rep. ¶ 13. She has authored more than 100 peer-reviewed publications on air quality, atmospheric chemistry, and aerosol science and has served as an editor for scientific journals, including as an Associate Editor of *ACS Earth and Space Chemistry* since 2016 and as a co-editor of *Atmospheric Chemistry and Physics* from 2007 to 2017. *Id.* ¶ 14; *see id.* at B2-B9. Dr. McNeill's research experience includes designing and carrying out chamber studies (like that at issue in the First Study), measuring VOC levels in controlled laboratory settings using mass spectrometry, and analyzing VOCs generated as reactive byproducts of chemical oxidation processes. *Id.* ¶ 18.

Dr. McNeill opines that "the First Study's conclusions are explicitly qualified throughout," and that treating them as "categorical false statements of scientific fact" "misrepresent[s] what the First Study actually says," a conclusion she reaches by juxtaposing the First Study's specific language, like "suggests" and "appears to," against the study's disclosed sample size, chamber design, and stated limitations, consistent with how scientists in her field are trained to describe preliminary findings. *Id.* ¶¶ 6, 95, 113–114; Ex. C (McNeill Tr.) at 17:7–11, 25:9–18. She disagrees with the chamber-design criticism, noting that the ion concentrations matched the range GPS itself told customers to expect because the First Study's own measured data showing ion concentrations of roughly 1,400–2,000 ions/cm³ was "squarely within the range" of GPS's manufacturer-recommended target of 1,500–5,000 ions/cm. McNeill Rep. ¶¶ 80, 84.

Turning to the scientific context in which the First Study arose, Dr. McNeill opines that, given "concerns about whether ions in the indoor environment could . . . induce chemical reactions that lead to unintended byproduct formation," the study reflects "a scientifically motivated investigation into the fundamental question of how the ion cloud that GPS had been describing for years would interact with the types of VOC sources commonly present in real indoor

environments," not a specification test. *Id.* ¶¶ 81, 85. She reaches that opinion by pointing to the study's actual design choices: the single-pass chamber configuration, which controlled the point of air entry and reduced infiltration of uncontrolled laboratory air, *id.* ¶ 84; the use of aged furnishings and materials to generate a representative mix of indoor VOC sources rather than a single target compound, *id.*; and ion concentrations that tracked the real-world range GPS was telling its customers to expect, rather than a single pass/fail threshold, *id.* ¶¶ 80, 128–130. She treats Dr. Stephens's deposition testimony describing his research aims as corroborating, not the source of, that independent design-based assessment. McNeill Tr. 124:9–125:5.

With respect to the First Study's proposed mechanism, Dr. McNeill opines that "Dr. Storey conflates mass spectrometric hard ionization with the ion-molecule cluster chemistry that occurs at atmospheric pressure," which the First Study's proposed mechanism reflects. McNeill Rep. ¶ 10. In other words, in Dr. McNeill's view, Dr. Storey's opinion that a so-called soft ionization device cannot lead to byproduct formation is inconsistent with her scientific understanding. She supports this with the broader scientific literature, *id.* ¶ 158, and with GPS's own pre-publication materials describing its "Plasma Field" breaking molecules "into their constituent ions," *id.* ¶ 76, and its 2019 public White Paper describing ionization as producing "intermediate byproducts" before "terminal products of carbon dioxide and water," *id.* ¶ 78—substantiated by Mr. Waddell's testimony that this was "the theory at the time." *Id.* ¶ 160. On that basis, she opines this "undermines Dr. Storey's views that soft ionization cannot result in VOC formation." *Id.* ¶ 164. Given her expertise in air quality research, Dr. McNeill further notes that co-author Dr. Farmer has authored multiple peer-reviewed papers specifically on chemical ionization mass spectrometry, which reflect an understanding of the distinction between hard ionization in a mass spectrometer and atmospheric-pressure ion-molecule chemistry. *Id.* ¶ 159 & n.231.

## LEGAL STANDARD

Rule 702 permits expert testimony to assist the factfinder where it is based on sufficient facts or data, results from reliable principles and methods, and reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Although the Court serves a gatekeeping function, that function "is not intended to serve as a replacement for the adversary system," and "the rejection of expert testimony is the exception rather than the rule." *Plyler v. Cox*, 145 F.4th 501, 514 (4th Cir. 2025) (citation omitted). Where an expert's methodology draws on experience, the inquiry considers "how [the expert's] experience leads to the conclusion reached, why [that] experience is a sufficient basis for the opinion, and how [that] experience is reliably applied to the facts" of the case. *United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010). The Court need not determine that an expert's testimony is "irrefutable or certainly correct" to find it admissible. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain the traditional means of addressing challenges to admissible expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## ARGUMENT

### II. GPS'S MOTION RESTS ON MISCHARACTERIZATIONS OF DR. MCNEILL'S OPINIONS

#### A. GPS Ignores That Dr. McNeill's Reading Of The First Study's Language Is Grounded In Scientific Convention

GPS's argument for exclusion fails at the outset because it relies on a flawed premise that Dr. McNeill's opinion of the First Study's language rests on nothing but her own say-so.

GPS first argues that Dr. McNeill's opinion—that Dr. Storey and Dr. Sobek

mischaracterized the First Study's findings as unqualified, categorical statements of fact—has no reliable methodology behind it because it cites only "GPS's experts' reports and the First Test's text itself," making it "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." GPS Mot. at 8 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). That argument overlooks the analysis that Dr. McNeill actually undertook, and the experience underlying it.

Dr. McNeill's opinion is not a reading of the text of the First Study in isolation from the data but is instead the product of considering the text together with the data, the study design, and the limitations that produced the reported results. McNeill Tr. 17:7–11; McNeill Rep. ¶¶ 95, 114. A scientist with her training does not treat words like "suggests" and "appears to" as interchangeable with an unqualified claim; hedged words like these signal, as a matter of convention in her field, that a finding is preliminary or limited to the conditions tested. *See* McNeill Rep. ¶¶ 6, 95, 113; McNeill Tr. 25:9–18. She explains the basis for that convention: the First Study's "very qualified, hedged language . . . reflects the authors' awareness" of specific, disclosed limitations (e.g., a single sample per condition for most VOC measurements, a single-pass rather than recirculating chamber design, and no ionizer-off control at the field site) and "[r]esearchers in my field reading the First Study would . . . immediately recognize these limitations and view the data as tentative findings, consistent with the very qualified way in which all of the First Study's 'conclusions' are expressed." McNeill Rep. ¶ 95. That is a scientist using their expertise to read language in light of what the underlying data can and cannot support, not a bare parsing of words in a vacuum. *Bynum*, 604 F.3d at 167–68 (considering how an expert's experience applied to specific facts provided "ample indicia of reliability" to support admission). Applying that holistic lens to Dr. Storey's and Dr. Sobek's opinions, Dr. McNeill concludes that

they "misrepresent[] what the First Study actually says or how it would be interpreted by someone working in my field." McNeill Rep. ¶ 114; *see also id.* ¶ 6.

Dr. McNeill's contextual analysis is not merely permissible under Rule 702; it supplies exactly what defamation law itself requires the jury to consider. The Fourth Circuit requires examination of "the context of the challenged statement within the writing . . . as a whole." *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1287 (4th Cir. 1987). The jury will accordingly be instructed to weigh "the nature of the language used and the context and general tenor of the article." *Choi v. Kyu Chul Lee*, 312 F. App'x 551, 554 (4th Cir. 2009) (per curiam). Dr. McNeill's testimony gives the jury the scientific convention it needs to carry out that context-driven inquiry, translating what the First Study's language would communicate to a reader trained in the field.

GPS asks the Court to weigh in on the merits of the debate between experts rather than test their respective methodologies. But "[c]rediting one expert over another . . . misapplies *Daubert* and intrudes on the province of the jury." *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 431 (4th Cir. 2025) (citation omitted). Dr. McNeill opines that those in her field reserve the word "false" for circumstances where "the data underlying those conclusions are manipulated," not merely where the sample size is small or the design has disclosed limitations. McNeill Rep. ¶ 117; McNeill Tr. 170:19–171:8. Dr. Sobek calls the First Study's conclusions false based on the absence of a formal hypothesis, the absence of statistical testing, and the unreplicated design, Sobek Opening Rep. at 2–3, none of which shows that the data were manipulated or that the reported observations did not occur. Dr. McNeill further applies this scientific convention to Dr. Sobek's own published work, pointing out that Dr. Sobek's 2023 published paper on the same GPS FC-48-AC device used the identical implicit-hypothesis structure he now criticizes in the

First Study. McNeill Rep. ¶ 116. GPS treats that same approach as sound science when Dr. Sobek's paper uses it, but dismisses it as unsupported opinion when Dr. McNeill points it out, which is itself an attempt to have the Court pick a winner between two experts' competing opinions. Courts reject that kind of argument as one "conceived by lawyers" and "unfounded in science" when a party's litigation position contradicts what its own experts actually do. *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 703 (S.D.W. Va. 2014).

GPS next argues that Dr. McNeill's opinion contradicts statements in a 2022 review article she authored in which she cited the First Study as one of six sources for the proposition that ionizers "can generate gas-phase oxidants, which degrade indoor air quality, lead to the formation of secondary [particulate matter], and potentially harm human health," ECF 286-6 at 10, and thereby "interpreted the First Study as concluding GPS's technology could harm human health." GPS Mot. at 9. Neither shows a contradiction, and Dr. McNeill already explained why. Asked whether that sentence used any "soft language," she identified precisely the qualifiers GPS's brief omits—"I said ionizers are generally not recommended because they can generate gas-phase oxidants . . . [a]nd potentially harm human health"—and confirmed that the words "generally" and "can" were deliberately chosen to "send some type of message that this is a softer conclusion." McNeill Tr. 25:7–18. She further explained the sentence's structure clause-by-clause: "[I]t doesn't say that the ionizers can potentially harm human health. It says that they can generate gas-phase oxidants, which degrade indoor air quality, and then the downstream effects of that is potentially harming human health." *Id.* at 25:22–26:2. The only part she did not caveat was the well-established chemistry principle that gas-phase oxidants degrade air quality, stating "there is . . . no doubt about what gas-phase oxidants can do, so that's why I didn't qualify that statement." *Id.* at 26:6–8. A point of settled science is distinct from the disputed, device-specific

question at issue in this case, and Dr. McNeill testified that she cited the First Study alongside five other sources, including lay media coverage, "to express the general temperature of the conversation in the field surrounding an issue," not to certify that any one source, including the First Study, reached an unqualified finding standing alone. *Id.* at 26:21–24. Given Dr. McNeill's consistent application of that same convention across both statements, what GPS calls a methodological challenge is in reality a veiled dispute with the conclusion she reached, which is not a proper basis for exclusion. *See Huskey*, 29 F. Supp. 3d at 733 ("These are not proper challenges to [the expert's] methodology. In reality, they are disputes with the conclusions [he] reached.").

GPS further erroneously contends that Dr. McNeill's deposition testimony undercuts her own opinion. But such a challenge goes to weight, not to admissibility. *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (affirming admissibility of expert testimony even when its clarity was challenged). In any event, when confronted with the First Study's statement that "chemistry initiated by the ionizer appears to impact VOC concentrations," Dr. McNeill conceded only the narrow grammatical point that the specific verb "initiated" carries no qualifier while affirmatively maintaining that the sentence's governing hedge is "appears to impact." McNeill Tr. 53:6–12. As she explained, "[i]t says: 'The ionizer appears to impact.' Strong language would be the ionizer impacts." *Id.* Distinguishing between one unqualified word and the qualified sentence surrounding it is not abandoning an opinion; it is precisely the close reading, in scientific context, that Rule 702 permits an expert to bring to bear and that the Fourth Circuit has held is "presumed to be helpful," given that it resides outside the province of lay knowledge. *Kopf*, 993 F.2d at 377.

GPS separately argues that Dr. McNeill's opinion is unhelpful because it does nothing

more than interpret "language that need[s] no interpretation," GPS Mot. at 10 (quoting *United States v. Wilson*, 484 F.3d 267, 278 (4th Cir. 2007)), a task the jury "can sufficiently . . . do . . . without help from an expert." *Id.* (quoting *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995)). *Wilson* does not support that argument; it undermines it. *Wilson* draws a line between interpreting "clear" conversational language, which is excluded, and interpreting specialized language, which the Fourth Circuit expressly permits experts to explain. 484 F.3d at 277–78. Scientific writing convention falls on the admissible side of that line: a lay reader knows what "suggests" means in casual conversation, not what it signals about the strength of a finding in a particular experimental setup, read together with the data and design that produced it. McNeill Rep. ¶¶ 95, 113–114, 117; McNeill Tr. 17:7–11, 25:9–26:24.

The Fourth Circuit admits expert testimony translating language that looks ordinary on its face but carries a specialized meaning within a particular field. In *United States v. Smith*, the Fourth Circuit held that an expert "must consider the context surrounding the language in determining the appropriate interpretation," 919 F.3d 825, 837 (4th Cir. 2019), and rejected the argument that the expert had to "point to a specific experience that informed each . . . opinion," explaining that his expertise "d[id] not derive from any singular piece of information" but was instead "gained over extended, repeated exposure." *Id.* at 836–37. Dr. McNeill's expertise rests on that same kind of context-driven, experience-based judgment: a chemist trained to read hedged language like "suggests" and "appears to" against a study's underlying data, design, and disclosed limitations can assess the degree of certainty that language actually conveys. Courts permit exactly this kind of technical opinion. *See SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 587–88 (E.D.N.C. 2015) (finding expert testimony admissible where the substance giving rise to the opinion was beyond a lay understanding), *aff'd*, 874 F.3d 370 (4th Cir. 2017).

GPS's remaining cases are inapposite for the same reason: none involves anything like the specialized convention at issue here. *Dorsey* excluded testimony about comparing two surveillance photographs, a task involving no specialized knowledge of any kind, which the court held "can sufficiently be done by the jury without help from an expert." 45 F.3d at 815. *United States ex rel. Shepherd v. Fluor Corp., Inc.* excluded a witness who disclaimed any methodology beyond ordinary English competence, testifying that his interpretation rested on the fact that he "understand[s] the English language." 2026 WL 105724, at *9 (D.S.C. Jan. 14, 2026) (alteration in original). And *Minnesota Lawyers Mutual Insurance Co. v. Batzli* excluded expert testimony in a lay matter about the reasonableness of an attorney's conduct where there was no scientific convention to apply at all. 2010 WL 670109, at *2 (E.D. Va. Feb. 19, 2010).

### B. GPS Mischaracterizes Dr. McNeill's Discussion Of GPS's Marketing Materials As Narrative Despite Her Application Of Chemistry Expertise

As to GPS's attacks on the reliability of Dr. McNeill's opinion about GPS's marketing materials, GPS improperly disregards the chemistry expertise she applies to interpret them.

GPS argues that Dr. McNeill's discussion of GPS's pre-publication marketing materials and Mr. Waddell's deposition testimony is "an improper narrative summary" with "no methodology underlying" it, because she "is simply reading the words of both the marketing materials and the First Study and determines they are the same." GPS Mot. at 12–14. That argument mischaracterizes the nature of the underlying documents and Dr. McNeill's reliance on them. GPS's marketing slides describe a "plasma field" that breaks VOC molecules into "constituent ions," and they list specific compounds by their ionization-potential values: *e.g.*, xylene at 7.89 eV, acetaldehyde 10.23 eV, formaldehyde at 10.88 eV. McNeill Rep. ¶¶ 75–76. GPS's 2019 White Paper describes the underlying chemistry "in considerable detail," stating that "[a]ir ionization is expected to follow similar mechanisms, involving both bipolar ions, and free

radicals, to oxidize organic compounds to intermediate byproducts and eventually to terminal products of carbon dioxide and water." *Id.* ¶ 78. Whether this description of ion-molecule chemistry and intermediate byproducts describes the same category of reaction the First Study proposes is the kind of technical question that calls for a chemist's training to answer, not a question jurors are expected to resolve on their own. *See SAS Inst., Inc.*, 125 F. Supp. 3d at 587–88 (permitting expert testimony summarizing technical material "not readily understood by lay persons" because "the cornerstone of admissibility is the expert's reliance on his or her expertise in conveying that summary").

That is precisely the kind of technical translation Dr. McNeill provides here. She does not stop at reciting the content of documents; she uses her training to conclude that GPS's own pre-publication literature already acknowledged, before the First Study was conducted, that NPBI ions react with airborne VOCs, that this process involves intermediate byproduct species, and that the identity of those byproducts was, at the time, an open scientific question. McNeill Rep. ¶ 79. She then ties that acknowledgment to the broader peer-reviewed literature on plasma-based VOC degradation, citing a scientific article for the proposition that "reactive ionic species . . . interact with VOCs through a variety of pathways including proton transfer, charge transfer, and oxidative decomposition, generating intermediate oxygenated byproduct species." *Id.* ¶ 158. And she corroborates her reading with Mr. Waddell's own deposition testimony confirming that GPS's White Paper described "the same proposed mechanism described in the First Study." *Id.* ¶ 161. The resulting opinion—that GPS's own account of its device's chemistry "reinforces the opinions proffered by the First Study authors" and "undermines Dr. Storey's views that soft ionization cannot result in VOC formation," *id.* ¶ 164—is a chemistry-informed conclusion built from Dr. McNeill's expertise and interpretation of these documents, not a mere narration of them.

GPS's own authority confirms that this kind of testimony is proper. *SAS Institute, Inc.* excluded testimony only where an expert sought to convey "the substance of *all* documents on which he relied," beyond the technical ones his expertise actually helped explain. 125 F. Supp. 3d at 588. The court held that an expert may "summarize or characterize the evidence in order to educate the jury on the import of the evidence, in light of the expert's field of expertise," where the underlying documents were "written 'programmer to programmer,' such that they are not readily understood by lay persons." *Id.* at 587–88. It explained that "[w]hen an expert summarizes evidence for the jury, the cornerstone of admissibility is the expert's reliance on his or her expertise in conveying that summary." *Id.* at 588. GPS's marketing materials and White Paper—describing ion-molecule chemistry, byproduct speciation, and specific ionization-potential values—are just as inaccessible to lay readers as the programmer-to-programmer documents *SAS Institute, Inc.* held an expert could properly characterize. *City of Huntington v. AmerisourceBergen Drug Corp.* draws the same line: it excluded narrative summary only after finding the underlying corporate documents were "[not] overly technical or scientific," expressly reserving admissibility for documents that involve scientific or technical data where "narrative summary would assist the trier of fact" in understanding the documents. 2021 WL 1320716, at *2 (S.D.W. Va. Apr. 8, 2021). GPS's technical marketing and White Paper fall squarely within that reserved category.

*In re C.R. Bard, Inc.*, which GPS cites for the proposition that "the documents and testimony should be presented directly to the jury, not through an expert," GPS Mot. at 16 (quoting 948 F. Supp. 2d 589, 628 (S.D.W. Va. 2013)), addressed a different problem: an expert opining directly on what a corporate defendant "knew and when [it] knew it." 948 F. Supp. 2d at 628. Dr. McNeill offers no opinion about what GPS knew or intended when it created its marketing materials; she offers an opinion about what the chemistry those materials describe means. A later

holding in the same case confirms the distinction: "[T]hough an expert may not simply narrate corporate documents in front of the jury, he may rely on such information in forming and supporting his opinions." *In re C.R. Bard, Inc.*, 2018 WL 4220602, at *4 (S.D.W. Va. Sept. 5, 2018). That is exactly what Dr. McNeill does. She relies on GPS's own technical documents to reach a chemistry-based opinion to rebut Dr. Storey's categorical claim that soft ionization "cannot" cause VOC fragmentation.

GPS's assertion that Dr. McNeill's testimony is misleading under Rule 403 because Mr. Waddell "does not have a chemistry background" and because GPS's marketing has since changed does not survive scrutiny. GPS Mot. at 13. Mr. Waddell's testimony is offered only to confirm what GPS's own technical documents said about the device's proposed mechanism at the relevant time—a factual underpinning—before Dr. McNeill applies her own training to compare that description to the First Study's mechanism. *In re C.R. Bard, Inc.*, 2018 WL 4220602, at *4. That GPS's marketing has since changed, GPS Mot. at 13 (citing ECF 286-7 (Waddell Tr.) at 158:7–159:6), goes to how much weight the jury should give the earlier materials, not to whether Dr. McNeill may discuss them at all. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging admissible expert testimony. *Daubert*, 509 U.S. at 596.

### C. GPS Improperly Recasts Dr. McNeill's Evaluation Of The Study's Design As Speculation About The Authors' Motives

GPS's attempt to undermine the reliability of Dr. McNeill's opinion concerning the type of scientific inquiry the First Study reflects fails because it mistakes her evaluation of the study's methodology for conjecture about the authors' subjective intent.

GPS argues that Dr. McNeill's opinion that the First Study was "a scientifically motivated investigation" rather than "a product efficacy test designed to evaluate whether the GPS-FC48-AC

met some manufacturer specification," McNeill Rep. ¶ 81, is unsupported speculation about the authors' subjective motivations. GPS Mot. at 14. GPS contends the opinion rests on nothing more than Dr. McNeill's "read of the first [study]" and Dr. Stephens's deposition testimony, with "no scientific principle or methodology" underlying it. *Id.* at 15. That argument treats a judgment about experimental design as if it were a judgment about state of mind, and the two are not the same. Whether a study's design reflects an attempt to answer an open scientific question, rather than to check compliance with a specification, is a question about research methodology that a chemist is trained to answer by looking at what a study, by design, actually measures. McNeill Rep. ¶ 81; McNeill Tr. 124:9–125:5. Dr. McNeill did exactly that: she pointed to the chamber's targeted ion concentration of 1,400–2,000 ions/$cm^3$, which corresponded to the range GPS itself told customers to expect from the device, McNeill Rep. ¶ 80, and to the single-pass configuration, which controlled the point of air entry and reduced infiltration of uncontrolled laboratory air. *Id.* ¶ 84. Dr. Stephens's testimony about why he made those choices corroborates her reading of the design. *Id.* ¶ 82 (quoting ECF 286-10 (Stephens Tr. (Mar. 6, 2026)) at 56:3–57:11). As Dr. McNeill testified, her inference is anchored in evaluating "some of the design choices in terms of the experimental setup," and she likewise assessed Dr. Stephens's testimony the same way—as context for her own analysis, not a substitute for it. McNeill Tr. 124:9–125:5. Her opinion reflects "a valid scientific connection to the pertinent inquiry," just as Rule 702 requires. *Daubert*, 509 U.S. at 580.

GPS incorrectly asserts that Dr. McNeill's opinion is "internally contradictory" because paragraph 116 of her report describes an "implicit hypothesis" to test whether the device "performs as the manufacturer claims," which GPS contends cannot be squared with paragraph 81's characterization of the study as something other than a manufacturer-specification test. GPS Mot.

at 15. The two paragraphs, however, answer two different criticisms and are not in conflict with each other. Paragraph 81 responds to GPS's characterization of the study as simply a test of "some manufacturer specification" using a formal, pass/fail compliance standard. McNeill Rep. ¶ 81. Paragraph 116 responds to a different criticism entirely: Dr. Sobek's claim that the First Study is invalid because it lacked a formally, expressly stated hypothesis. Dr. McNeill's response is that an implied research question is a standard, accepted structure in the field, proven by the fact that Dr. Sobek's own 2023 paper on the same GPS device used the identical structure. *Id.* ¶ 116. Recognizing that a study can be organized around an implied research question is not the same as saying the study is, in substance, a manufacturer-compliance test. And even if the two paragraphs could be read to have some disagreement, that would not require exclusion. Dr. McNeill's opinions need not be "certainly correct" in every aspect to satisfy Rule 702, so long as they reflect a reliable application of her methodology. *Westberry*, 178 F.3d at 261.

GPS next points to deposition testimony from First Study co-authors Dr. Gall and Dr. Stephens that it contends contradicts and thus supports exclusion of Dr. McNeill's opinion. GPS Mot. at 16–17. GPS describes Dr. Gall's testimony as showing that "the field experiment portion of the First Study was a paid product test," and relies on Dr. Stephens's testimony that testing "GPS[,] specifically their claims about their product" was "partially a motivator" for the chamber study. *Id.* (quoting ECF 286-9 (Stephens Tr. (Mar. 5, 2026)) at 179:20–25).

Neither piece of testimony bars Dr. McNeill's opinion, and at most, speak to weight. Courts evaluating an expert's opinion under *Daubert* may not evaluate the conclusion itself, only the methodology underlying it, *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003), and when "questions regarding the factual underpinnings" are raised, these "affect the weight and credibility" of the expert's assessment, "not its admissibility." *Bresler*, 855 F.3d at 195–96. GPS's

reliance on Dr. Gall and Dr. Stephens raises exactly that kind of question. Dr. Gall testified only that a school district wanted "additional measurements" before expanding its use of an "air-cleaning technology system[]" it had already installed. ECF 286-8 (Gall Tr.) at 33:25–34:22. That testimony concerns why a client engaged Dr. Gall to take field measurements; it says nothing about how Dr. Gall designed the field study experiment Dr. McNeill's opinion addresses. McNeill Rep. ¶¶ 171–172. And Dr. Stephens, in turn, described testing GPS's claims as only a "partial[]" motivator among several considerations for the study. Stephens Tr. (Mar. 5, 2026) at 179:12–25. A study can be partly motivated by curiosity about a specific manufacturer's marketing claims and still be, in Dr. McNeill's opinion, a scientific investigation of a more fundamental question about how ions introduced into an indoor space interact with VOC sources given the study's design. McNeill Rep. ¶ 81.

GPS's cited cases address a different problem than the one presented here. *In re Rezulin Products Liability Litigation* excluded testimony about corporate defendants' motive and intent where an expert assumed the role of an advocate with "no basis in any relevant body of knowledge or expertise." 309 F. Supp. 2d 531, 546–47 (S.D.N.Y. 2004). Notably, even the *Rezulin* court recognized that testimony about "the intention of the authors" of a published medical article stands on different footing where the witness brings "some understanding" of the relevant scientific field to that question. *Id.* at 547 n.38. That is exactly Dr. McNeill's position: a chemist assessing, from a scientist's perspective, what a study's experimental design was built to measure. *In re C.R. Bard* is no broader, barring an expert from opining on what a corporate defendant "knew and when [it] knew it," 948 F. Supp. 2d at 628, an inquiry distinct from Dr. McNeill's evaluation of whether a chamber and field test experimental configuration and air sampling design reflect hypothesis-driven research.

### D. GPS Omits the Literature Underlying Dr. McNeill's Background Statements Before Calling Them Unsupported

GPS's effort to discredit the reliability and qualifications behind statements Dr. McNeill offered to provide context for her opinions misses the mark because each one rests on literature she specifically cites.

GPS challenges two sentences in Dr. McNeill's report as unsupported factual assertions: paragraph 85's statement that, at the time the First Study was published, "there were concerns about whether ions in the indoor environment could also induce chemical reactions that lead to unintended byproduct formation," which GPS says "has no citation" and "is not supported by any methodology," GPS Mot. at 17–18; and paragraph 159's description of co-author Dr. Delphine Farmer as a "globally renowned expert in chemical ionization mass spectrometry," which GPS says has "no methodology to support her being an expert on another scientist's qualifications." *Id.* at 18. GPS relies on *Tyger Construction Co. v. Pensacola Construction Co.* for the proposition that an expert opinion "based on assumptions which are speculative and are not supported by the record" must be excluded. *Id.* (quoting 29 F.3d 137, 142 (4th Cir. 1994)).

Both statements are background Dr. McNeill supplies in support of the technical opinions GPS does not otherwise challenge, and a rebuttal expert is entitled to supply that background from her own field experience without independently footnoting every sentence of it. Just as an expert's specialized knowledge "need not derive from any singular piece of information" but may instead come from "extended, repeated exposure" to a body of work, *Smith*, 919 F.3d at 836–37, Dr. McNeill's decades of experience in indoor air chemistry qualify her to describe the state of scientific concern in her own field without citing a source for every clause. Her deposition testimony bears this out directly. Asked about the state of the field before the First Study was published, she testified that in her pre–First Study publications she had recommended filtration,

rather than ionization, as a COVID-19 mitigation technique specifically because "filtration technology targets the removal of aerosols from air and it's well studied and is not known to have any byproducts," dovetailing paragraph 85's account of that same concern. McNeill Tr. 166:19–23. That recommendation reflected her contemporaneous awareness that ionization itself was "generally not recommended as of 2021." *Id.* at 35:22–24. Dr. McNeill's discussion of general background will help the jury understand a complex subject and is a proper, routine use of expert testimony. *See United States v. Benkahla*, 530 F.3d 300, 309–10 (4th Cir. 2008) (affirming admissibility of background testimony on a complicated subject).

*Tyger* does not support excluding the challenged statement in paragraph 85 of Dr. McNeill's report. In *Tyger*, the Fourth Circuit excluded a damages expert's calculation because it rested on a factual premise that a sand stockpile had been depleted, causing delay, which the uncontroverted record affirmatively disproved: multiple witnesses, including the opposing party's own personnel, testified the stockpile was never depleted during the relevant period. 29 F.3d at 142–43. Paragraph 85 is the opposite situation. It appears under the heading "Study Design, Methodology, and Results" in Dr. McNeill's report, explaining the scientific backdrop against which the First Study's stated objectives make sense. McNeill Rep. ¶ 85. That backdrop is not Dr. McNeill's invention: the First Study's own introduction states that many electronic air-cleaning technologies, including ionizers, "are not evaluated by any federal agency or industry standards organizations for their efficacy or their potential for unintended consequences, including the generation of chemical byproducts." First Study at 1. GPS's motion likewise corroborates this. In arguing elsewhere that Dr. McNeill contradicted herself, GPS quotes her own 2022 peer-reviewed article stating that "[i]onizers are generally not recommended for COVID-19 risk-reduction applications because they can generate gas-phase oxidants . . . and potentially harm

human health," and notes that she cited six sources for that statement, one of which is the First Study itself. GPS Mot. at 8–9. GPS cannot argue in one part of its brief that this concern was documented across multiple peer-reviewed sources and, in another part of the same brief, that Dr. McNeill's reference to that same concern is a bare, uncited assumption unsupported by the record.

GPS's separate argument that paragraph 85 is inadmissible because it happens to be relevant to Elsevier's affirmative defenses does not change this analysis. GPS Mot. at 17–18. That an opinion may also bear on an affirmative defense does not make it unreliable; the question under Rule 702 is whether the opinion is the product of reliable principles reliably applied to sufficient facts, not whether it happens to serve more than one purpose in the litigation. *Daubert*, 509 U.S. at 596 (1993). Nothing in *Tyger*, or any other authority GPS cites, supports excluding an otherwise reliable background statement for that reason. And because the statement is factually supported background Dr. McNeill relies on in furtherance of opinions responding directly to Dr. Storey's and Dr. Sobek's reports, she has no burden to produce more than what she has already supplied. *G.W. Aru, LLC v. W.R. Grace & Co.-Conn.*, 2025 WL 1068581, at *9 (D. Md. Apr. 9, 2025).

Dr. McNeill's challenged statement in paragraph 159 of her report is likewise supported and is the kind of experiential assessment an expert may make about a fellow scientist within the same area of scientific discipline. Dr. McNeill's description of Dr. Farmer's expertise cites to three peer-reviewed papers on chemical ionization mass spectrometry that Dr. Farmer co-authored. McNeill Rep. ¶ 159 n.231 (citing Brophy & Farmer (2016); Link et al. (2021); Berg, Link & Farmer (2025)). Given their shared domain expertise, Dr. McNeill and Dr. Farmer also served as co-authors on a multi-author review paper on indoor surface chemistry. *Id.* ¶ 23 n.16. Because published literature can serve as "a guidepost" for expert testimony generally, *United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019), the reliance on Dr. Farmer's own publications here is

more than sufficient support for Dr. McNeill's assessment of Dr. Farmer's specific technical qualifications. Dr. McNeill's assessment responds directly to Dr. Storey's opinion that soft ionization "cannot" cause the molecular rearrangement his theory requires, Storey Opening Rep. at 9–10, and to his related accusation that Dr. Farmer improperly "cites the ionization potential as a reason for" that rearrangement, *id.* at 10, by identifying that Dr. Farmer specializes in precisely the soft, atmospheric-pressure ionization technique at issue. McNeill Rep. ¶ 159.

GPS fails to show that either statement rests on an unsupported assumption, only that it disagrees with what Dr. McNeill concluded from a record she was entitled to describe from her own experience. That disagreement is not a basis for exclusion. *Bynum*, 604 F.3d at 167–68.

## III. IN ANY EVENT, GPS'S MOTION SHOULD BE DENIED BECAUSE IT APPLIES THE INCORRECT LEGAL FRAMEWORK

Across all four categories of testimony it challenges, GPS repeats the same refrain: that Dr. McNeill's opinions are "divorced from any reliable methodology." GPS Mot. at 1. In so arguing, however, GPS fails to apply the relevant standard for rebuttal experts like Dr. McNeill, which permits a rebuttal expert to identify flaws in the opposing expert's opinion. For this reason alone, GPS's motion should be denied.

The "task of a rebuttal expert is different from that of an affirmative expert." *G.W. Aru, LLC*, 2025 WL 1068581, at *9. "There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.* (citation omitted).

Here, GPS's motion rests on the incorrect premise that Dr. McNeill is required to build a freestanding, affirmative methodology of her own before she can say why Dr. Storey's and Dr. Sobek's opinions are wrong. That misapprehends Dr. McNeill's role. She was retained for a single purpose: to evaluate and respond to the opinions of Dr. Storey and Dr. Sobek. McNeill

Rep. ¶ 2. As a rebuttal expert, Dr. McNeill "has no burden to produce models or methods of [her] own; [she] need only attack those of the opposing party's experts." *G.W. Aru*, 2025 WL 1068581, at *9 (citation omitted). Courts in the Fourth Circuit routinely recognize this principle. *See, e.g.*, *EarthKind, LLC v. Lebermuth Co.*, 2021 WL 2226492, at *3 (W.D.N.C. June 2, 2021) ("When offering rebuttal expert testimony, the expert has no burden to produce models or methods of their own; they need only attack those of the [opposing party's] experts." (alteration in original)); *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 720 (D.S.C. 2019) (a rebuttal expert "may criticize other experts' theories and calculations without offering alternatives" (citation omitted)). In any event as explained above,[3] each opinion GPS challenges is independently supported by Dr. McNeill's scientific training, citations, and her evaluation of the record.

## CONCLUSION

For the foregoing reasons, Elsevier respectfully requests that the Court deny GPS's motion in its entirety.

Dated: August 28, 2026

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ *Rachel E. Epstein*
Rachel E. Epstein
N.Y. Bar No. 4795092
(admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
Ellyde R. Thompson
N.Y. Bar No. 4729687
ellydethompson@quinnemanuel.com
(admitted *pro hac vice*)
JP Kernisan

[3] *See supa* Section I.

N.Y. Bar No. 4817045
jpkernisan@quinnemanuel.com
(admitted *pro hac vice*)
Nicholas A. LoCastro
N.Y. Bar No. 5477286
nicholaslocastro@quinnemanuel.com
(admitted *pro hac vice*)
Taylor L. Jones
N.Y. Bar No. 5358601
taylorjones@quinnemanuel.com
(admitted *pro hac vice*)
Margaret Schmidt
N.Y. Bar No. 5328018
margaretschmidt@quinnemanuel.com
(admitted *pro hac vice*)
295 5th Avenue
New York, New York 10016-7103
Phone: (212) 849-7485
Tara Srinivasan
C.A. Bar No. 341484
tarasrinivasan@quinnemanuel.com
(admitted *pro hac vice*)
50 California St., Floor 22
San Francisco, CA 94111

**POYNER SPRUILL LLP**

/s/ *Paul M. Cox*
Andrew H. Erteschik
N.C. Bar No. 35269
aerteschik@poynerspruill.com
Paul M. Cox
N.C. Bar No. 49146
pcox@poynerspruill.com
John Michael ("J.M.") Durnovich
N.C. Bar No. 47715
jdurnovich@poynerspruill.com
N. Cosmo Zinkow
N.C. Bar No. 53778
nzinkow@poynerspruill.com
P.O. Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-2895

*Counsel for Defendants*

**Certificate of Word Count Compliance**

Pursuant to the Pretrial Order and Case Management Plan (ECF No. 168), I certify that the annexed Memorandum of Law is no more than 25 pages.

This the 28th day of August, 2026.

/s/ *Rachel E. Epstein*
Rachel E. Epstein

**Certificate of Service**

I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

This the 28th day of August, 2026.

*/s/ Paul M. Cox*
Paul M. Cox