UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| GLOBAL PLASMA SOLUTIONS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>ELSEVIER INC. and ELSEVIER LTD.,<br><br>*Defendants*. | C.A. No. 3:22-cv-00034-KDB-WCM |

**DEFENDANTS ELSEVIER INC. AND ELSEVIER LTD.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE THE AUGUST 3, 2026 SUPPLEMENTAL DECLARATION OF JONATHAN I. ARNOLD, ELSEVIER INC.'S THIRD SUPPLEMENTAL RULE 26 INITIAL DISCLOSURES, AND ELSEVIER INC. AND ELSEVIER LTD.'S FOURTH SUPPLEMENTAL RULE 26 INITIAL DISCLOSURES**

**TABLE OF CONTENTS**

**Page**


PRELIMINARY STATEMENT ....... 1

BACKGROUND ....... 3

LEGAL STANDARD ....... 6

ARGUMENT ....... 7

I. GPS'S OWN DISCLOSURES AND DEPOSITION OF DR. GALL DEFEAT ANY CLAIM OF SURPRISE ....... 7

A. GPS Disclosed Dr. Gall Itself And Its Motion Misstates The Record To Suggest Otherwise ....... 7

B. Every Remaining *Southern States* Factor Confirms Dr. Gall's Disclosure Is Harmless And There Is Nothing To Cure ....... 8

II. GPS IGNORES THAT DR. STEPHENS'S EXPANDED TOPIC IS HARMLESS BECAUSE IT ADDS NOTHING NEW ....... 12

A. Truth Was Already A Live Subject Before The Challenged Disclosure ....... 12

B. The Remaining *Southern States* Factors Defeat Exclusion ....... 14

III. THE FALFURRIAS WITNESSES ARE GPS'S OWN BOARD MEMBERS, NOT A SURPRISE ELSEVIER MANUFACTURED ....... 17

IV. DR. ARNOLD'S SUPPLEMENTAL DECLARATION RESTS ON POST-DEADLINE PRODUCTIONS AND TESTS GPS'S OWN EXPERT'S REPRESENTATION ....... 19

CONCLUSION ....... 23

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Beller ex rel. Beller v. United States*,
221 F.R.D. 696 (D.N.M. 2003) .... 21

*Benjamin v. Sparks*,
986 F.3d 332 (4th Cir. 2021) .... 7

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017) .... 7, 21, 22

*Clear Touch Interactive, Inc. v. Ockers Co.*,
171 F.4th 715 (4th Cir. 2026) .... 17

*Dixon Lumber Co. v. Austinville Limestone Co.*,
256 F. Supp. 3d 658 (W.D. Va. 2017) .... 8

*Edwards v. McElliotts Trucking, LLC*,
268 F. Supp. 3d 867 (S.D.W. Va. 2017) .... 8

*Gallagher v. Southern Source Packaging, LLC*,
568 F. Supp. 2d 624 (E.D.N.C. 2008) .... 20, 21

*Gomez v. Haystax Tech., Inc.*,
761 F. App'x 220 (4th Cir. 2019) .... 17

*High Voltage Beverages, LLC v. Coca-Cola Co.*,
No. 3:08-cv-367, 2010 WL 3788288 (W.D.N.C. Sept. 22, 2010) .... 20

*Jones v. Town of Spring Lake*,
No. 5:18-CV-385-D, 2020 WL 4587519 (E.D.N.C. Aug. 10, 2020) .... 10, 16, 19, 23

*In re Levesque*,
653 B.R. 127 (D.S.C. 2023) .... 22

*McCullough v. Gannett, Co., Inc.*,
No. 1:22-cv-1099, 2023 WL 3075940 .... 14

*Morgan v. City of Charlotte*,
No. 3:22-CV-00003-KDB-DCK, 2023 WL 4002524 (W.D.N.C. June 14, 2023), *aff'd*, 180 F.4th 159 (4th Cir. 2026) .... 18

*Reynolds v. Smith*,
No. 5:25-cv-00044, 2026 WL 2086039 (W.D. Va. July 20, 2026) .... 16

*Richardson v. Am. United Life Ins. Co.*,
No. 1:05-CV-378, 2006 WL 3327683 (M.D.N.C. Nov. 15, 2006) ....................................8, 17

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ..........................................................................................6, 18

*United States v. Perkins*,
470 F.3d 150 (4th Cir. 2006) ..............................................................................................14

*Wallace v. Love's Travel Stops & Country Stores*,
2022 WL 3021019 (E.D. Va. July 20, 2022) .................................................................9, 10, 13

*Whitaker v. Hyundai Motor Co.*,
2019 WL 8348859 (W.D. Va. Feb. 5, 2019) ..............................................................................22

**Other Authorities**

Fed. R. Civ. P. 26(a)(1).......................................................................................1, 3, 14, 15

Fed. R. Civ. P. 26(e) ...................................................................................2, 6, 16, 18, 21

Fed. R. Civ. P. 37(c)(1)..............................................................................................2, 6, 14

Fed. R. Evid. 701 ..................................................................................................................14

## PRELIMINARY STATEMENT

Plaintiff Global Plasma Solutions, Inc.'s ("GPS") Motion to Strike Defendants Elsevier Inc.'s and Elsevier Ltd.'s (collectively, "Elsevier") Supplemental Rule 26 Initial Disclosures and Supplemental Expert Declaration is fatally flawed at the outset because it treats as new and surprising discovery that GPS itself already possessed, or that responds directly to a representation GPS's own expert made. GPS specifically challenges: (1) Elsevier's disclosure of Dr. Elliott Gall, a co-author of the First Study[1]; (2) Elsevier's disclosure of the "truth or lack of falsity of the statements contained in the First Study and Second Study"[2] as a topic for Dr. Brent Stephens, a co-author of the Studies; (3) Elsevier's disclosure of three Falfurrias Capital Partners executives who sit on GPS's own board; and (4) the entirety of the Supplemental Declaration of Elsevier's rebuttal damages expert, Dr. Jonathan Arnold. ECF 296 at 2-3. GPS asks this Court to treat that combination as a mirror image of the Order this Court entered in May 2026, when it partially granted Elsevier's motion to strike twenty witnesses GPS added to its disclosures seven months into discovery. *Id.* at 2 (citing ECF 203; ECF 245 ¶¶ 2-4). It is not: the witnesses this Court excluded in May were not known to Elsevier, while every witness and subject at issue here was already known to GPS, as GPS's own Motion proves.

As to Dr. Gall, the premise of GPS's argument is factually incorrect. GPS tells this Court that "[a]t the time" of Dr. Gall's July 22, 2026 deposition, "Dr. Gall had not been disclosed by any party in initial disclosures." *Id.* at 4. That is not true. GPS itself disclosed Dr. Gall in its own Rule 26(a)(1) Initial Disclosures on September 5, 2025—almost a year before his deposition—identifying him as having "[k]nowledge of the First Study, the Corrigendum, the Second Study,

---

1 ECF 233-1, hereinafter referred to as the "First Study."

2 Ex. A, hereinafter referred to as the "Second Study."

and all related data and experiments." Ex. B (GPS Sept. 5, 2025 Initial Disclosures) at 6. GPS then carried that identical disclosure forward, word for word, in its October 16, 2025, April 3, 2026, and April 15, 2026 supplemental disclosures. Ex. C (GPS Oct. 16, 2025 Suppl. Disclosures) at 6; Ex. D (GPS Apr. 3, 2026 Suppl. Disclosures) at 8-9; Ex. E (GPS Apr. 15, 2026 Suppl. Disclosures) at 8-9. There is no dispute that Dr. Gall has been on GPS's own witness list, continuously, since the very first round of disclosures exchanged in this case. GPS cannot tell this Court in good faith that a witness was undisclosed "by any party" when that witness has appeared by name on GPS's own disclosures four separate times over the course of a year.

The same is true of Dr. Stephens. GPS's Motion casts the addition of "truth or lack of falsity" of the Studies to Dr. Stephens's disclosed topics as some previously unannounced theory. But Dr. Stephens is the lead author of the very studies whose statements GPS alleges are defamatory, and GPS already deposed him on the Studies' respective methodologies, data, conclusions, and limitations. There is no plausible universe in which Dr. Stephens's testimony in a defamation case about his own papers does not bear on whether the papers' statements are true—that is not a new theory Elsevier sprang on GPS in August 2026; it is the obvious and anticipated subject of his testimony from the moment GPS brought this suit.

The remainder of GPS's Motion with respect to its own witnesses fares no better. GPS calls the addition of three Falfurrias Capital Partners executives to Elsevier's disclosures a prejudicial ambush, ECF 296 at 8, but Ed McMahan, Marc Oken, and Wilson Sullivan are GPS board members, are employed by its controlling parent, and are represented in this litigation by GPS's counsel. Elsevier promptly disclosed them after learning in the July 16, 2026 deposition of Ken Walker that these Falfurrias executives doubled as GPS directors. That is precisely the kind

of good-faith supplementation Rule 26(e) requires, not the tactical delay Rule 37(c)(1) is designed to punish.

And Dr. Arnold's Supplemental Declaration adds nothing new for GPS to defend against: it adds further support to Dr. Arnold's opinion based on documents produced by GPS and Falfurrias *after* Dr. Arnold submitted his report, and further tests GPS's damages expert's own rebuttal representation that his model "already incorporates market normalization," ECF 276-19 ¶ 69, using the same BCC industry data Mr. Spindler's own model relies on. GPS cannot manufacture prejudice out of an exercise it invited.

Because none of the challenged disclosures surprises, prejudices, or disrupts GPS or the pending litigation, the Court should deny GPS's motion.

## BACKGROUND

GPS filed this defamation action on January 26, 2022, arising from the First Study evaluating GPS's NPBI™ technology—normally intended for air cleaning applications—under specific laboratory-chamber and real-world "field" conditions. ECF 1. On June 5, 2023, GPS filed a First Amended Complaint, expanding its defamation claim to include the Second Study. ECF 39. Pursuant to the Court's First Case Management Order, all parties served Rule 26(a)(1) Initial Disclosures on September 5, 2025. ECF 106. GPS's September 5 disclosures identified ten individuals, including Dr. Brent Stephens and Dr. Elliott Gall—two of the lead co-authors of the First Study—as possessing "[k]nowledge of the First Study, the Corrigendum, the Second Study, and all related data and experiments." Ex. B at 6. GPS supplemented those disclosures on October 16, 2025, April 3, 2026, and April 15, 2026, and named Dr. Gall and Dr. Stephens, using identical language, in every one of those supplements. Ex. C at 6; Ex. D at 8-9; Ex. E at 8-9. GPS's October 16, 2025 supplemental disclosures also added Ken Walker, "the chairman of GPS's board" and "a partner of Falfurrias [Capital Partners]," GPS's controlling parent. Ex. C at 5.

Discovery proceeded over the following months. On March 5, 2026, GPS deposed Dr. Brent Stephens, examining him at length on the First Study and Second Study's respective methodologies, limitations, reporting of data and conclusions, and on his and Dr. Gall's alleged bias against GPS. *See, e.g.*, Ex. F (Brent Stephens 3/5/26 Dep. Tr.) at 50:6-55:3 (alleged bias), 116:15-118:16 (limitations), 134:17-183:17, 196:4-24, 207:25-209:9 (methodology, reporting of data, conclusions), 237:6-241:7 (Second Study). Elsevier examined Dr. Stephens on March 6, 2026, *see generally* Ex. G (Brent Stephens 3/6/26 Dep. Tr.), and served its own First Supplemental Rule 26 Disclosures on March 9, 2026, which identified "[t]he truthfulness of the contents of the First Study" as a subject on which GPS's corporate representatives and "other persons identified during the course of discovery" might testify. ECF 296-2 at 5. Elsevier served its Second Supplemental Disclosures on May 7, 2026, which continued to list Dr. Stephens for "the research, writing, and accuracy of the First Study and the Second Study" and continued to reserve "[t]he truthfulness of the contents of the First Study" as a general topic for GPS's corporate representatives and "other persons identified during the course of discovery." ECF 296-3 at 4.

On April 30, 2026, Elsevier moved to strike twenty witnesses GPS had added to its Second and Third Supplemental Initial Disclosures served on April 3 and April 15, 2026, respectively. ECF 203. By that point, seven months had passed since GPS's original Initial Disclosures, and Elsevier had conducted extensive discovery in reliance on that original witness list. *See generally id.* GPS opposed, and on May 11, 2026, the Court partially granted Elsevier's motion, precluding fourteen of GPS's newly disclosed witnesses from offering substantive testimony and extending certain case deadlines. ECF 208 at 3-4; ECF 245 ¶¶ 2-4 (modifying to nine witnesses).

On June 16, 2026, GPS filed its Second Amended Complaint, adding a false advertising claim to the pending litigation. ECF 233. On June 30, 2026, GPS made a production of 9,279

documents. On July 7, 2026, Elsevier Ltd. answered GPS's Second Amended Complaint and, based on these recently produced documents, asserted an unclean hands/*in pari delicto* defense, alleging that GPS board members conspired to overstate GPS's 2020 EBITDA to lenders.[3] ECF 242 at 31-32. That defense did not yet identify which individuals were involved. On July 16, 2026, at the deposition of Ken Walker, Elsevier's counsel learned that three Falfurrias executives—Ed McMahan, Marc Oken, and Wilson Sullivan—currently sit and at all relevant times sat on GPS's board of directors. Ex. H (Kenneth Walker 7/16/26 Dep. Tr.) at 40:17-41:1.

On July 22, 2026, GPS took the deposition of Dr. Gall, which lasted nearly seven hours on the record. During that deposition, GPS questioned Dr. Gall on the background and motivation for the First Study, Ex. I (Elliot Gall 7/22/26 Dep. Tr.) at 32:18-33:5, 66:17-21; its methodology, *id.* at 78:2-8, 149:13-22; the conditions and limitations of the field test, *id.* at 52:24-53:4, 63:11-14; the Study's results and conclusions, *id.* at 243:8-244:21; the Study's limitations generally, *id.* at 233:9-234:25; Dr. Gall's own background and potential alleged bias, *id.* at 201:6-203:5; his role in drafting the First Study, *id.* at 25:24-27:14; correspondence with the journal after publication, *id.* at 316:1-317:15; and whether his conclusion was that GPS's ionizer caused an increase in ethanol, the precise causation question underlying the truth or falsity of the First Study's findings. *Id.* at 253:23-256:4.

On August 3, 2026—the last day of written discovery—Elsevier Inc. served its Third Supplemental Rule 26 Disclosures, adding Dr. Gall (on "[b]ackground, methodology, field test, results, limitations, research, writing, and publication of the First Study; truth or lack of falsity of the statements contained in the First Study"), the three Falfurrias executives (on "allegations in

---

[3] GPS continued to make additional, substantial document productions through the close of written discovery: on July 7, 2026, GPS produced 5,230 documents and on August 3, 2026, it produced 9,093 documents.

GPS's Second Amended Complaint and Elsevier Ltd.'s defenses thereto; Falfurrias Capital Partners' acquisition, ownership, and control of GPS; GPS's corporate governance and strategy; Falfurrias' direction over or knowledge of GPS's business strategy and marketing of its NPBI technology, including the mechanism and operation of GPS's NPBI technology, such as FC-48; the damages alleged to result from the First Study and Second Study and/or any statements regarding peer review; the damages to GPS's business not related to the First or Second Study; GPS loans, financials, and dividend distributions"), and expanding Dr. Stephens's previously disclosed topics to include "truth or lack of falsity of the statements contained in the First Study and Second Study." ECF 296-4 at 4-6. On August 3, 2026, Elsevier also served a 4-paragraph supplemental declaration from its rebuttal damages expert, Dr. Jonathan Arnold, applying the normalization methodology GPS's own expert, Michael Spindler, had represented in his reply report that his own model already used. ECF 296-7; ECF 276-19 ¶ 69. On August 19, 2026, Elsevier Inc. and Elsevier Ltd. jointly served their Fourth Supplemental Disclosures, adding the same witnesses for Elsevier Ltd. as were previously disclosed for Elsevier Inc. ECF 296-5 at 4-6.

On August 14, 2026, the parties met and conferred about GPS's pending motion to strike during which GPS requested that Elsevier withdraw the presently challenged disclosures. Elsevier declined and GPS filed the pending motion on August 27, 2026. ECF 295.

**<u>LEGAL STANDARD</u>**

Rule 26(e) requires a party to supplement its initial disclosures "in a timely manner" as it learns that a prior disclosure was incomplete or as new information comes to light; it does not impose a fixed cutoff at the close of discovery. Fed. R. Civ. P. 26(e)(1)(A). Where a party fails to make a required disclosure, Rule 37(c)(1) bars use of the undisclosed witness or information "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[T]he basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party." *S.*

*States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

The Fourth Circuit has identified five *Southern States* factors to guide a district court's analysis "in exercising its broad discretion" to determine whether the challenged disclosure is substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Benjamin v. Sparks*, 986 F.3d 332, 342-43 (4th Cir. 2021). "The first four factors . . . relate primarily to the harmlessness exception, while the last factor . . . relates mainly to the substantial justification exception." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017). A district court, however, "is 'not *required* to tick through each of [these] factors.'" *Benjamin*, 986 F.3d at 343 (citation omitted).

## <u>ARGUMENT</u>

### I. GPS'S OWN DISCLOSURES AND DEPOSITION OF DR. GALL DEFEAT ANY CLAIM OF SURPRISE

#### A. GPS Disclosed Dr. Gall Itself And Its Motion Misstates The Record To Suggest Otherwise

GPS's entire theory of surprise as to Dr. Gall rests on a factual premise that the record disproves. GPS represents to this Court that "[a]t the time" of the July 22, 2026 deposition, "Dr. Gall had not been disclosed by any party in initial disclosures." ECF 296 at 4. That representation is incorrect. GPS itself named Dr. Gall in its own Initial Disclosures on September 5, 2025, as possessing "[k]nowledge of the First Study, the Corrigendum, the Second Study, and all related data and experiments," Ex. B at 6, and repeated that identical disclosure in its October 16, 2025, April 3, 2026, and April 15, 2026 supplements. Ex. C at 8-9; Ex. D at 8-9. A representation to this Court that no party had disclosed a witness GPS itself named four times over the course of a year is not a fair characterization of the record—it is either careless or worse.

Courts applying the *Southern States* factor framework consistently hold that there can be no cognizable surprise where the subject matter of a disclosure, or the witness's identity, was already known to the objecting party—including where that party identified the very witness in its own initial disclosures, *Dixon Lumber Co. v. Austinville Limestone Co.*, 256 F. Supp. 3d 658, 669 (W.D. Va. 2017), or where the witness's connection to the case has been apparent "since the inception of th[e] lawsuit," *Richardson v. Am. United Life Ins. Co*., No. 1:05-CV-378, 2006 WL 3327683, at *1 (M.D.N.C. Nov. 15, 2006); *accord Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 884 (S.D.W. Va. 2017). Dr. Gall's identity and his connection to the First Study as a co-author have been apparent to GPS since the very inception of this case; there is no plausible surprise left for GPS to claim.

GPS's own Motion elsewhere confirms the point. GPS declines to strike four other witnesses (Charles Waddell, Glenn Brinckman, Ken Walker, and Dr. John Storey) in Elsevier's Supplemental Disclosures because, in GPS's own words, "GPS had already disclosed" them "on its witness lists," so Elsevier's disclosure of those witnesses is "not prejudicial in the same way as the disclosures of the other witnesses in the Supplemental Disclosures." ECF 296 at 3 n.2. GPS's own logic disposes of its Motion as to Dr. Gall: he has likewise been on GPS's own witness list since September 2025, just like Mr. Waddell and Mr. Brinckman. GPS offers no explanation for applying its own "already disclosed" rule to some of its own witnesses but not to others named in the very same disclosures. The first *Southern States* factor, surprise, therefore favors Elsevier.

**B. Every Remaining *Southern States* Factor Confirms Dr. Gall's Disclosure Is Harmless And There Is Nothing To Cure**

The remaining factors confirm that no exclusion is warranted, because GPS already had—and used—its opportunity to examine Dr. Gall on every subject now disclosed.

The second factor, GPS's ability to cure any surprise, likewise favors Elsevier, because there is nothing left to cure. GPS argues that "Elsevier's experts had uniformly characterized the [First Study] as 'scientific opinion' that was neither true nor false, so GPS had no reason to explore a 'truth' defense at that deposition." ECF 296 at 8. That characterization does not describe what GPS actually did at Dr. Gall's deposition. Regardless of how Elsevier's experts framed their opinions about the First Study, GPS's own counsel repeatedly pressed Dr. Gall on precisely the truth of central findings in the First Study related to the field test, including whether his own conclusion was that GPS's ionizer caused an increase in ethanol. Ex. I at 253:23-25 ("Dr. Gall, so is your answer your conclusion was not that the ionizer increased ethanol?"); *id.* at 254:7-8 ("Was your conclusion that the ionizer increased ethanol? Yes or no?"); *id.* at 255:17-20 ("Caused by the ionizer or not caused [by] the ionizer?"). And over the course of a nearly seven-hour deposition, GPS's counsel questioned Dr. Gall on every other subject Elsevier's Third Supplemental Disclosures later listed: background and motivation, *id.* at 32:18-33:5, 66:17-21; methodology, *id.* at 78:2-8, 149:13-22; the field test's conditions and limitations, *id.* at 52:24-53:4, 63:11-14; results, *id.* at 243:8-244:21; limitations generally, *id.* at 233:9-234:25; his own background and potential bias, *id.* at 201:6-203:5; his role in writing the Study, *id.* at 25:24-27:14; and post-publication correspondence, *id.* at 316:1-317:15. *Compare id.*, *with* ECF 296-4 at 6 (listing "[b]ackground, methodology, field test, results, limitations, research, writing, and publication of the First Study; truth or lack of falsity"). Having already examined Dr. Gall on every one of these subjects, GPS cannot now claim it needs a cure.

The third factor, disruption, favors Elsevier for the same reason. Because GPS already examined Dr. Gall on every subject at issue, his disclosure by Elsevier requires no new deposition, no reopening of written discovery, and no continuance of the trial date. Nothing about the case

schedule—including the pending *Daubert* and summary judgment motions—needs to move to accommodate a witness GPS has already questioned at length. *See Wallace v. Love's Travel Stops & Country Stores*, 2022 WL 3021019, at *12 (E.D. Va. July 20, 2022) (finding no disruption where a witness was deposed before the close of discovery and a party had not identified the witness "on the eve of trial").

The fourth factor, importance, likewise weighs heavily in Elsevier's favor. Dr. Gall is not a peripheral witness; he co-authored the First Study and led the field research described therein, meaning he has firsthand knowledge of the very methodology and results that GPS alleges to be defamatory. Because truth is a complete defense to a defamation claim, his testimony bears directly on an element that could resolve GPS's claims outright, and excluding it would deprive the factfinder of testimony from the person best positioned to speak to whether the challenged statements are true. *See id.* (importance factor favored admission because, "if believed, [the witness] provides the most direct evidence" of the very facts on which the defendant's liability depended).

The first four factors alone establish harmlessness, and that showing is independently sufficient to defeat GPS's request for exclusion. The Court need not even reach whether Elsevier had an explanation for the timing of the disclosure. *Jones v. Town of Spring Lake*, No. 5:18-CV-385-D, 2020 WL 4587519, at *1 n.2 (E.D.N.C. Aug. 10, 2020) (*Southern States* factors favored admitting affidavits of witnesses not included on initial disclosures despite lack of "an explanation").

Elsevier's explanation nonetheless independently supports disclosure. Dr. Gall is a third-party witness, not an employee or agent within Elsevier's control, and Elsevier did not add him to its disclosures until after he testified at his July 22, 2026 deposition—testimony that, for the first

time, gave Elsevier a basis to identify him as a witness on the truth of the Study's findings rather than merely a potential source of information. GPS attempts to manufacture bad faith by pointing to Dr. Gall's testimony that he and Elsevier's counsel executed a common-interest agreement in 2025 and that he met with counsel three times to prepare before his deposition, arguing this shows Elsevier "knew or should have known much earlier that it would rely on" him. ECF 296 at 4, 9 (citing ECF 296-6 at 13:6-23, 14:1-16:12).[4] That inference does not follow. A common-interest agreement reflects coordination between a party and an aligned non-party witness on overlapping legal interests; it does not place that witness under the party's control, and it did not obligate Elsevier to designate him as an affirmative trial witness before he had even testified. Fed. R. Civ. P. 26 advisory committee notes to 2000 amendment (a party is not "obligated to disclose witnesses . . . that it does not intend to use" but must "supplement its disclosures when it determines that it may use a witness . . . it did not previously intend to use"). Preparing a third-party witness for a deposition is not the same as deciding, in advance, to rely on him for a specific defense theory—and here, disclosure promptly followed his deposition testimony by less than two weeks.

GPS separately argues that disclosing Dr. Gall only after his deposition "depriv[ed] GPS of the opportunity to examine him as a disclosed trial witness on a significant affirmative defense." ECF 296 at 9-10. That distinction is formalistic rather than substantive—GPS's counsel examined Dr. Gall on every subject later disclosed, including truth, so the label under which the examination occurred did not change the scope or adequacy of GPS's opportunity to question him.

[4] Moreover, Dr. Gall either misremembered or misspoke at his deposition. He did not enter into a common interest agreement with Elsevier until June 2026, about six weeks before his deposition. To the extent the Court would like a copy of the agreement for *in camera* inspection, Elsevier will supply a copy upon request.

## II. GPS IGNORES THAT DR. STEPHENS'S EXPANDED TOPIC IS HARMLESS BECAUSE IT ADDS NOTHING NEW

### A. Truth Was Already A Live Subject Before The Challenged Disclosure

GPS treats the addition of "truth or lack of falsity" to Dr. Stephens's disclosed topics as a subject sprung on it for the first time on August 3, 2026, asserting that "Elsevier had never previously indicated it would support its truth defense through fact witnesses." *Id.* at 9. That assertion fails under the first *Southern States* factor, surprise, because it is not accurate. Elsevier's First Supplemental Disclosures, served March 9, 2026—nearly five months before the challenged disclosure—already identified "[t]he truthfulness of the contents of the First Study" as a subject on which GPS's own corporate representatives and "other persons identified during the course of discovery" might testify. ECF 296-2 at 5. Elsevier's Second Supplemental Disclosures, served May 7, 2026—the very disclosures GPS says it was entitled to treat as complete, ECF 296 at 7—repeated that same reservation. ECF 296-3 at 4.

GPS's conduct confirms it already understood truth and credibility to be live issues for Dr. Stephens specifically well before the challenged disclosure. GPS examined Dr. Stephens over the course of two days on March 5 and March 6, 2026,[5] and devoted substantial time to whether he and Dr. Gall harbored bias against GPS that would color the Study's conclusions, Ex. F at 50:6-55:3. GPS's counsel also questioned him on the very mechanics of how the Study's data were gathered and whether they support its conclusions: the methodology used to calculate reported percent changes, *id.* at 150:3-18; whether the reported increases were actually caused by the ionizer or by a larger drop in outside-chamber concentrations, *id.* at 154:2-155:12; the mechanism by which ionization could produce byproducts, *id.* at 85:5-14; and the absence of any prior published

---

[5] On March 5, 2026, GPS's counsel examined Dr. Stephens; on March 6, 2026, Elsevier's counsel examined Dr. Stephens followed by further cross examination by GPS's counsel.

testing on bipolar ionization and byproduct formation before the Study, *id.* at 82:20-24. GPS's counsel likewise went through the First Study's reported conclusions compound by compound. *Id.* at 154:2-155:12, 159:20-160:3 (ethanol); *id.* at 238:5-9 (toluene); *id.* at 237:17-22, 240:8-13 (acetone); *id.* at 165:13-17, 166:8-11 (acetaldehyde). GPS's counsel pressed further on whether the Second Study's results were consistent with the First Study's conclusions in Dr. Stephens' view, walking through each of the three VOCs the First Study identified as elevated—ethanol, toluene, and acetone—and securing Dr. Stephens's testimony that the Second Study showed some VOCs increased, decreased, or were unchanged when GPS's device was running. *Id.* at 238:13-15, 239:23-240:7 (ethanol); *id.* at 238:5-9, 238:20-22, 239:5-9, 239:15-22, 240:14-21 (toluene); *id.* at 237:23-238:4, 238:16-19, 239:1-4, 239:10-14, 240:8-13 (acetone). GPS also sought Dr. Stephen's testimony about whether the Second Study fails to support the First Study's allegedly defamatory conclusion. *Id.* at 239:23-241:7. GPS's own examination, in other words, already treated the truth of the Studies as squarely at issue—the very subject it now claims was never disclosed.

Elsevier's counsel likewise probed similar ground, questioning Dr. Stephens directly about whether he still stood behind the Study's central conclusion—that GPS's NPBI device could lead to an increase in certain VOCs, Ex. G at 67:18-68:1, 107:10-25—and about whether other scientists in the field considered the Study reliable or flawed, *id*. at 107:10-108:6, 110:20-111:12. Dr. Stephens did not equivocate: "Nothing's changed in . . . my interpretation of the findings." *Id.* at 67:25-68:1. A witness examined at this level of depth, by both sides, on the data underlying the First Study and the soundness of its conclusions is not a witness GPS can credibly claim it never anticipated testifying to the truth of those conclusions. *See Wallace*, 2022 WL 3021019, at *11-12 (counsel "should not be surprised by [an adversary's] reliance on" a witness where the

adversary "consistently—and, at times rather explicitly—signaled [their] belief that [the witness] possessed relevant knowledge"). Formalizing an already-examined subject as a disclosed topic is not the kind of surprise Rule 37(c)(1) exists to prevent. The first *Southern States* factor thus favors Elsevier.

### B. The Remaining *Southern States* Factors Defeat Exclusion

The remaining *Southern States* factors each independently confirm that Dr. Stephens's expanded topic warrants no exclusion.

GPS's ability to cure any surprise under the second *Southern States* factor is not in question because GPS has already done what a cure would require. GPS argues that Dr. Stephens's expanded disclosure on truth and falsity of the Studies "deprived GPS of the chance to pursue relevant documents and follow-up discovery or examine Dr. Stephens on the expanded topic," which it erroneously frames as the subject of "impermissible . . . expert testimony." ECF 296 at 8. Dr. Stephens's testimony about the truth of his own conclusions is not expert testimony requiring separate disclosure under Rule 26(a)(2) at all—he is a percipient witness testifying to what he personally observed, measured, and concluded as an author of the allegedly defamatory Studies, not an expert retained to offer opinions outside his personal knowledge. *See* Fed. R. Evid. 701 advisory committee notes (rule "does not distinguish between expert and lay witnesses, but rather between expert and lay testimony"); *see also United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) (a lay witness may testify to matters within his own personal knowledge, including "eyewitness observations and particularized experience" without qualifying as an expert).

Nor does GPS's characterization of "incurabl[e] prejudic[e]" resulting from Dr. Stephens's disclosure on truth and falsity of the Studies survive the fact that a defendant is entitled to pursue multiple, even alternative, defenses to a defamation claim. ECF 296 at 8; *see McCullough v. Gannett, Co., Inc.*, No. 1:22-cv-1099, 2023 WL 3075940, at *6 (defendant asserted defenses that

alleged defamatory "statements are not false, because they are (1) opinions; (2) scientific facts that are not demonstrably false; and/or (3) literally true."). That Elsevier's experts have characterized the Studies as scientific opinion for purposes of one defense does not foreclose Elsevier from also defending on the ground that the Studies' statements are true, nor does it give GPS license to claim surprise when Elsevier discloses fact witnesses in support of that independently available defense. Fed. R. Civ. P. 26(a)(1)(A)(i) (defendant must disclose individuals it "*may* use to support its . . . *defenses*" (emphasis added)). Regardless, GPS was not deprived of any opportunity here. Elsevier's March 9, 2026 disclosures identified "[t]he truthfulness of the contents of the First Study" as a subject in the case five months before the challenged disclosure, ECF 296-2 at 5, and GPS's examination of Dr. Stephens shows it used that opportunity in full.

The third factor asks whether admitting the evidence would disrupt the proceedings, and here it would not disrupt anything. Unlike a genuinely new witness, Dr. Stephens has already sat for two full days of examination covering the precise subject matter at issue. Allowing his testimony on the expanded topic changes nothing about the case schedule: it requires no additional deposition, no extension of the discovery period, no delay to the *Daubert* or summary judgment briefing already underway, and no continuance of the trial date. Tellingly, GPS does not identify any actual evidence or discovery it was deprived from taking or that it would have to take now.

The fourth factor, the importance of the evidence, weighs heavily in Elsevier's favor as well. Dr. Stephens is not a peripheral witness offering cumulative or tangential testimony—he is the lead author of the Studies whose statements GPS alleges are defamatory, and his testimony speaks directly to whether those statements are true. Because truth is a complete defense to a defamation claim, excluding his testimony on that subject would not merely narrow the evidence at the margins; it would remove testimony bearing on an element that could resolve GPS's claims

outright. *Reynolds v. Smith*, No. 5:25-cv-00044, 2026 WL 2086039, at *6 (W.D. Va. July 20, 2026). As with Dr. Gall, a finding of harmlessness under these four factors is independently sufficient to defeat exclusion, regardless of whether Elsevier offers any explanation at all for the timing of the disclosure. *See Jones*, 2020 WL 4587519, at *1 n.2.

Elsevier's explanation for the timing independently supports disclosure regardless. GPS argues that "Elsevier also kept Dr. Stephens on its witness list for months, then expanded his subjects after written discovery closed," and that Elsevier "refused to answer GPS's interrogatories [Nos. 11-13] concerning it." ECF 296 at 10 (citing ECF 287 at 4). Keeping a previously disclosed witness on a witness list while an affirmative defense develops is not evidence of bad faith; it is the ordinary course of Rule 26(e) supplementation, which contemplates that a party's understanding of a witness's relevance may sharpen as the case progresses. *See, e.g.*, Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendment ("Supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period"). And Elsevier supplemented its disclosure of Dr. Stephens's topics in compliance with the Court's deadline for written discovery. *Compare* ECF 245 ¶ 4 (setting August 3, 2026 deadline), *with* ECF 296-4 (served August 3, 2026). Elsevier's responses to Interrogatory Nos. 11-13 confirm exactly this explanation rather than undermine it. As amended on September 9, 2026, Elsevier's responses cited directly to Dr. Gall's deposition, Dr. Stephens's deposition, GPS founder Mr. Charles Waddell's testimony, and Elsevier's expert opinions as the basis for its truth defense. Ex. J (Elsevier Ltd.'s Sept. 9, 2026 Am. Resps.) at 13-22. Elsevier's responses included nothing GPS did not already have—the same depositions and expert opinions already in the record—confirming that Dr. Stephens's expanded disclosure rests on information GPS itself

had known about and used throughout discovery, not on anything Elsevier withheld or introduced at the last minute.

## III. THE FALFURRIAS WITNESSES ARE GPS'S OWN BOARD MEMBERS, NOT A SURPRISE ELSEVIER MANUFACTURED

GPS's objection to Elsevier's disclosure of Ed McMahan, Marc Oken, and Wilson Sullivan does not survive scrutiny of who these witnesses are in relation to GPS. GPS argues that "[h]ad GPS known Elsevier might call these witnesses, it would have investigated their purported knowledge or potentially even sought third-party discovery to rebut Elsevier's claims. It did not because Elsevier withheld that information." ECF 296 at 8. That argument fails under the first *Southern States* factor, surprise, because GPS did not need Elsevier to tell it who sits on its own board. McMahan, Oken, and Sullivan are executives of Falfurrias Capital Partners—the entity that owns 90% of GPS—and directors of GPS itself, represented in this litigation by GPS's counsel. Any surprise GPS suffered is the result of its own decision not to look into its own boardroom, not a failure by Elsevier. *Richardson*, 2006 WL 3327683, at *1. The first factor thus favors Elsevier.

The second factor, cure, also favors Elsevier. GPS argues that "[n]o meaningful cure exists within the schedule," citing cases finding no practical way to cure prejudice from a late disclosure. ECF 296 at 7 (citing *Clear Touch Interactive, Inc. v. Ockers Co.*, 171 F.4th 715, 731 (4th Cir. 2026); and *Gomez v. Haystax Tech., Inc.*, 761 F. App'x 220, 231 (4th Cir. 2019). Those cases involved witnesses whose relevant knowledge the objecting party had no independent way to obtain except through new discovery directed at the witnesses themselves. That is not this case. The knowledge to which McMahan, Oken, and Sullivan would testify—Falfurrias's ownership interest in GPS, GPS's corporate governance, and GPS's financing and dividend history—resides with GPS itself, not inside three third-party witnesses that only new discovery could unlock.

The third factor, disruption, follows from the same set of facts: GPS does not explain, and cannot explain, what it would need to investigate about its own corporate structure, its own financing, or its own dividend history that it cannot already answer from its own files and its own knowledge. Admitting testimony about a company's own board from that company's own directors does not require reopening discovery, delaying dispositive-motion briefing, or moving the trial date—it simply requires GPS to consult its own records or speak with its own directors.

GPS argues that the fourth factor, importance, cuts against Elsevier because the defense's importance only "reinforces the prejudice caused by the untimely nature of its filing." ECF 296 at 9 (quoting *Morgan v. City of Charlotte*, No. 3:22-CV-00003-KDB-DCK, 2023 WL 4002524, at *5 (W.D.N.C. June 14, 2023), *aff'd*, 180 F.4th 159 (4th Cir. 2026)). That reasoning proves too much: if importance always amplified prejudice, no probative evidence could ever be timely supplemented under Rule 26(e), collapsing the fourth factor into an automatic vote for exclusion rather than the independent factor *Southern States* designed it to be. 318 F.3d at 597. The testimony here is important precisely because of what it bears on: McMahan, Oken, and Sullivan have direct knowledge of the corporate governance and financing decisions underlying Elsevier's unclean hands/*in pari delicto* defense, which alleges that GPS board members conspired to overstate GPS's 2020 EBITDA to lenders in or around summer and fall of 2020 for the express purpose of defrauding those lenders. ECF 242 at 31-32. That defense, if established, could bar or substantially reduce GPS's recovery altogether, not merely narrow the damages at the margins. Excluding testimony bearing on a defense of that consequence, based on a disclosure that surprised no one and disrupted nothing, would not serve Rule 37(c)(1)'s purpose of preventing prejudice; it would manufacture prejudice to Elsevier by removing evidence central to whether GPS can recover at all. At a minimum, Elsevier should be allowed to rely on the Falfurrias witnesses to

"give procedural testimony in accordance with Judge MetCalf's Order"—namely, to authenticate and admit into evidence documents they produced. ECF 245 ¶ 2. As with the first three factors, importance favors Elsevier here. A finding of harmlessness under these four factors is independently sufficient to defeat exclusion. *Jones*, 2020 WL 4587519, at *1 n.2.

The fifth factor, Elsevier's explanation, supports disclosure regardless. Elsevier did not plead its unclean hands/*in pari delicto* defense until July 7, 2026, ECF 242 at 31-32, which was based on information contained in GPS's 9,279-document production made a week prior, on June 30, 2026. And it did not learn that these Falfurrias executives also sat on GPS's own board until Ken Walker's July 16, 2026 deposition. Ex. H at 40:17-20. Elsevier disclosed them less than three weeks later, on August 3, 2026—the deadline for the close of written discovery, not a delay of Elsevier's choosing. GPS's reliance on Elsevier's February 12, 2026 subpoena to Falfurrias, *see* ECF 296 at 10, does not show otherwise: that subpoena sought documents about ownership and voting rights, not the identity of individual board members. If anything, it shows GPS was always in the superior position to know who sat on its own board, while Elsevier had to subpoena a third party just to begin investigating the relationship.

## IV. DR. ARNOLD'S SUPPLEMENTAL DECLARATION RESTS ON POST-DEADLINE PRODUCTIONS AND TESTS GPS'S OWN EXPERT'S REPRESENTATION

GPS moves to strike the Supplemental Declaration of Elsevier's damages expert in its entirety, asserting that it "relies entirely on information already available before Dr. Arnold's original report." ECF No. 296 at 6. That is incorrect. Paragraph 1 states that additional documents were produced in this matter after Dr. Arnold served his May 1, 2026 report, that he reviewed them, and that they confirm the opinions in his report. ECF 296-7 ¶ 1. Those documents are identified by Bates number in Appendix A—thirty-nine documents drawn from six production

volumes served after the rebuttal deadline. *Id.* at 5 app. A. GPS does not contend that any of these documents was produced before May 1, 2026.[6]

For the same reason, GPS is wrong that Dr. Arnold "does not even attempt to provide an explanation for his belated supplemental declaration." ECF No. 296 at 11. The explanation is in the declaration's first sentence: he reviewed documents GPS produced only after the deadline for expert reports had passed. He could not have addressed them sooner, and Dr. Arnold's supplemental report is timely on that basis. *See High Voltage Beverages, LLC v. Coca-Cola Co.*, No. 3:08-cv-367, 2010 WL 3788288, at *2 (W.D.N.C. Sept. 22, 2010) (finding timely supplement to expert report based on "additional damages information . . . discovered . . . well after the damages expert had served his report.").

GPS separately objects to the remainder of the declaration on the ground that it "proffers an affirmative damages calculation for the first time," when he "included no such calculation in his original report," and is therefore not "true supplementation" under *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624, 630-31 (E.D.N.C. 2008). ECF 296 at 3, 11. That framing ignores what prompted the declaration in the first place. Dr. Arnold's original May 1, 2026 rebuttal report already identified that GPS's 2020 revenue reflected "a positive, transient demand shock" from COVID-19 that would be expected to normalize over time, and it discussed the BCC Air Purifier Industry growth rates—the same data GPS's expert, Mr. Spindler, used to build his own affirmative damages model—at length. ECF 276-17 ¶¶ 43-47, 90; ECF 283 at 250-53. When Mr. Spindler's May 29, 2026 reply represented that his own but-for model "already

[6] Nor can it. FMP (Falfurrias) Volume 3 was produced on May 18, 2026; FMP Volume 4 was produced on May 26, 2026; GPS Volume 15 (14,117 documents) was produced on May 15, 2026; GPS Volume 16 (18,373 documents) was produced on May 18, 2026; GPS Volume 17 (9,279 documents) was produced on June 30, 2026; and GPS Volume 18 (5,230 documents) was produced on July 7, 2026.

incorporates market normalization," ECF 276-19 ¶ 69, Dr. Arnold's declaration did nothing more than apply the BCC data Mr. Spindler himself used to test that representation. ECF 296-7 ¶¶ 2-4. No new data source and no new methodology entered the case.

These facts distinguish this case from the authorities GPS cites, each of which excluded supplementation for a reason absent here. In *Gallagher*, the court excluded a supplemental report that changed an expert's ultimate conclusion and was intended to avoid summary judgment by addressing flaws identified in the opposing party's briefing—not, as here, citation to previously unproduced documents and a numerical application of a theory already stated in the original report. 568 F. Supp. 2d at 630-31. *Beller* likewise involved an attempt to introduce "new opinions" and new bases for existing opinions without justification—the very sandbagging Rule 26(e) is designed to prevent, and the opposite of testing an opposing expert's own representation using that expert's own data and specifically identifying supporting, newly produced documents. *Beller ex rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003). *Akeva L.L.C. v. Mizuno Corp.* addressed whether an expert's new empirical testing—a second laboratory test disclosed after the close of discovery—was a permissible supplement to his existing report, and held that a party may not use late disclosure to make up for omissions attributable to inadequate preparation. 212 F.R.D. 306, 310-11 (M.D.N.C. 2002). In contrast, Dr. Arnold Supplemental Declaration generates no new evidence. It addresses documents produced after the report was served and applies growth rates drawn from Mr. Spindler's own schedules in response to his reply report.

GPS's reliance on *Bresler* is doubly mistaken. The proposition GPS quotes—that the challenged evidence added "opinions outside the scope of [the] original report"—comes not from the court's holding, but from Judge Wynn's separate view that that the majority should have excluded the evidence on that basis. 855 F.3d 178, 212 (4th Cir. 2017) (Wynn, J., concurring in

part and dissenting in part). The majority held the opposite: it affirmed the admission of an expert's supplemental damages exhibit containing an entirely new formula, new data, and a full damages calculation absent from the original report, because the first three *Southern States* factors—surprise, cure, and disruption—were satisfied even though the fourth and fifth factors were not. *Id*. at 190-94 (majority opinion). If anything, *Bresler* supports admitting Dr. Arnold's declaration: the supplementation at issue there was far more extensive than the narrow quantification at issue here, which introduces nothing new and instead further clarifies the demand-shock opinion his original report already stated.

Even if the declaration were treated as a late disclosure rather than true supplementation, each *Southern States* factor favors disclosure. GPS cannot show surprise as to either component: Appendix A documents are GPS's own productions, and GPS is intimately familiar with the BCC growth-rate data, since its own expert relied on it as the foundation of his opening damages model. Nor can GPS demonstrate a problem necessitating a cure or a disruption: GPS's own reply report from Mr. Spindler, served May 29, 2026, already responded on the merits to the theory underlying Dr. Arnold's declaration, so no new expert-report cycle is needed. *See Whitaker v. Hyundai Motor Co.*, 2019 WL 8348859, at *1 (W.D. Va. Feb. 5, 2019) (denying motion to strike supplemental expert report served in response to opposing expert because it "pose[d] no risk of prejudice" as the expert's conclusions were unchanged and any surprise was slight). Any remaining disagreement is a matter for cross-examination, not exclusion. *In re Levesque*, 653 B.R. 127, 145 (D.S.C. 2023) (courts "allow for the presentation of competing evidence from experts on both sides of a case" and critique of expert opinion "goes to the weight of the evidence, not its admissibility"). Importance favors Elsevier for the same reason it does not favor GPS elsewhere in its brief—the probative value of evidence is not, by itself, a reason to exclude, particularly where the remaining

*Southern States* factors show no genuine prejudice. *Bresler*, 855 F.3d 178 at 194. And that probative value is substantial because Dr. Arnold's declaration applies the normalization Mr. Spindler represented his model "already incorporates," ECF 276-19 ¶ 69, to Mr. Spindler's own model and data, and reports the result. He could not have done so on May 1, because that representation did not yet exist. Excluding the declaration would leave GPS's expert's account of his own model unexamined. Harmlessness under these four factors independently defeats exclusion. *Jones*, 2020 WL 4587519, at *1 n.2.

The fifth factor, Elsevier's explanation for the timing, likewise favors Elsevier. GPS faults Dr. Arnold for not narrating, within the declaration itself, why he was submitting it when he did. But the explanation is plain from the record even without that narration: Mr. Spindler's own May 29 representation that his model "already incorporates market normalization" is what triggered the August 3 declaration testing it, nine weeks earlier—not an unexplained delay, but a reasonable interval for an expert to review an adversary's own representation and test it before the discovery deadline closed. ECF 276-19 ¶ 69; ECF 296-7 ¶¶ 2-4. GPS thus cannot credibly claim prejudice from a declaration that does nothing more than test, using GPS's own expert's own data, a representation GPS's own expert made.

## **CONCLUSION**

For these reasons, Elsevier respectfully requests that the Court deny GPS's motion.

Dated: September 10, 2026

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ *Rachel E. Epstein*
Rachel E. Epstein
N.Y. Bar No. 4795092
(admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
Ellyde R. Thompson
N.Y. Bar No. 4729687
ellydethompson@quinnemanuel.com
(admitted *pro hac vice*)
JP Kernisan
N.Y. Bar No. 4817045
jpkernisan@quinnemanuel.com
(admitted *pro hac vice*)
Nicholas A. LoCastro
N.Y. Bar No. 5477286
nicholaslocastro@quinnemanuel.com
(admitted *pro hac vice*)
Taylor L. Jones
N.Y. Bar No. 5358601
taylorjones@quinnemanuel.com
(admitted *pro hac vice*)
Margaret Schmidt
N.Y. Bar No. 5328018
margaretschmidt@quinnemanuel.com
(admitted *pro hac vice*)
295 5th Avenue
New York, New York 10016-7103
Phone: (212) 849-7485
Tara Srinivasan
C.A. Bar No. 341484
tarasrinivasan@quinnemanuel.com
(admitted *pro hac vice*)
50 California St., Floor 22
San Francisco, CA 94111

**POYNER SPRUILL LLP**

*/s/ John Michael ("J.M.") Durnovich*
Andrew H. Erteschik
N.C. Bar No. 35269
aerteschik@poynerspruill.com
Paul M. Cox
N.C. Bar No. 49146
pcox@poynerspruill.com
John Michael ("J.M.") Durnovich
N.C. Bar No. 47715
jdurnovich@poynerspruill.com
N. Cosmo Zinkow
N.C. Bar No. 53778
nzinkow@poynerspruill.com
P.O. Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-2895

*Counsel for Defendants*

**Certificate of Word Count Compliance**

Pursuant to the Pretrial Order and Case Management Plan (ECF No. 168), I certify that the annexed Memorandum of Law is no more than 25 pages.

This the 10th day of September, 2026.

/s/ *John Michael ("J.M.") Durnovich*
John Michael ("J.M.") Durnovich

**Certificate of Service**

I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

This the 10th day of September, 2026.

*/s/ John Michael ("J.M.") Durnovich*
John Michael ("J.M.") Durnovich